# 21-2949(L)

### 21-2974(CON)

IN THE

## United States Court of Appeals for the Second Circuit

CAPITOL RECORDS, LLC, a Delaware Limited Liability company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC INC., a Connecticut Corporation, EMI APRIL MUSIC INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellants*,

v.

VIMEO, INC., a Delaware Limited Liability company, AKA VIMEO.COM, CONNECTED VENTURES, LLC, a Delaware Limited Liability company,

*Defendants-Appellees*,

DOES, 1-20 INCLUSIVE,

*Defendants*.

Appeal from the United States District Court
for the Southern District of New York

## FINAL BRIEF FOR PLAINTIFFS-APPELLANTS

RUSSELL J. FRACKMAN
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-2000

CATHERINE E. STETSON
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellants Caroline Records, Inc. and Virgin Records America, Inc. have merged into Appellant Capitol Records, LLC. Capitol Records, LLC's parent company is Universal Music Group Holdings, Inc., a wholly-owned subsidiary of Universal Music Group, Inc., which in turn is a wholly-owned subsidiary of Universal Music Group N.V., a publicly-traded company organized under the laws of The Netherlands. Vivendi SE and Compagnie de Cornouaille SAS are publicly-traded companies organized under the laws of France and own more than 10% of Universal Music Group N.V.'s stock. No other publicly traded company owns more than 10% of Universal Music Group N.V.'s stock.

Appellants EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music, Inc. (now known as EMI Consortium Music Publishing, Inc.), Colgems-EMI Music, Inc., EMI Virgin Songs, Inc. (now known as EMI Consortium Songs, Inc.), EMI Gold Horizon Music Corp., EMI U Catalog, Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., and Stone Diamond Music Corporation are all partially owned, indirect subsidiaries of Sony Group Corporation, a publicly-traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of their stock.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT .......................................................i

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT ..........................................................1

INTRODUCTION ..................................................................................2

ISSUES PRESENTED............................................................................6

STATEMENT OF THE CASE................................................................7

    A.    The Digital Millennium Copyright Act ...........................................7

    B.    Vimeo's Original And Creative Content .........................................9

        1.    Vimeo's Employees Manually Curate Vimeo To Preserve The Site's Originality And Creativity...................9

        2.    Vimeo Purges And Bans "Gameplay" Videos ....................11

    C.    Vimeo Permits Videos Containing Copyrighted Music ...............12

        1.    Vimeo Encourages Users To Upload Infringing Videos Containing Copyrighted Music And Forgoes Measures To Prevent Infringement ......................12

        2.    In 2006, Vimeo Invents The "Lip Dub," Which Puts Vimeo "On The Map"..................................................14

    D.    Music Recording And Publishing Companies Sue Vimeo............15

    E.    The District Court Denies Vimeo's Right To The Section 512(c) Safe Harbor........................................................................16

        1.    The District Court Grants Vimeo Summary Judgment On "Right And Ability To Control" ...................16

        2.    The District Court *Denies* Vimeo Summary Judgment On Its Knowledge Of Specific Infringement.......................................................................20

# TABLE OF CONTENTS—Continued

Page

      3.    The District Court Certifies An Interlocutory Appeal ...................................................................20

    F.    This Court Remands For The District Court To Reconsider Vimeo's Knowledge .................................21

        1.    This Court Clarifies The Legal Standard For Red-Flag Knowledge .................................................21

        2.    On Remand, The District Court Grants Vimeo Summary Judgment On Knowledge ...................23

STANDARD OF REVIEW ......................................................24

SUMMARY OF ARGUMENT ...............................................24

ARGUMENT ...........................................................................27

I.    A REASONABLE FACTFINDER COULD CONCLUDE THAT VIMEO POSSESSED THE RIGHT AND ABILITY TO CONTROL INFRINGING ACTIVITY AND RECEIVED A BENEFIT ...........................................................................27

    A.    A Provider Exerts "Substantial Influence" When It Makes Editorial Judgments About Users' Uploads ......................28

        1.    Step 1: Is There A Relationship Between The Provider's Control And The Infringing Activity? ..............28

        2.    Step 2: Does The Provider Exercise Editorial Judgment Over Its Users' Activity? ....................................30

        3.    *Cybernet* And Subsequent Precedent Confirm These Steps .........................................................................32

    B.    A Jury Could Find That Vimeo Exerted Significant Editorial Judgment Over Users' Content .......................................35

        1.    Vimeo's Control Exceeded The Provider's Control In *Cybernet* ...........................................................................35

iii

## TABLE OF CONTENTS—Continued

Page

    2.    The District Court Misapplied The Substantial Influence Standard And Improperly Drew Every Inference In Vimeo's Favor ...................................................42

C.    Vimeo Directly Benefited From Infringement ............................49

    1.    "Direct Financial Benefit" Has Its Common-Law Meaning ..............................................................................49

    2.    Vimeo Received A Financial Benefit Causally Related To Users' Infringement ..........................................50

II.    VIMEO POSSESSED RED-FLAG KNOWLEDGE OF INFRINGEMENT ...................................................................54

A.    Vimeo Employees Possessed Red-Flag Knowledge.....................55

    1.    Vimeo Staff Knew The Videos Contained Copyrighted Music ................................................................55

    2.    Vimeo Staff Knew Specific Facts And Circumstances Indicating The Videos Were Neither Licensed Nor Fair Use ...........................................55

B.    The District Court Ignored Key Evidence ....................................60

CONCLUSION ......................................................................................63

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

iv

# TABLE OF AUTHORITIES

Page(s)

CASES:

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)..............................................................................24, 47, 48

*Capitol Recs., LLC v. Vimeo, LLC*,
826 F.3d 78 (2d Cir. 2016) ........................................................*passim*

*Columbia Pictures Indus., Inc. v. Fung*,
710 F.3d 1020 (9th Cir. 2013) ..............................................30, 51, 52

*CoStar Grp., Inc. v. LoopNet, Inc.*,
373 F.3d 544 (4th Cir. 2004) ...............................................................31

*Ellison v. Robertson*,
357 F.3d 1072 (9th Cir. 2004) .....................................................49, 50, 51

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
844 F.3d 79 (2d Cir. 2016) ...........................................49, 53, 58, 61

*Feingold v. RageOn, Inc.*,
472 F. Supp. 3d 94 (S.D.N.Y. 2020) ....................................................34

*Fonovisa, Inc. v. Cherry Auction, Inc.*,
76 F.3d 259 (9th Cir. 1996) ...............................................................53

*Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*,
443 F.2d 1159 (2d Cir. 1971) .............................................................29

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
No. 2:16-CV-04587, 2017 WL 2729584 (C.D. Cal. May 1, 2017)....................34

*Howley v. Town of Stratford*,
217 F.3d 141 (2d Cir. 2000) ..........................................................24, 45, 48

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
873 F.3d 1045 (9th Cir. 2017) ................................................. *passim*

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
545 U.S. 913 (2005).........................................................................19, 28, 29

## TABLE OF AUTHORITIES—Continued

Page(s)

*Perfect 10, Inc. v. CCBill LLC,*
    488 F.3d 1102 (9th Cir. 2007) ..........................................................49

*Perfect 10, Inc. v. Cybernet Ventures, Inc.,*
    213 F. Supp. 2d 1146 (C.D. Cal. 2002) ......................................*passim*

*Purdy v. Zeldes,*
    337 F.3d 253 (2d Cir. 2003) ...............................................................24

*Shapiro, Bernstein & Co. v. H.L. Green Co.,*
    316 F.2d 304 (2d Cir. 1963) .................................................... *passim*

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC,*
    718 F.3d 1006 (9th Cir. 2013) ............................................................28

*Ventura Content, Ltd. v. Motherless, Inc.,*
    885 F.3d 597 (9th Cir. 2018) ................................................... *passim*

*Viacom Int'l, Inc. v. YouTube, Inc.,*
    676 F.3d 19 (2d Cir. 2012) ........................................................*passim*

**STATUTES:**

17 U.S.C. § 512(c) ......................................................................*passim*

17 U.S.C. § 512(c)(1).....................................................................7, 42

17 U.S.C. § 512(c)(1)(A) ....................................................................44

17 U.S.C. § 512(c)(1)(A)(i) ..................................................................7

17 U.S.C. § 512(c)(1)(A)(ii) .....................................................5, 7, 8, 58

17 U.S.C. § 512(c)(1)(A)(iii) ............................................................7, 8

17 U.S.C. § 512(c)(1)(B) .............................................................*passim*

17 U.S.C. § 512(c)(1)(C) ......................................................................8

17 U.S.C. § 512(c)(2)............................................................................7

## TABLE OF AUTHORITIES—Continued

Page(s)

17 U.S.C. § 512(c)(3) ................................................................8

17 U.S.C. § 512(m) ...........................................................43, 44

17 U.S.C. § 512(m)(1) ...........................................................43

28 U.S.C. § 1291 ....................................................................1

28 U.S.C. § 1331 ....................................................................1

28 U.S.C. § 1338 ....................................................................1

28 U.S.C. § 1367 ....................................................................1

### LEGISLATIVE MATERIAL:

S. Rep. No. 105-190 (1998) .............................................31, 44

### OTHER AUTHORITIES:

*Machinima*, Oxford English Dictionary (3d ed. Mar. 2022 update), tinyurl.com/mrxyxbyb...............................................................36

Press Release, Vimeo, Vimeo Reports Q4 2021 and Full-Year 2021 Financial Results (Feb. 9, 2022), tinyurl.com/6yd7tddp .........................................2

Murray Stassen, *TikTok And Universal Music Group Sign Global Licensing Deal*, Music Bus. Worldwide (Feb 8, 2021), tinyurl.com/sjd5xc5c................................................................41

Dan Zak, *Office Drones, Lip-Sync Your Heart Out*, Wash. Post (Nov. 11, 2007), tinyurl.com/bdctazfx.........................................14

IN THE

# United States Court of Appeals for the Second Circuit

————————

No. 21-2949(L)
No. 21-2974(CON)

————————

**FINAL BRIEF FOR PLAINTIFFS-APPELLANTS**

————————

**JURISDICTIONAL STATEMENT**

In this case, rightsholders brought claims against Vimeo under federal copyright law and state common law. The District Court had jurisdiction under 28 U.S.C. §§ 1331, 1338, and 1367. On May 28, 2021, the district court granted Vimeo partial summary judgment. SPA97-124 [ECF 227]. The parties stipulated that the rightsholders would dismiss the remaining claims without prejudice, with any refiling conditioned on the rightsholders prevailing in this appeal. SPA126 [ECF 235 at 2].

On November 1, 2021, the District Court entered judgment on all claims. SPA131 [ECF 238 at 2]. The rightsholders timely filed notices of appeal on November 29. JA1530-31 [ECF 240 at 1-2]. This Court has jurisdiction under 28 U.S.C. § 1291.

## INTRODUCTION

This appeal concerns widespread infringement of copyrighted music on a website called "Vimeo.com." Vimeo allows users to upload and share videos. But because there are many video-sharing sites on the internet, Vimeo carved out a specific niche to differentiate itself. Vimeo doesn't host just any kind of video. It defines itself as a home for "original" and creative content. And Vimeo doesn't passively host videos. Its employees carefully curate the site by promoting, demoting, and purging content. Vimeo's editorial efforts seek to ensure that it displays the most engaging videos to attract advertisers, viewers, and users alike.

Vimeo's niche proved lucrative. Today, the company is publicly traded and generates nearly $100 million in revenue every quarter.[1] This dispute involves the way Vimeo built and grew its business: by exploiting well-known hit songs and willfully violating copyright law from 2006-2013.

Since its founding in 2004, Vimeo realized that popular music is a key ingredient to its business. Unlike competitors such as YouTube, however, Vimeo refused to license and pay for that music. Instead, Vimeo adopted a "don't ask, don't tell" policy. JA941 [ECF 94-8 at 17]. Users uploaded videos containing famous songs. In turn, Vimeo curated those videos to highlight the best content, earning advertising

---

[1] *See* Press Release, Vimeo, Vimeo Reports Q4 2021 and Full-Year 2021 Financial Results (Feb. 9, 2022), tinyurl.com/6yd7tddp.

revenue for every viewer. But Vimeo did not pay a dime to the people who owned the music that drove its traffic.

Appellants are rightsholders—owners of copyrighted sound recordings and musical compositions—whose music Vimeo exploited for profit. In 2009, they sued to stop Vimeo's infringement and recover damages for Vimeo's misconduct. The rightsholders have identified approximately 1,600 videos that appeared on Vimeo and which contained their copyrighted works, ranging from The Beatles to The Beastie Boys. Vimeo claims, however, that it can exploit the rightsholders' intellectual property without authorization, compensation, or fear of liability because it qualifies for one of the "safe harbors" established by the Digital Millennium Copyright Act (DMCA).

In 2013, the District Court initially denied Vimeo summary judgment but certified an interlocutory appeal. On interlocutory review, this Court clarified a narrow legal question about one aspect of the DMCA and returned the case to the District Court for further proceedings. *See Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78 (2d Cir. 2016) (*Vimeo I*).

On remand, and after detailed briefing regarding the copious record, the District Court granted Vimeo summary judgment based on the DMCA. That was wrong. The DMCA does not provide Vimeo a safe harbor for two reasons.

3

First, the safe harbor does not apply to online businesses, like Vimeo, that possess "the right and ability to control" users' infringing activity. 17 U.S.C. § 512(c)(1)(B). This Court has explained that a website has "the right and ability to control" infringement when it exerts a "substantial influence on the activities of users." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012). Although this Court has not yet had an opportunity to further define "substantial influence," the statute's text, purpose, and persuasive precedent suggest that "substantial influence" means a degree of editorial control over users' activities.

Vimeo's staff exercises the kind of control that renders it ineligible for the DMCA "safe harbor"—and liable for infringement. Vimeo employees add videos to staff-curated channels, promote content they deem interesting and inventive, demote content they consider "trashy," and purge videos from Vimeo they deem insufficiently creative. Indeed, at periods covered by this lawsuit, Vimeo told advertisers that its "editorial team literally watches every video that gets uploaded," and that its significant editorial efforts differentiated Vimeo from the competition. JA928 [ECF 94-6 at 6].

It thus makes good sense why the DMCA does not give Vimeo a free pass to exploit users' infringement. Vimeo was in a unique position to prevent infringement. It decided to maximize profit instead.

4

But at summary judgment, the District Court found that Vimeo did not possess "the right and ability to control" users' infringing activity. 17 U.S.C. § 512(c)(1)(B). That was wrong. The District Court misapplied the legal standard for "substantial influence." Indeed, it applied no real standard at all. And the District Court drew every inference *in Vimeo's favor*, rather than (as it should have on summary judgment) the other way around. Most notably, the District Court ignored Vimeo's pre-litigation characterization of its editorial efforts as extensive and effective, instead crediting Vimeo's post-litigation arguments to the contrary. A factfinder should decide which of Vimeo's statements to believe—not a court at summary judgment.

The second reason this Court should vacate the District Court's judgment is that the DMCA safe harbor does not apply when Vimeo's employees watched specific videos and were aware of "facts or circumstances"—known colloquially as "red flags"—that made the videos objectively infringing. *Id.* § 512(c)(1)(A)(ii). In its interlocutory decision earlier in this case, this Court clarified that the fact that a video contains an entire song does not, *by itself*, mean the video is obviously infringing to a hypothetical person. But this Court remanded the case for the District Court to determine whether Vimeo's employees had "expertise or knowledge with respect to the market for music and the laws of copyright" such that the videos were obviously infringing. *See Vimeo I*, 826 F.3d at 97.

A jury could find that Vimeo's staff had that requisite expertise or knowledge. Vimeo recruited employees who were familiar with the music industry, and told them that incorporating music into videos "generally" violated copyrights. At least as of late 2008, employees knew that the plaintiff rightsholders had never authorized their music to appear on Vimeo. And in early 2009, Vimeo's lawyers warned employees to remove their own infringing videos from the site.

In response, Vimeo insists its employees could nevertheless have thought individual users had negotiated licenses with rightsholders to use entire recordings of well-known hit songs in amateur productions. Given everything Vimeo's employees knew, that conclusion is as implausible as it sounds—and a reasonable jury could conclude as much.

This Court should vacate the District Court's judgment and permit this case to proceed to trial.

## ISSUES PRESENTED

1.      Whether a reasonable juror could find that Vimeo had the right and ability to control users' infringing activity and received a direct benefit from it, making Vimeo ineligible for Section 512(c)'s safe harbor.

2.      Whether a reasonable juror could find that Vimeo's employees possessed red-flag knowledge of infringement, making Vimeo ineligible for Section 512(c)'s safe harbor.

6

## STATEMENT OF THE CASE

### A.     The Digital Millennium Copyright Act.

In 1998, Congress passed the DMCA "to update domestic copyright law for the digital age." *Viacom*, 676 F.3d at 26.  Among other things, the Act specifies when internet service providers—a broad category that includes websites—are liable for storing or transmitting copyrighted material.  *Id.* at 27.

The DMCA reflects "a compromise" between providers and rightsholders. *Vimeo I*, 826 F.3d at 82, 89-90.  To strike the proper balance, the DMCA creates "safe harbors" that limit providers' liability "for certain common activities."  *Viacom*, 676 F.3d at 27 (internal quotation marks omitted).  The Act preserves liability for conduct falling outside a safe harbor.  *Id.*

This appeal involves Section 512(c)'s safe harbor, which applies when providers store material "at the direction of a user."  17 U.S.C. § 512(c)(1).  Section 512(c) "insulates service providers from liability for infringements of which they are unaware."  *Vimeo I*, 826 F.3d at 82.  If a provider learns about specific, infringing material a user uploaded to a network, however, it must "remove, or disable access to, the material."  17 U.S.C. § 512(c)(1)(A)(i)-(iii).  Providers must designate "an agent to receive notifications of claimed infringement," allowing rightsholders to inform providers about users' infringing material and triggering an obligation to remove it.  *Id.* § 512(c)(2).

7

If a provider learns about infringement but does *not* remove infringing material, it cannot invoke the DMCA's safe harbor. *Id*. § 512(c)(1)(A)(iii), (c)(1)(C), (c)(3). A provider also cannot invoke the safe harbor if it fails to remedy infringement despite having red-flag knowledge—meaning awareness of "facts or circumstances from which infringing activity is apparent." *Id*. § 512(c)(1)(A)(ii).

A provider also cannot invoke Section 512(c)'s safe harbor if the provider possesses "the right and ability to control" users' "infringing activity" and "receive[s] a financial benefit directly attributable to the infringing activity." *Id*. § 512(c)(1)(B). This Court interpreted the phrase "right and ability to control" in *Viacom*. As the Court explained, the phrase originates in the common law of vicarious copyright liability. *Viacom*, 676 F.3d at 37. At common law, *any* ability to block access to a computer network constitutes control and makes a service provider vicariously liable for users' infringement. *Id*. But Section 512(c) already presumes providers have the ability to "block access to infringing material," such as when rightsholders send providers takedown notices. *Id*. (cleaned up).

This creates a "catch-22." *See id*. If the common-law vicarious-liability standard applies to Section 512(c), a "prerequisite to safe harbor protection"—the ability to block content after receiving a takedown notice—"would at the same time be a disqualifier" under Section 512(c)'s right-and-ability-to-control-provision. *Id*.

8

To resolve the catch-22, this Court concluded that "the right and ability to control" in Section 512(c) does not carry its precise common-law meaning.  *Id*. at 37-38.  As used in the statute, the ability to control "requires something more" than the mere "ability to remove or block access to materials posted on a service provider's website."  *Id*. at 38 (internal quotation marks omitted).  According to *Viacom*, a provider has the "right and ability to control" if the provider exerts "substantial influence on the activities of users."  *Id*.

### B.     Vimeo's Original And Creative Content.

#### 1.     Vimeo's Employees Manually Curate Vimeo To Preserve The Site's Originality And Creativity.

Vimeo defines itself by a commitment to originality and creativity.  From "the beginning," Vimeo was dedicated to "creative work," and the site only permits users to upload videos they have "created."   JA915-916 [ECF 94-1 at 24-25].  According to Vimeo's co-founder, the company's slogan could be "Not YouTube," a contrast with the popular platform which allows users to upload just about anything.  JA899 [ECF 93-5 at 45].  Originality "sets Vimeo apart from other video sharing websites" because "almost everything you see on the site was actually created by the person who uploaded it."  JA946 [ECF 94-8 at 43].

Vimeo's staff are active participants in their "vibrant community of intelligent and creative people," and lead "by positive example."  JA915; 827 [ECF 94-1 at 24; ECF 90-7 at 41].  Nearly everyone who works for Vimeo uses the site personally,

9

something that differentiates Vimeo "from other video services, like YouTube." JA974 [ECF 94-10 at 22]. The company entices hires with the promise of time "spent inventing, sharing, shooting, editing, gazing at amazing videos." JA1024 [ECF 96-3 at 2]. The staff review videos, and like and comment on user content. JA825 [ECF 90-6 at 40]. At one time, Vimeo had a dedicated group called the "Street Team" "charged with making" and uploading videos. JA791-792 [ECF 89-6 at 27-28].

As part of their duties, Vimeo's staff curate their site by actively promoting, demoting, and purging content based on its artistic merit (or deemed lack thereof). As Vimeo's community director colorfully explained, "hardline Vimeo editorial fascism has been important to keeping our website from becoming a trashpile." JA826 [ECF 90-7 at 40]. Vimeo staff "[w]atch a lot of videos" and remove content that "should not be on Vimeo." JA793; 674 [ECF 89-6 at 60; ECF 89-1 at 41]; *see also, e.g.*, JA541 [ECF 88-4 at 37]. Vimeo even told advertisers that Vimeo's "editorial team literally watches every video that gets uploaded." JA928 [ECF 94-6 at 6]; *see* JA650 [ECF 88-7 at 15].

In the period covered by this lawsuit, employees used a proprietary suite of 40 software tools to efficiently curate Vimeo. *See* JA736-739; 539; 979 [ECF 89-4 at 40-43; ECF 88-4 at 23; ECF 94-13 at 65]. One particular tool showed staff the most popular videos on the site. JA556 [ECF 88-4 at 98]. Staff reviewed these

10

popular videos daily to ensure they comply "with the community guidelines." JA556-557, 560 [ECF 88-4 at 98-99, 102].

If a popular clip comported with Vimeo's terms-of-use but was not "exemplary of Vimeo-esc'd stuff," Vimeo staff "buried" the video. JA561-562 [*Id.* at 103-104]. "Burying" removed the video from the website's "Discover" feature, making the material less visible on the site. *See* JA801-802; 616-617 [ECF 89-7 at 55-56; ECF 88-6 at 50-51].

In addition to burying material they disliked, Vimeo employees actively promoted users' videos based on their subjective view of the videos' artistic merit. Vimeo's curated "Staff Picks" channel (to which all users were automatically subscribed) and "HD" channel prominently presented staff-selected videos to the Vimeo user community. JA711; 964 [ECF 89-2 at 6; ECF 94-9 at 83]. The staff watched videos from across the site, picked the ones they liked, and added that content to Vimeo's featured channels. JA600-606 [ECF 88-6 at 16-22]; *see* JA867 [ECF 93-3 at 29].

### 2. Vimeo Purges And Bans "Gameplay" Videos.

In 2008, after a vigorous internal debate, Vimeo banned a particular type of content called "gameplay" from the site. Gameplay is a recording of someone playing a video game. Vimeo staff questioned whether such videos were in keeping with Vimeo's commitment to originality and creativity. JA826-828 [ECF 90-7 at 40-42].

11

Ultimately, Vimeo decided to ban gameplay uploads and purged existing gameplay videos from the site. JA913 [ECF 93-15 at 2]. Senior staff expressed concern that Vimeo's new policy could engender "backlash": "We are fascists, but so far no one has called us out on it too publicly. This could be the thing that really wakes people up." JA950 [ECF 94-8 at 49]. When someone in response suggested justifying the ban on gameplay videos as motivated by copyright concerns, others pushed back. "Legal is kind of a cop out in my opinion since we ignore music and say that legality doesn't matter when it comes to the uploading rules." *Id*. Instead, by banning gameplay, Vimeo was "just straight controlling our website." *Id*.

### C. Vimeo Permits Videos Containing Copyrighted Music.

#### 1. Vimeo Encourages Users To Upload Infringing Videos Containing Copyrighted Music And Forgoes Measures To Prevent Infringement.

Vimeo took the opposite tack from its gameplay ban when it came to another type of content: music.

In 2007, Vimeo estimated users "incorporate[d] copyrighted music in" 10%-20% of "personal videos." JA896 [ECF 93-5 at 25]. But Vimeo did not purge videos containing that copyrighted music. Rather, it encouraged users to upload more. *See* JA950 [ECF 94-8 at 49]. Meanwhile, Vimeo's users reported migrating to Vimeo because Vimeo freely permitted copyrighted music, unlike other websites. *See infra* pp. 53-54.

12

According to Vimeo, music is an essential ingredient for sufficiently creative videos. Music sets "the mood," creates "a more dynamic feel," and adds "a little extra emotion." JA1080, 1083 [ECF 97-20 at 3, 6]. Vimeo's online tutorials taught users how to add music to videos using popular software. *Id.* And as part of their leadership by example, Vimeo's staff routinely uploaded their *own* infringing videos to the site. *See, e.g.*, JA1080, 1083; 584; 712-713, 716-723 [ECF 97-20 at 3, 6; ECF 88-5 at 33; ECF 89-2 at 7-8, 36-43].

Vimeo almost never deleted a video "because it used copyrighted music," unless Vimeo affirmatively received a takedown notice. JA568-569 [ECF 88-5 at 2-3]; *see, e.g.*, JA683-684; 733 [ECF 89-1 at 50-51; ECF 89-3 at 14]. When users asked whether they can upload material containing copyrighted music, Vimeo staff frequently replied "yes." *See, e.g.*, JA830; 904; 936; 1002, 1004 [ECF 90-7 at 57; ECF 93-14 at 52; ECF 94-8 at 7; ECF 95-9 at 7, 9].

Vimeo also made a conscious decision to forgo using readily available software to identify copyrighted music on its site. Vimeo developed special software to delete copyrighted television and movies from the site. *See* JA744-748, 750, 752-753, 759-760 [ECF 89-4 at 48-52, 63, 65-66, 84-85]. Vimeo could have deployed this or other software to purge copyrighted music. It chose not to. *See* JA754-755 [ECF 89-4 at 67-68].

13

Vimeo similarly refused to deploy "content-recognition technologies," which identify the presence of copyrighted content, including music, and allow providers to pay rightsholders when users upload copyrighted material. JA493-495 [ECF 87-1 at 44-46]. Vimeo's competitor YouTube has used content-recognition software since 2006. JA494 [*Id.* at 45]. As early as January 2008, Vimeo tested content-recognition software. It worked "well" and could "ID videos with songs." JA981 [ECF 95-1 at 6]. Vimeo staff recommended budgeting $11,000 a month for software and coordinating royalties to the appropriate rightsholder. JA987 [*Id.* at 12]. But Vimeo made a "business decision" against it. *See* JA785 [ECF 89-5 at 54].

### 2. In 2006, Vimeo Invents The "Lip Dub," Which Puts Vimeo "On The Map."

In 2006, Vimeo invented and inspired a unique category of infringing videos it called "lip dubs." In a lip-dub video, an individual or group lip-syncs to a popular sound recording performed by a recording artist. In perhaps the first example of the trend, Vimeo's co-founder shot a video of himself lip-syncing, uploaded it to Vimeo, and, in the comments, wrote "Why don't YOU make one??" JA1071, 1073 [ECF 97-17 at 6, 8]. The meme quickly took off and put Vimeo "on the map." JA857 [ECF 91-43 at 7]; *see* JA885-886 [ECF 93-5 at 2-3]; Dan Zak, *Office Drones, Lip-Sync Your Heart Out*, Wash. Post (Nov. 11, 2007).[2]

---

[2] Available at tinyurl.com/bdctazfx and JA856-857 [ECF 91-43 at 6-7].

Vimeo staff made and uploaded numerous lip dubs of their own, including a companywide lip dub to Harvey Danger's *Flagpole Sitta* that was "watched millions of times" and "received international press." JA885-886 [ECF 93-5 at 2-3]. Vimeo's front page encouraged users to "[s]hoot yourself mouthing along to a song. Then sync with a high quality copy of the song in an editing program." JA883 [ECF 93-4 at 46]. Vimeo hosted a special channel titled "Lip Dub Stars" dedicated to lip dubs and entered into a special arrangement with Carmex Lip Balm to advertise on the channel. JA858; 921 [ECF 91-43 at 8; ECF 94-3 at 15]. And Vimeo staff provided technical assistance to users making their own lip dubs, including in Vimeo's public forums. *See, e.g.*, JA876; 1091; 919 [ECF 93-3 at 40; ECF 97-28 at 19; ECF 94-3 at 7].

### D.    Music Recording And Publishing Companies Sue Vimeo.

The rightsholders in this case own some of the most famous recordings and sheet music in the world, such as works by The Beatles and Nat King Cole.

Over the course of this litigation, the rightsholders have identified approximately 1,600 videos on Vimeo that unlawfully include their works and appeared on the site between 2006 and 2013. *See, e.g.*, JA1364-65 [Video Ex. 99 at 1-2] (uploaded Aug. 12, 2006). The infringing videos contain entire recordings of well-known, recognizable songs and range from music videos to numerous lip dubs. In dozens of those instances, Vimeo staff personally made and uploaded infringing

15

videos.  In many others, Vimeo staff "liked," commented, or promoted the videos on employee-run channels.

In 2008, the rightsholders notified Vimeo of the rampant infringement on its site, and demanded that Vimeo "take appropriate action" to prevent infringement. *See* JA103-110 [ECF 55-3 at 3-10].  In response, Vimeo employees mocked the rightsholders as "all dicks" and "goofballs" in staff-wide emails.  JA994 [ECF 95-1 at 22].  One employee joked that the staff should "just film shitty covers of these songs and write FUCK EMI at the end."[3]  *Id.*

When Vimeo refused to act, the rightsholders sued to protect their intellectual property.

### E.   The District Court Denies Vimeo's Right To The Section 512(c) Safe Harbor.

In 2013, the District Court partially denied Vimeo summary judgment on its right to the Section 512(c) safe harbor but certified an interlocutory appeal.  SPA1-56; 65-66, 82-83 [ECF 119; ECF 139 at 9-10, 26-27].

#### 1.   The District Court Grants Vimeo Summary Judgment On "Right And Ability To Control."

The District Court granted summary judgment for Vimeo on the question whether it possessed the right and ability to control a user's infringing activity—a prerequisite for Section 512(c)'s safe harbor.  SPA37 [ECF 119 at 37].  Because the

---

[3] At the time, all plaintiffs were affiliated with EMI.

District Court found Vimeo did not possess the right and ability to control its users' activity on the site, it did not reach the related question whether Vimeo received a benefit directly attributable to users' infringing activity. *Id*.

The District Court recognized that, in *Viacom*, this Court "clarified what it means for a service provider to have 'the right and ability to control,' as the term is used in § 512(c)(1)(B)." *Id*. A service provider has the right and ability to control if it " 'exerted substantial influence on the activities of its users.' " SPA38 [*id*. at 38] (brackets omitted).

To determine whether Vimeo exercised substantial influence over its users' activities on the site, the District Court looked to two cases cited in *Viacom* as examples of substantial influence.

In *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002), "an adult magazine sued a service provider that supplied age verification services to a network of participating adult websites." SPA39 [ECF 119 at 39]. The service provider had "a monitoring program in place," through which, for instance, the provider forbade "certain types of images." SPA40 [*id*. at 40] (quoting *Cybernet*, 213 F. Supp. 2d at 1173). The provider "prescreen[ed] sites, [gave] them extensive advice, prohibit[ed] the proliferation of identical sites" and exhibited the "slightly difficult to define 'something more' " that constitutes the right and ability to control. *Id*. (quoting *Cybernet*, 213 F. Supp. 2d at 1181-82).

17

The District Court did not dispute that Vimeo's editorial efforts "can be effective at removing undesirable content from the Website," as occurred, for example, when Vimeo purged gameplay videos from its platform. SPA40-41 [*id.* at 40-41]. And the court acknowledged that "Vimeo staff has significant discretion to manipulate the visibility" of particular content, for instance by promoting videos on the "Staff Picks" channel and burying other videos. SPA41-42 [*id.* at 41-42].

Nevertheless, the District Court concluded that *no* reasonable juror could find that Vimeo's various editorial efforts constituted "substantial influence." SPA43 [*id.* at 43]. According to the District Court, Vimeo lacked the ability to control users' infringing activity because Vimeo leaves specific "editorial decisions" about creative content "in the hands of its users." *Id.*

The District Court also acknowledged "evidence demonstrating that Vimeo engaged in a concerted effort to remove" undesirable gameplay videos in 2008. *Id.* But the District Court then stated—on summary judgment, remember—that this evidence in its view "does not establish that Vimeo actually did so." *Id.* The court further reasoned that it could not even consider Vimeo's 2008 gameplay purge in any event because any finding that Vimeo exercised supervision and control over its site would "potentially create the perverse result that service providers stay out of the monitoring business altogether." SPA44 [*id.* at 44].

18

The District Court also concluded that Vimeo employees did not exercise control when they manipulated videos' visibility on the site, such as by adding videos to Vimeo's staff-curated channels. The court credited Vimeo's statement that "the Staff Picks channel represents only one of the approximately 354,000 channels that were on the Website in November 2012." *Id.* The court decided that these and similar statistics conclusively proved, beyond the ability of any juror to find otherwise, that Vimeo's control over content "is rather arguably *de minimis.*" *Id.*

The District Court next turned to *Viacom*'s second example of the right and ability to control, *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). In *Grokster*, the Supreme Court held that someone "who distributes a device with the object of promoting its use to infringe copyright" faces federal copyright liability. *Id.* at 919.

The District Court held that no reasonable juror could find that Vimeo's inducement constituted substantial influence under *Grokster*. The court acknowledged that Vimeo employees responded "to user inquiries about copyrighted music with statements that indicate tacit, or at times explicit, acceptance of infringing uploads." SPA50 [ECF 119 at 50]. Indeed, Vimeo "may have induced a particular user to infringe" in specific instances, and the District Court characterized itself as "troubled" by the staff's actions. SPA45, 50 [*id.* at 45, 50]. But the District Court deemed

19

the evidence of Vimeo's inducement "limited," and thus unworthy of consideration by a jury.  SPA50 [*id.* at 50].

### 2. The District Court *Denies* Vimeo Summary Judgment On Its Knowledge Of Specific Infringement.

Although the District Court granted summary judgment in Vimeo's favor on the "right and ability to control," it ruled that a juror *could* conclude that Vimeo possessed actual or red-flag knowledge for some of the specific infringing videos at issue in this case.  As a result, the District Court denied Vimeo summary judgment on its right to Section 512(c)'s safe harbor.

The District Court explained that Vimeo employees "interacted with" many of the infringing videos, including by commenting on and liking the videos, placing them on specific channels, promoting them, and burying them.  SPA29 [ECF 119 at 29].  Music in those videos "would be characterized by many as popular, and in some cases legendary—indeed, it is difficult to think of a song more iconic than The Beatles' 'All You Need is Love.' "  SPA30 [*id.* at 30].  A Vimeo employee who watched a video containing legendary music could have been "aware of facts and circumstances that would make it objectively obvious to a reasonable person that those videos were infringing."  *Id.*

### 3. The District Court Certifies An Interlocutory Appeal.

At Vimeo's request, the District Court certified two questions to this Court: whether "a service provider's viewing of a user-generated video containing all or

virtually all of a recognizable, copyrighted song may establish 'facts or circum-stances' giving rise to 'red flag' knowledge of infringement;" and a separate question regarding the DMCA's applicability to recordings protected under state (and not federal) law.  SPA82 [ECF 139 at 26].

The rightsholders requested the District Court certify other aspects of the case, including the court's summary judgment ruling that Vimeo lacked the right and abil-ity to control users' infringing activity.  SPA79-80 [*id*. at 23-24].  The court declined to certify that question.  It acknowledged that "a second appeal may be inevitable" on Vimeo's right and ability to control users' infringing activity.  SPA80 [*id*. at 24].  But the court concluded that the right-and-ability-to-control question was ill-suited to interlocutory review because it would require extensive record review.  *Id.*

### F.    This Court Remands For The District Court To Reconsider Vimeo's Knowledge.

#### 1.    This Court Clarifies The Legal Standard For Red-Flag Knowledge.

On interlocutory review, this Court clarified its interpretation of Section 512(c), vacated the District Court's order, and remanded for reconsideration under a new standard for red-flag knowledge.  *See Vimeo I*, 826 F.3d 78.

The Court explained that the fact that a video "includes substantially all of a recording of recognizable copyrighted music, and that an employee of the service provider saw" it does not by itself constitute red-flag knowledge of infringement.

21

*Id*. at 96.  Instead, a provider has red-flag knowledge if the user's "infringement" would be "obvious" to "an ordinary person—not endowed with specialized knowledge or expertise concerning music or the laws of copyright."  *Id*. at 93-94. This Court identified three reasons why the use of a recognizable song in a Vimeo video still might not "make infringement *obvious* to an ordinary reasonable person." *Id*. at 94.  *First*, an "employee's viewing might have been brief."  *Id*. at 96. *Second*, an "employee might have viewed the video" for "many different business purposes," including applying "computer expertise."  *Id*.  *Third*, "ordinary people know little or nothing of music," nor "have expertise" in copyright law.  *Id*. at 96-97.

This Court stressed, however, that some employees *may* "have expertise or knowledge with respect to the market for music and the laws of copyright," and that an employee viewing a video "may well have known that the work was infringing, or known facts that made this obvious."  *Id*. at 97.  But the District Court's "formulation" of the certified question suggested the District Court believed the use of a recognizable song—without more—constituted red-flag knowledge.  *Id*. at 93; *see id*. at 97.  This Court therefore remanded the case for further proceedings on the question whether "Vimeo personnel either knew the video was infringing or knew facts making that conclusion obvious."  *Id*. at 98.

### 2. On Remand, The District Court Grants Vimeo Summary Judgment On Knowledge.

On remand, following further briefing, the District Court granted summary judgment for Vimeo.

The court acknowledged evidence that Vimeo's employees watched the videos for their content; knew the videos contained copyrighted music; were familiar with the music industry; knew about the need to license music; *and* knew that videos they personally uploaded infringed copyright. SPA108-109, 111 [ECF 227 at 12-13, 15]. The court even acknowledged evidence that employees interacted with hundreds of videos containing plaintiffs' music after the rightsholders demanded Vimeo remove all of their works from its website, after the staff-wide email chain mocking the rightsholders, and after the rightsholders sued Vimeo. SPA118 [*id*. at 22]. But the District Court nevertheless concluded that despite everything Vimeo employees knew, the employees *could* have thought individual users might have licensed the rightsholders' music or that their videos constituted fair use. SPA108-109, 110 [*id*. at 12-13, 14].

The effect of District Court's short-circuiting the rightsholders' case at the summary-judgment stage: No jury will determine whether Vimeo's employees knew facts which made the use of entire, famous songs obviously infringing for hundreds of videos that Vimeo employees themselves watched. SPA97-124 [ECF 227].

This appeal follows. [4]

## STANDARD OF REVIEW

This Court reviews the District Court's grant of summary judgment *de novo* "to determine whether there is a genuine triable issue as to a material fact." *Howley v. Town of Stratford*, 217 F.3d 141, 150-151 (2d Cir. 2000). The Court must "resolve all ambiguities," and "credit all factual inferences that could rationally be drawn, in favor of the" non-movant. *Id.* If "there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the nonmoving party, summary judgment is improper." *Id.* at 151. At summary judgment, the rightsholders' evidence must "be believed, and all justifiable inferences are to be drawn in" their "favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## SUMMARY OF ARGUMENT

I. The District Court erred in granting Vimeo summary judgment on its "right and ability to control."

I.A. Section 512(c)'s "right and ability to control" provision originates in the common law of vicarious liability, preserving the prospect of liability for those providers best situated to police against infringement. This Court in *Viacom* interpreted

---

[4] The court denied Vimeo summary judgment on videos Vimeo employees uploaded. The rightsholders voluntarily dismissed these claims without prejudice, after stipulating they will only refile those claims if they prevail in this appeal. SPA131 [ECF 238 at 2]; *see Purdy v. Zeldes*, 337 F.3d 253, 258 (2d Cir. 2003).

"the right and ability to control" to mean "substantial influence," and remanded to the trial court for further development of that standard. The District Court in this case similarly declined to certify an interlocutory appeal of the right-and-ability-to-control question—the record-heavy issue was not a proper candidate for mid-case review—but acknowledged that "a second appeal may be inevitable." SPA80 [ECF 139 at 24].

That time has arrived. Under Section 512(c)'s text, purpose and precedent, "substantial influence" means the exercise of editorial judgment over the kind of user activity that resulted in infringement. This standard properly imposes vicarious liability on those providers positioned to prevent infringement, and just as properly immunizes providers engaged in more routine operations.

I.B. The record is replete with evidence that Vimeo's editorial control constituted substantial influence. Vimeo staff watched *every* video uploaded to Vimeo at times. Vimeo staff promoted, demoted, or purged content based on its artistic merit. And Vimeo proudly touted its unique degree of editorial control, internally and externally. The District Court misapplied the substantial influence standard, ignored the most probative evidence of Vimeo's control, and drew every key factual inference *in Vimeo's favor*, the opposite of the summary-judgment standard of review.

I.C. The record facts also support a conclusion that Vimeo received a benefit directly attributable to its users' infringing activity, meaning Vimeo cannot invoke

Section 512(c).  Record evidence shows that Vimeo sought special sponsorship for its infringing "Lip Dub Stars" channel; received other advertisement revenue directly attributable to infringing videos; and attracted users with its "don't ask, don't tell" policy toward infringement.  Although the District Court did not analyze whether Vimeo deserved summary judgment on this issue, this Court can and should resolve it, and finally send this entire case to the factfinder it deserves.

II.  For an additional reason, the District Court improperly granted summary judgment with respect to the 307 discrete videos that Vimeo employees watched and interacted with.  A jury could find that, based on the employees' knowledge or expertise, the employees knew that it was extremely unlikely that individual Vimeo users had somehow secured licenses from major rightsholders to use well-known hit songs in amateur video productions.  The employees knew that licensing music was a difficult process.  And after the rightsholders sent a cease and desist letter in December 2008, the employees knew that these specific rightsholders had not authorized their works to appear on Vimeo.

Nor could Vimeo's employees reasonably believe that the music featured in user videos was "fair use."  Vimeo instructed its staff that incorporating music into videos generally infringed copyright.  In February 2009, Vimeo even held a meeting with lawyers present and instructed employees to cease uploading unauthorized

music.  Yet the employees continued to watch—and promote—nearly identical videos made by users.  If that does not qualify as red-flag knowledge, nothing does.

The District Court's summary judgment ruling should be vacated, and the case remanded for trial.

## ARGUMENT

### I.  A REASONABLE FACTFINDER COULD CONCLUDE THAT VIMEO POSSESSED THE RIGHT AND ABILITY TO CONTROL INFRINGING ACTIVITY AND RECEIVED A BENEFIT.

Section 512(c) is not a blank check to exploit intellectual property without consent or compensation.  The DMCA's safe harbor instead reflects a "compromise" between rightsholders and providers.  *Vimeo I*, 826 F.3d at 82, 89-90.  Section 512(c) shields providers from vicarious copyright liability for routine operations.  But it preserves vicarious liability for providers best situated to prevent infringement: those who can exercise "substantial influence" over users' infringing activity, and who derive a financial benefit from that activity.  *Viacom*, 676 F.3d at 38 (citing *Cybernet*, 213 F. Supp. 2d at 1173).

The District Court misapplied *Viacom* and *Cybernet*.  Indeed, the court applied no discernible legal standard at all.  And the District Court incorrectly drew every factual inference *in Vimeo's favor* on Vimeo's summary judgment motion.  Given the considerable record of Vimeo's right and ability to control what was featured on its platform, this case should have gone to a factfinder.

27

### A. A Provider Exerts "Substantial Influence" When It Makes Editorial Judgments About Users' Uploads.

This Court in *Viacom* left open the question of what constitutes "substantial influence." The answer can be derived from Section 512(c)'s text and purpose, this Court's precedent, and *Cybernet*, which this Court endorsed in *Viacom*. *First*, there should be a relationship between the provider's existing abilities to control its network and the infringing activity. *Second*, a provider's influence should be found "substantial" when the provider exercises editorial judgment, such as by evaluating content for its merit. Together, these requirements will identify those providers best positioned to police infringement while shielding providers from liability for rote operations.[5]

### 1. Step 1: Is There A Relationship Between The Provider's Control And The Infringing Activity?

Section 512(c) preserves copyright liability for providers with the "ability to control" "infringing activity." 17 U.S.C. § 512(c)(1)(B). Section 512(c)'s focus on

---

[5] Providers also can exercise "substantial influence" when they induce infringement, as occurred in *Grokster*. *See Viacom*, 676 F.3d at 38; *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013). *Grokster* represents a different type of control that "premises liability on purposeful, culpable expression and conduct." *Viacom*, 676 F.3d at 38 (quoting *Grokster*, 545 U.S. at 937). The rightsholders acknowledge that *Vimeo I* forecloses (at this stage) the argument that Vimeo's "urging" and "encouraging users to post infringing material" constituted inducement under *Grokster*. *Vimeo I*, 826 F.3d at 99. The rightsholders preserve this argument for further review.

"ability to control" invokes common-law vicarious liability. *See Viacom*, 676 F.3d at 36-37 (citing *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 307 (2d Cir. 1963)). And vicarious liability serves a specific purpose: to incentivize the entity in the "position to police the conduct of the 'primary' infringer" to act, and to hold that entity responsible when it does not. *Shapiro*, 316 F.2d at 309; *see Grokster*, 545 U.S. at 930; *Gershwin Publ'g Corp. v. Columbia Artists Mgmt., Inc.*, 443 F.2d 1159, 1163 (2d Cir. 1971).

As this Court has explained, however, the DMCA's "right and ability to control" standard is not "coextensive with vicarious liability." *Viacom*, 676 F.3d at 37. Section 512(c) *assumes* providers possess the technical ability to "block access to infringing material"—for instance, after receiving a rightsholder's takedown notice. *Viacom*, 676 F.3d at 37 (cleaned up). To prevent creating a "catch-22," then, *Viacom* held that "the right and ability to control" must mean "more than the ability to remove or block access to materials." *Id.* at 38 (internal quotation marks omitted). Instead, control means "exerting substantial influence on the activities of users." *Id.* Which activities must a provider be in a position to control? The "infringing" ones. 17 U.S.C. § 512(c)(1)(B).

A provider need not "necessarily—or even frequently—acquir[e] knowledge of *specific* infringing activity," however, in order to be found capable of exercising the right and ability to control its users' activities. *Viacom*, 676 F.3d at 38 (emphasis

29

added).  The ability to control depends on a "service provider's general practices, not its conduct with respect to the specific infringements" alleged in a given case. *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045, 1058 (9th Cir. 2017); *see also Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013) (right and ability to control depends on "the overall relationship between" a provider "and the infringers, rather than on specific instances of infringement").

### 2. Step 2:  Does The Provider Exercise Editorial Judgment Over Its Users' Activity?

Where a relationship exists between a provider's control and its users' infringing activity, this Court should deem a provider's influence to be "substantial" when a provider exerts editorial judgment over user activity on its site.  Drawing the line at this kind of editorial judgment ensures that liability attaches to providers in the best position to prevent infringement given that the providers *already* evaluate the details of user-uploaded content for its intrinsic merit.

Defining "substantial influence" to require a degree of editorial judgment shields providers who remove "objectively obvious" infringing material, as required by Section 512(c) and *Vimeo I*, 826 F.3d at 93.  Under *Vimeo I*, where a provider's employee lacks "specialized knowledge or expertise," infringement is objectively obvious when the infringement is easily recognizable on cursory review.  *Id*. at 93-94.  In *Ventura Content, Ltd. v. Motherless, Inc.*, for example, a provider generated "thumbnail" samples of users' videos to look for "copyright notices" or

30

"watermarks" superimposed on the still image. 885 F.3d 597, 601 (9th Cir. 2018) (internal quotation marks omitted). That kind of cursory review for objectively obvious infringement does not involve any editorial judgment about the video's content.

Drawing the line at editorial judgments likewise protects providers who engage only in other "common activities," such as removing child pornography or other blatantly illegal content. *Viacom*, 676 F.3d at 27 (quoting S. Rep. No. 105-190, at 19 (1998)). This kind of basic site maintenance similarly entails only cursory, non-editorial review. Likewise, providers do not exercise editorial judgments if they remove clearly inappropriate content. Thus, a real-estate listing website would not face liability if its employee glances at photographs to ensure they actually depict houses (and not, say, pornography). *See CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544, 556 (4th Cir. 2004) ("The employee's look is so cursory as to be insignificant . . . ."); *Vimeo I*, 826 F.3d at 96 (noting that certain providers sample content "to detect inappropriate obscenity or bigotry").

When a provider makes subjective judgments about the *merit* of its content, however, the policy balance shifts. When that provider "curate[s] uploaded content" or "reject[s] unpopular groups or content," it is in a prime position to prevent infringement. *Motherless*, 885 F.3d at 613. This Court's *Vimeo I* opinion itself shows why: (1) Editorial review is not "brief" or cursory review. *Vimeo I*, 826 F.3d at 96.

31

It entails the kind of evaluation that this Court has indicated enables someone to spot infringing content. *See id*. at 96-97. (2) Editorial review also is content-based—the type of review this Court has indicated can effectively identify infringement. *Id*. And (3) when a provider's employee exercises editorial judgment, the employee also must be more skilled, and trained to exercise significant discretion to further the provider's editorial vision. *Id*.

Drawing the line at editorial judgment also provides a clear rule of decision based on objective criteria. Courts need not wrestle with the "difficult . . . question" of when their influence becomes too "substantial." *Viacom*, 676 F.3d at 38. Instead, once a provider actively evaluates content for its merit, the provider cannot close its eyes to infringement.

### 3. *Cybernet* **And Subsequent Precedent Confirm These Steps.**

In *Viacom*, this Court endorsed *Cybernet* as an example of "substantial influence." *Viacom*, 676 F.3d at 38. *Cybernet* confirms that "substantial influence" means exercising editorial judgments about the kinds of activities that resulted in infringement.

In *Cybernet*, a pornographic magazine sued "Cybernet," a service provider that provided age-verification and credit-card services for over 300,000 pornographic websites. 213 F. Supp. 2d at 1158. Cybernet did not run the pornographic sites; individual webmasters were "responsible for" "creating the site's content,

32

finding a server to host the site and other technical details." *Id*. Customers purchased a blanket Cybernet membership to receive access to the sites. *Id*. at 1158-59. The magazine sued Cybernet because its photos appeared on websites in Cybernet's network. *Id*. at 1162. One question for decision was whether Cybernet exercised the right and ability to control. The court concluded that it did, and therefore could not invoke the Section 512(c) safe harbor.

Cybernet staff reviewed the "layout, appearance, and content" of the sites it hosted. *Id*. at 1173; *see also Viacom*, 676 F.3d at 38 (quoting this passage). Cybernet required sites to "contain unique, quality and adequate content," which generally meant "at least 30 pictures." *Cybernet*, 213 F. Supp. 2d at 1160. Cybernet also prohibited multiple versions of sites which were "substantially identical, despite minor variations such as site title." *Id*. Before adding a new site, Cybernet staff screened for "potentially underage images and overuse of celebrity images." *Id*. at 1164. And Cybernet "forbade certain types of content and refused access to users who failed to comply with its instructions." *Viacom*, 676 F.3d at 38. Cybernet's staff thus exerted editorial influence over the site, screening for an oversaturation of celebrity images and ensuring some limited measure of originality. *Cybernet*, 213 F. Supp. 2d at 1164, 1181-82. That degree of editorial control was enough. *Id.* at 1181-82.

33

Post-*Cybernet*, the Ninth Circuit similarly found "substantial influence" when a provider exercised editorial judgment over users' infringing content. In *Mavrix Photographs, LLC v. LiveJournal, Inc*, users uploaded to a website "photographs, videos, links, and gossip about celebrities' lives," some of which contained copyrighted material. 873 F.3d at 1050. Moderators reviewed users' posts to ensure the posts related "to new and exciting celebrity news" and did not infringe copyright. *Id.*; *see id*. at 1059. Applying this Court's substantial-influence standard, the Ninth Circuit held that a factfinder could consider moderators' review "the right and ability to control." *See id*.

Other cases have found a right and ability to control may exist where a service provider is involved in the provision of tangible, infringing goods or "controls vendor sales" in some fashion. *Viacom*, 676 F.3d at 38 n.13; *see*, *e.g.*, *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 97, 102 (S.D.N.Y. 2020) (website "allow[ed] vendors to design merchandise and sell it to consumers"); *Greg Young Publ'g, Inc. v. Zazzle, Inc.*, No. 2:16-CV-04587, 2017 WL 2729584, at *1, *8 (C.D. Cal. May 1, 2017) (same). These cases reinforce the conclusion that a provider need only possess *ability* to control infringement, not actually exercise it. *Zazzle*, 2017 WL 2729584, at *8 (holding that an entirely "automatic" manufacturing and distribution process "would suggest at most that [a provider] had chosen not to exercise its right and ability to reject infringing products, not that it *lacked* the right or ability to do so").

34

**B.    A Jury Could Find That Vimeo Exerted Significant Editorial Judgment Over Users' Content.**

Viewed in the light most favorable to the rightsholders, Vimeo employees made significant editorial judgments about the precise kind of activity—user uploads—that infringe copyright.  Indeed, the record demonstrates that Vimeo's level of control over its users' activity outstripped *Cybernet*.  Vimeo's employees promoted, demoted and purged content based on its artistic merit, and encouraged users to produce infringing content containing music.  And—straight from the horse's mouth—Vimeo repeatedly trumpeted that its editorial control differentiated Vimeo from its competition.  The rightsholders sought and arguably were entitled to summary judgment in *their* favor on this point; but at the least, this case should have gone to a factfinder.

**1.    Vimeo's Control Exceeded The Provider's Control In *Cybernet*.**

Vimeo's staff exercise the kind of significant, editorial judgments that constitute "substantial influence" under *Viacom* and *Cybernet*.  Unlike many providers, Vimeo does not merely monitor for obviously illegal or inappropriate content.  Vimeo's employees instead curate content according to detailed guidelines and subjective standards of artistic merit.  Indeed, at times, Vimeo's editorial team watched *every* video uploaded to the site.

35

That is not just Plaintiffs' assessment of Vimeo's editorial control. It's how Vimeo repeatedly characterized its operations—until Vimeo faced liability, that is.

a. *Formal policies*. Vimeo's detailed policies prohibited insufficiently creative content—policies far more extensive than Cybernet's requirements that participating sites post "pictures of sufficient quality" and not be "substantially identical" to another site. *Cybernet*, 213 F. Supp. 2d at 1160.

Consider Vimeo's editorial policies regarding gameplay. Vimeo prohibited gameplay "regardless if it is edited or not." JA916 [ECF 94-1 at 25]. But Vimeo did not ban *all* videos related to computer games. It permitted "machinima"—animated videos made using video games[6]—as long as the machinima "story" was "more than 'guys doing exactly what the game was made for (eg skateboarding or shooting people).' " *Id*. Vimeo also permitted professional game developers to "post videos of their work." *Id*. But Vimeo forbid amateur developers from posting "maps and mods to commercial games." *Id*.

Other Vimeo policies were similarly detailed. For instance, Vimeo prohibited videos "containing ads"—but permitted such videos with "explicit permission" from staff. *Id*. And like Cybernet, Vimeo prohibited unoriginal content, even if the

---

[6] *See Machinima*, Oxford English Dictionary (3d ed. Mar. 2022 update), tinyurl.com/mrxyxbyb.

unoriginal upload complied with copyright. *Id*.; *Cybernet*, 213 F. Supp. 2d at 1160 ("Each site submitted must be unique.").

Enforcing Vimeo's complex, exception-ridden editorial policies required nuanced, content-based decision-making. That degree of editorial assessment was categorically different from complying with routine takedown notices or conducting basic site maintenance.

b. *Nature and extent of review*. Vimeo staff watched entire videos to evaluate content for its artistic merit. *See, e.g.*, JA825; 1030; 664-665 [ECF 90-6 at 40; ECF 96-4 at 8; ECF 89-1 at 22-23]. In late 2009, Vimeo told advertisers that "Vimeo's editorial team literally watches every video that gets uploaded, assigning them to categories and posting favorites to the immensely popular HD and Staff channels." JA928 [ECF 94-6 at 6]; *see* JA649-650 [ECF 88-7 at 14-15].[7] Other Vimeo documents buttress this claim. *See, e.g.*, JA943, 958; 688; 909, 911; 1030 [ECF 94-8 at 33, 67; 89-1 at 56; ECF 93-14 at 68, 70; 96-4 at 8]. Vimeo also focused its editorial efforts on the content with the most visibility. Every day, staff reviewed and curated videos receiving the greatest increase in views. JA556-557 [ECF 88-4 at 98-99]. Staff similarly curated videos in Vimeo's "Discover" tab promoting content to users.

---

[7] The document is undated but cites a study published in October 2009. *See* JA929 [ECF 94-6 at 7].

JA825 [ECF 90-6 at 40]. This curation ensured that Vimeo effectively manipulated the most prominent material.

c. *Promoting and demoting videos*. Vimeo staff promoted or demoted videos based on subjective criteria. Vimeo staff promoted content by adding videos they "liked" to the site's Staff Picks and HD channels. JA601 [ECF 88-6 at 17]. Adding a video to the staff-curated channels was "an editorial decision" "based on" a video's "quality" and an employee "seeing something different." JA808-809 [ECF 89-7 at 82-83]. The staff took particular care to ensure none of the selected videos had "bad music." JA822 [ECF 90-6 at 37].

Vimeo's staff-curated channels occupied a uniquely prominent location on Vimeo's home page and in users' inboxes. *See* JA490-492; 504-505; 1017-22 [ECF 87-1 at 15-17; ECF 87-2 at 12-13; ECF 96-1 at 2-7]. Vimeo considered the staff-curated channels "front page placement" on the website, and they differentiated Vimeo from other service providers. JA711 [ECF 89-2 at 6]. In an interview with a senior employee, the interviewer complimented Vimeo: "I'm blown away." JA1030 [ECF 96-4 at 8]. Vimeo's employee explained that staff review large numbers of videos and pick "what we find interesting." *Id*. Vimeo's human editorial control is "a big difference" from "other sites." *Id*. "It's not just an algorithm, it's people, we're watching this stuff and we're, we're excited . . . ." *Id*.

Similarly, every day Vimeo's staff promoted content by liking videos, posting comments, and making their own videos—all in an effort to shape the site's image. *See supra* pp. 9-10, 13. And in 2010, Vimeo hosted an awards show for videos, and prominently displayed the finalists on its website. JA796-800 [ECF 89-7 at 32-36].

Meanwhile, Vimeo staff actively *demoted* "trashy" material by burying it to make it less visible on the site. *See* JA825 [ECF 90-6 at 40]. Demoted content included extreme sports videos, "sexy vids, political vids" and "anything" that is "not something" Vimeo would "like to promote." *Id.*; *see* JA561-562 [ECF 88-4 at 103-104] (staff buried videos not "exemplary of Vimeo-esc'd stuff"). Just as when they promoted content, staff buried videos based on subjective evaluations. *See* JA616-617; 561-562 [ECF 88-6 at 50-51; ECF 88-4 at 103-104]. And the staff could "auto-bury" entire user accounts they deemed insufficiently creative, demoting every future upload for a given user. *See* JA756 [ECF 89-4 at 79]. These various efforts to "curate uploaded content" constitute substantial influence. *Motherless*, 885 F.3d at 613.

d. *Purging uncreative videos*. Even beyond demoting videos based on staff's subjective assessment, Vimeo also *purged* content it considered insufficiently creative.

In 2008, Vimeo decided that gameplay videos lacked artistic merit. JA826-828; 913; 950 [ECF 90-7 at 40-42; ECF 93-15 at 2; 94-8 at 49] After banning

gameplay, Vimeo staff searched for and deleted "thousands" of gameplay videos "every day." JA833 [ECF 90-7 at 60]; *see* JA640; 704 [ECF 88-6 at 89; ECF 89-1 at 82]; *see also Motherless*, 885 F.3d at 613 (rejecting "unpopular groups or content" can constitute substantial influence); *Cybernet*, 213 F. Supp. 2d at 1173 (Cybernet "monitors images to make sure that celebrity images do not oversaturate the content").

e. *Influencing users regarding video's content.* Vimeo encouraged users to make specific types of content. *Cf. Cybernet*, 213 F. Supp. 2d at 1181-82 (noting that Cybernet provided "extensive advice"). For instance, Vimeo encouraged users to incorporate music into their videos to set "the mood," create "a more dynamic feel," and add "a little extra emotion." JA1080, 1083 [ECF 97-20 at 3, 6].

In 2006, Vimeo's co-founder invented the "lip dub" genre, in which users lip synched to popular sound recordings—without authorization from the rightsholders. *See supra* at pp. 14-15. Vimeo encouraged users to make and upload lip dubs—including on the website's frontpage. *See, e.g.*, JA883 [ECF 93-4 at 46]. And Vimeo employees made and promoted lip dubs using popular music, including the "company-wide lip dub" which was "watched millions of times" and "received international press." JA885-886 [ECF 93-5 at 2-3]; *see also, e.g.*, JA87; 514-56, 528; 507 [ECF 93-3 at 43; ECF 88-1 at 33-35, 61; ECF 87-8 at 2]. Vimeo's examples "motivated" users to produce their own lip dubs. JA844 [ECF 90-17 at 1]. As Vimeo's

co-founder bragged to the *Washington Post*, lip dubs "put us on the map." JA857 [ECF 91-43 at 7]. Today, lip dubs remain popular on social media networks like TikTok.[8]

f. *Vimeo's own assessment.* Other probative evidence of Vimeo's substantial influence comes from Vimeo's own assessment that curation distinguished Vimeo from its competitors.

Vimeo touted its control to advertisers and users alike. Vimeo told advertisers that its staff's "[i]nvolvement" and "[c]uration" made Vimeo "unlike any other site when it comes to online video sharing." JA927 [ECF 94-6 at 5]; *see* JA649-650 [ECF 88-7 at 14-15]. And Vimeo told users that, unlike "some other video sites," Vimeo "very strictly" enforces its "policy" that users may only upload original content. JA962-963 [ECF 94-9 at 71-72]; *see also, e.g.*, JA1030 [ECF 96-4 at 8] (touting Vimeo staff's curation); 840-841 [ECF 90-8 at 9-10] (similar); 805 [ECF 89-7 at 79] (similar in deposition).

Internally, the staff's assessment was the same, and then some. *See, e.g.*, JA950 [ECF 94-8 at 49] ("we are just straight controlling our website"); 803-804; 1008 [ECF 89-7 at 73-74; ECF 95-9 at 26] (internal presentation stating Vimeo is

---

[8] Unlike Vimeo, however, TikTok licenses rightsholders' intellectual property. *See* Murray Stassen, *TikTok And Universal Music Group Sign Global Licensing Deal*, Music Bus. Worldwide (Feb 8, 2021), tinyurl.com/sjd5xc5c.

different because it is curated). As Vimeo's community director colorfully explained, "hardline Vimeo editorial fascism has been important to keeping our website from becoming a trashpile. If you let a plant grow any which way it wants to, you end up with an ugly fucking plant. If you prune the right branches, you end up with something beautiful." JA826 [ECF 90-7 at 40].

> **2.** **The District Court Misapplied The Substantial Influence Standard And Improperly Drew Every Inference In Vimeo's Favor.**

Despite all that evidence, including Vimeo's own admissions of its editorial control, the District Court concluded that no reasonable juror could find that Vimeo exercised substantial influence. To do so, the court misapplied the legal test for "substantial influence," and drew every key inference *in Vimeo's favor*—the opposite of the summary-judgment standard.

a. The District Court incorrectly read *Cybernet* to mean that a provider does not exert "substantial influence" if the provider leaves *any* "editorial decisions" about "content of the uploaded material" "in the hands of its users." SPA43 [ECF 119 at 43]. This approach contradicts both Section 512(c)'s text and precedent.

Section 512(c)'s safe harbor only applies to material stored "at the direction of a user." 17 U.S.C. § 512(c)(1). If a service provider controls all aspects of an upload's content, the resulting material is no longer simply stored "at the direction of a user." *Id*.; *see Motherless*, 885 F.3d at 608; *Mavrix*, 873 F.3d at 1056-57;

*Viacom*, 676 F.3d at 40. The District Court's interpretation of *Cybernet* "renders the control provision duplicative;" it would mean that no "additional service provider would be excluded by § 512(c)(1)(B) that was not already excluded." *Viacom*, 676 F.3d at 36.

Precedent also refutes the District Court's approach. The provider in *Cybernet* did not itself select the pornographic images displayed on affiliated sites; independent webmasters were "responsible for providing all content." 213 F. Supp. 2d at 1160. And in *Mavrix*, the Ninth Circuit held a jury could find "substantial influence" despite the fact that users authored the content. *See* 873 F.3d at 1050. Like Vimeo, these providers may have left crucial "editorial decisions in the hands of its users," but the providers exercised significant editorial judgments of their own. SPA43 [ECF 119 at 43].

b. The District Court also erred when it suggested that Section 512(m) precluded it from considering Vimeo's 2008 decision to eliminate gameplay videos as evidence of Vimeo's ability to control. SPA43-44 [*Id.* at 43-44].

Section 512(m) provides that "[n]othing in this section shall be construed to condition the applicability of" a safe harbor on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m)(1). As this Court explained in *Viacom*, Section 512(m) is limited: It states simply that "DMCA safe harbor protection cannot be conditioned on affirmative

43

monitoring by a service provider." *Viacom*, 676 F.3d at 35; *accord Vimeo I*, 826 F.3d at 98. Thus, a provider who *lacks* a monitoring program cannot face liability solely because it refuses to institute one. *See Viacom*, 676 F.3d at 35. But once a provider curates the content of its network, Section 512(m) no longer applies. Indeed, *Cybernet* and *Mavrix* both premised liability based on providers' efforts to review and curate content. *Cybernet*, 213 F. Supp. 2d at 1181-82; *Mavrix*, 873 F.3d at 1059.

Context and legislative history confirm Section 512(m)'s limited reach. Section 512(m) is titled "Protection of privacy" and "is designed to protect the privacy of Internet users." 17 U.S.C. § 512(m); S. Rep. No. 105-190, at 55. Section 512(m) protects users' privacy by not imposing a requirement for providers to *implement* a monitoring program. It does not immunize service providers for *any* actions related to monitoring. After all, the statute expressly contemplates situations in which monitoring results in liability, such as when providers monitor networks and learn about obviously infringing material but decline to remove it. *See* 17 U.S.C. § 512(c)(1)(A).

The District Court was also wrong to opine that imposing liability on Vimeo could incentivize providers to "stay out of the monitoring business altogether" even if it would benefit "the service provider and the copyright holder alike." SPA44 [ECF 119 at 44]. The typical provider who merely "monitor[s] for infringements posted by users" does not exercise editorial judgment and thus does not possess the

44

right and ability to control users' infringing activity under the "substantial influence" standard. *Vimeo I*, 826 F.3d at 98; *see supra* pp. 30-32.

c. The District Court also incorrectly downplayed the extent of Vimeo's gameplay purge—viewing the record in Vimeo's favor, despite Vimeo being the movant.

According to the court, evidence that "Vimeo engaged in a concerted effort to remove 'game play' videos . . . does not establish that Vimeo actually did so." SPA43 [ECF 119 at 43]. That is a flat-out interpretation of disputed evidence. In contemporary communications, Vimeo's community director stated that Vimeo was "working to remove all game play videos," removing "thousands every day." JA833 [ECF 90-7 at 60]. Other evidence confirmed that staff extensively searched for and removed gameplay. *See* JA841; 638, 640-641; 704; 913 [ECF 90-8 at 10; ECF 88-6 at 85, 89-90; ECF 89-1 at 82; ECF 93-15 at 2]. A jury thus could reasonably conclude that Vimeo removed, as one employee testified, "a lot" of gameplay. JA640-641 [ECF 88-6 at 89-90]. "It is not the province of the court itself to decide what inferences should be drawn . . . ." *Howley*, 217 F.3d at 151.

d. The District Court also relied heavily on statistics from November 2012, toward the tail end of the relevant time period, to reach its conclusion that Vimeo staff did not exert substantial influence—and that no jury could possibly conclude otherwise. The court declared it "difficult to imagine how Vimeo's staff of seventy-

45

four (as of 2012)" could "exert substantial influence on approximately 12.3 million registered users uploading 43,000 new videos each day." SPA44 [ECF 119 at 44]. The court likewise noted that "as of November 2012," staff made .2% of likes and 1.6% of comments on Vimeo. *Id.* And the court observed that "the Staff Picks channel represents only one of the approximately 354,000 channels that were on the Website in November 2012." *Id.* Based on these statistics, the District Court concluded that Vimeo's influence must be "arguably *de minimis*." *Id.*

This was error multiple times over:

*First*, in evaluating right and ability to control, the District Court should have considered "the service provider's procedures that existed at the time of the infringements," which in this case date back to 2007. *Mavrix*, 873 F.3d at 1058. In April 2007, Vimeo had just "40,000 registered users." JA127 [ECF 57 ¶ 6]. The District Court's exclusive reliance on 2012 statistics ignored Vimeo's considerable growth over time. *Id.* Vimeo cannot escape liability for past infringements just because it grew bigger.

*Second*, the District Court's (impermissible) inferences do not hold up. In *Cybernet*, a twelve-person staff reviewed "20 million images" "on participating web sites." 213 F. Supp. 2d at 1158, 1164. Yet *Viacom* deemed Cybernet's editorial influence substantial. Because "right and ability to control" depends on the *ability* to influence infringing activity, not whether the provider exercised that ability with

46

respect to a specific user, a few dozen employees can exert substantial influence even on a large network. *See supra* pp. 29-30. In any event, if anything, it is actually a sign of the staff's industriousness that the staff itself posted 1.6% of comments in 2012, given Vimeo's assertions of the website's size at that late date in the claims period.

*Third*, the District Court completely ignored Vimeo's own assessment of its effectiveness. *See supra* pp. 41-42. The court likewise glossed over Vimeo's assertion early in the relevant time period that its editorial team *literally* watched every uploaded video. *See supra* p. 37. Vimeo changed its tune in litigation, disclaiming any ability to shape or control its site. But contemporaneous assessments provide particularly probative proof that Vimeo's control was not "arguably *de minimis*." SPA44 [ECF 119 at 44]. A jury should decide which of Vimeo's statements to believe, not a court at summary judgment. *See Anderson*, 477 U.S. at 255.

*Fourth*, the District Court incorrectly dismissed "the Staff Picks channel" as just "one of the" many channels on Vimeo. SPA44 [ECF 119 at 44]. But the Staff Picks and HD channels occupied prominent and unique front-page placement on Vimeo's homepage and in users' inboxes. *See supra* p. 38. A juror could conclude Vimeo's staff-curated channels were qualitatively different from other channels on the site—after all, Vimeo itself thought so.

Likewise, when Vimeo's employees liked and commented on videos, or provided public advice about adding commercial music to videos, the employees were identified by a "staff badge." A juror could conclude that the staff badge gave their comments and "likes" unique authoritativeness. *See* JA489 [ECF 87-1 at 14]. In fact, according to training materials for new Vimeo staff, receiving "a like or a comment from a staff member is a huge deal to our users." JA825 [ECF 90-6 at 40]. At summary judgment, it is not the District Court's "function[]" to pick the inference it deems more persuasive. *Anderson*, 477 U.S. at 255; *see Howley*, 217 F.3d at 151.

*Fifth*, the court ignored evidence that Vimeo's staff aggressively curated the most popular content through specialized software tools. *See supra* p. 37. Even if Vimeo could not curate every video, Vimeo's targeted curation of the most significant content—like tailoring the window displays in a department store—gave Vimeo a significant degree of control over the site.

*Sixth*, at bottom, the District Court engaged in a freewheeling assessment of the merits unmoored from any metric—and decided for itself that Vimeo's control was not sufficiently "substantial." *That* approach proves the wisdom of drawing the line for substantial influence at editorial judgments. *This* approach provides a clear rule of decision, in this case and the next.

## C.     Vimeo Directly Benefited From Infringement.

A jury could also find that Vimeo received "a financial benefit directly at-tributable to the infringing activity."  17 U.S.C. § 512(c)(1)(B).  Although the Dis-trict Court did not decide this issue, this Court should resolve this lingering issue now and send this dispute to the factfinder it deserves.

### 1.     "Direct Financial Benefit" Has Its Common-Law Meaning.

This Court should interpret "direct financial benefit" "consistent with the sim-ilarly-worded common law standard."  *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007); *see Mavrix*, 873 F.3d at 1059.

Like "the right and ability to control," Section 512(c)'s direct financial benefit test has a "settled meaning under the common law" of vicarious liability. *Viacom*, 676 F.3d at 37 (internal quotation marks omitted); *see, e.g.*, *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 99 (2d Cir. 2016); *Shapiro*, 316 F.2d at 307.  But unlike "the right and ability to control," applying the common-law mean-ing of a direct financial benefit does not "render the statute internally inconsistent" or create a catch-22.  *Viacom*, 676 F.3d at 37.  As a result, the statute incorporates the existing, common law meaning.  *Id.*

 At common law, the "essential aspect of the 'direct financial benefit' inquiry is whether there is a causal relationship between the infringing activity and any fi-nancial benefit a defendant reaps."  *Ellison v. Robertson*, 357 F.3d 1072, 1079 (9th

Cir. 2004). The "financial benefit need not be substantial or a large proportion of the service provider's revenue." *Mavrix*, 873 F.3d at 1059.

The classic "dance hall" cases provide the defining example of a "causal relationship" constituting a direct financial benefit. At common law, a landlord who merely rents a space to another for a fixed fee does not directly benefit from the lessee's decision to infringe copyright on her premises. *Shapiro*, 316 F.2d at 307. The landlord does not derive her fixed fee—the rent—from the infringing activity.

As the seminal *Shapiro* case explains, one in the position of—say—a proprietor of a dance hall is another story. If the owner invites a band to perform in the hall, and if the band's infringing "activities provide the proprietor with a source of customers and enhanced income"—*i.e.* more tickets sold—the proprietor derives a direct financial benefit. *Id*. Brought into the current era: If a provider invites a user to post infringing material on its site, and those activities generate income for the provider, the provider derives a direct financial benefit.

### 2. Vimeo Received A Financial Benefit Causally Related To Users' Infringement.

Jurors could reasonably—indeed, easily—conclude that Vimeo received a direct financial benefit causally related to its users' infringing activities.

a. Vimeo received a direct benefit from advertisement. Carmex Lip Balm paid Vimeo "to sponsor the lip dub channel." JA921 [ECF 94-3 at 15]; *see* JA840 [ECF 90-8 at 9]. This unique advertising arrangement monetized the infringing

50

meme that Vimeo popularized. And Vimeo made the most of it: Its July 2008 in-voice to Carmex charged more for space on the lip dub channel than anywhere else on the site. JA842-843 [ECF 90-9 at 14-15]. The Carmex lip-dub deal plainly con-stitutes "a causal relationship between the infringing activity" and Vimeo's financial gain. *Ellison*, 357 F.3d at 1079.

Vimeo also received advertising revenue from other major brands, including Coca-Cola, Rolex, Mercedes-Benz, Nike, and Proctor & Gamble. *See* JA123 [ECF 56 at 6]. These brands paid Vimeo on a cost-per-impression basis—each time the website displayed their advertisement. *See* JA123; 810-811 [ECF 56 at 6; ECF 89-8 at 7-8]. Google also displayed advertisements on Vimeo and paid when viewers clicked on the ads. *See* JA811 [89-8 at 8].

Here again, Vimeo's benefit was causally related to infringing activity. *Ellison*, 357 F.3d at 1079. Vimeo's receipt of ad revenue from infringing videos con-stituted a direct financial benefit. *See Shapiro*, 316 F.2d at 308 (direct financial benefit where vicarious infringer received a percentage of sales "whether 'bootleg' or legitimate"); *see also Fung*, 710 F.3d at 1045 (advertising revenue constituted direct financial benefit).

But the nexus between users' infringement and Vimeo's revenue was even tighter. Vimeo earned more money precisely because it adopted a "don't ask, don't tell" policy toward infringement. JA941 [ECF 94-8 at 17]. The data in this case

demonstrates that the infringing videos-in-suit received approximately 18 times more views than average Vimeo videos. *See* JA308-309 [ECF 75 ¶¶ 6, 10]. Meanwhile, Vimeo embedded the metatag "lip dub" into the website's source code to drive searches for lip dubs to Vimeo. *See* JA498-502 [ECF 87-1 at 49-53]. According to Vimeo's own data, "Lip Dub" even became a "Top Keyword Referral[]." JA818 [ECF 90-5 at 7]. Because Vimeo charged advertisers per view or per click, [9] Vimeo earned more revenue on its more popular, infringing content.

In short, Vimeo hosted more user content, enjoyed more views, and thus earned more revenue because Vimeo positioned itself as a safe haven for infringing content. *See Cybernet*, 213 F. Supp. 2d at 1181 ("The more new visitors an infringing site attracts, the more money Cybernet makes."). Like yesterday's dance-hall proprietor, Vimeo did not dictate which songs users incorporated into their videos, but the users' "activities provide[d]" Vimeo "with a source of customers and enhanced income." *Shapiro*, 316 F.2d at 307; *see Fung*, 710 F.3d at 1045; *Mavrix*, 873 F.3d at 1059; *Motherless*, 885 F.3d at 613. All the while, Vimeo *also* saved itself

---

[9] The number of users who click on an advertisement will be a function of how many users see the advertisement.

the cost and hassle of obtaining licenses and paying for the music like its competitors did.[10]

b. Vimeo additionally received a benefit because its "don't ask, don't tell" policy toward infringement was "a 'draw' " for users. *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 263-264 (9th Cir. 1996). As this Court has explained, "where infringing material acts as a 'draw' to attract subscribers to a defendant's business," that constitutes a direct benefit, "even if it is not the primary, or even a significant draw." *MP3tunes*, 844 F.3d at 99 (citation omitted).

Users flocked to Vimeo because—unlike other providers—Vimeo freely permitted infringing content. *See* JA966, 968; 863, 864, 865-866; 1032-1045; 1046-1063; 1064-1069 [ECF 94-9 at 96, 98; ECF 91-44 at 39, 46, 49-50; ECF 97-14 at 2-15; ECF 97-15 at 1-18; ECF 97-16 at 1-6]. For instance, one user wrote that "Vimeo offers a platform which allows me to upload my work without copyright issues and conflicts which I run into with YouTube many times." JA1036 [ECF 97-14 at 6]. Others explained that they posted videos to Vimeo because the "Youtube version" was "blocked by EMI." JA1060 [ECF 97-15 at 15]. In 2007, Vimeo's internal documents described Vimeo as "showing early signs of capturing the defections" from

---

[10] Rightsholders charge "a revenue share of 20-50% for use of music." JA896 [ECF 93-5 at 25]. By refusing to pay licensing fees, Vimeo gained a considerable financial advantage over its competitors directly related to its users' infringement.

YouTube. JA997, 999 [ECF 95-3 at 29, 31]. And Vimeo's founder touted that infringing lip-dubs put Vimeo "on the map." *See* JA857 [ECF 91-43 at 7]. Vimeo also charged users for premium access. JA122-123 [ECF 56 at 5-6]. As a result, a jury could infer that Vimeo derived additional paying users based on its overall attraction of new users to its site.

## II. VIMEO POSSESSED RED-FLAG KNOWLEDGE OF INFRINGEMENT.

The Court should also vacate the District Court's judgment for a second and independent reason: The court improperly took from the jury the question whether Vimeo employees had "red-flag knowledge" of infringement.

In the prior interlocutory appeal, this Court resolved a narrow question: Does "the mere fact that a video contains . . . famous, copyrighted music and was to some extent viewed (or even viewed in its entirety) by some employee of a service provider," without more, mean the video was objectively infringing to a hypothetical ordinary individual? *Vimeo I*, 826 F.3d at 97. The Court answered "no," and remanded for further proceedings on that issue.

On remand, the rightsholders identified 307 specific videos with which Vimeo employees interacted, for instance by selecting videos for staff-curated channels. *See, e.g.*, JA1203-1335, 1533 [ECF 219 and associated hard drives]. A jury could find that Vimeo's employees knew any one "of the innumerable facts that might

make infringement obvious." *Vimeo I*, 826 F.3d at 94.  The District Court erred in concluding otherwise.

### A.    Vimeo Employees Possessed Red-Flag Knowledge.

In *Vimeo I*, this Court articulated three factors to determine whether an employee had red-flag knowledge:  The length of an employee's interaction with infringing content; the nature of that interaction; and the employee's knowledge or expertise.  *Id*. at 96-97.  A reasonable jury could find that each factor militates in favor of finding red-flag knowledge here.

#### 1.    Vimeo Staff Knew The Videos Contained Copyrighted Music.

The first two factors are not meaningfully disputed.  Vimeo employees' interaction with the 307 videos was anything but "brief" or unrelated to the content. *Id*. at 96.  Vimeo's staff watched entire videos to decide whether to promote or demote the video.  Vimeo did not bother contesting these factors below, beyond a throwaway line or two.  *See, e.g.*, JA1132, 1134, 1137 [ECF 197 at 6, 11, 23].  And the District Court agreed that Vimeo employees were "aware of the content" in a video they watched and that "it was objectively obvious that such a video contained copyrighted music."  SPA111 [ECF 227 at 15].

#### 2.    Vimeo Staff Knew Specific Facts And Circumstances Indicating The Videos Were Neither Licensed Nor Fair Use.

The only real dispute on red-flag knowledge concerns the third factor: whether Vimeo's employees could legitimately think users secured licenses from

major music companies or could claim fair use. Based on the record evidence show-

ing what Vimeo's employees knew, a jury could find that those beliefs would have

been preposterous.

a. First, Vimeo's employees knew specific facts with which they could eval-

uate "how likely or unlikely it may be that the user who posted the material had

authorization to use the copyrighted music." *Vimeo I*, 826 F.3d at 97. Based on their

personal experience, Vimeo staff knew that licensing music from a major music

company was difficult or impossible. In 2011, Vimeo launched a virtual music store

to enable users to obtain rights to free and non-major-label music. A Vimeo em-

ployee explained why in a blog post: "Licensing music on your own can be confus-

ing" and "painful." JA1130 [ECF 189-8 at 11]. As he explained, Vimeo staff "are

video creators or filmmakers" who "experience" the "frustrations" of licensing first

hand. *Id*.; *see also* JA582-583 [ECF 88-5 at 22-23] (Vimeo created a list of sites

where users could find free music).

Vimeo also made no secret that it sought employees with a specific interest in

making videos. *See, e.g.*, JA1024 [ECF 96-3 at 2]. Vimeo's employees were people

who knew how the music industry worked. While employed at Vimeo, these em-

ployees uploaded their own infringing videos, without securing licenses. A jury

could reasonably conclude the employees forwent licensing because they knew the

impracticality of getting licenses for their uploaded videos.

56

Meanwhile, anyone who watched the videos in this case would have found it highly unlikely in the extreme that the users had secured a license from a major music company. For instance, many lip dubs—despite generating revenue for Vimeo—were clearly unsophisticated, low-budget productions. Watching a lip-dub, a Vimeo employee could not have reasonably believed that an amateur artist armed with a camcorder obtained a license. Indeed, the credits to one lip dub identified the song and included the words: "Please don't sue us. We love you." Video 6 at 4:08. While not necessary to create red flag knowledge, that kind of admission certainly does.

But that's not all. After December 2008—and remember, the period here ran from 2006 through 2013—Vimeo staff knew that *any time* the rightsholders' music appeared on Vimeo, it was unlicensed. In December 2008, the rightsholders sent Vimeo a letter explaining that Vimeo was exploiting their property "without author-ization" and demanded that Vimeo remove "*all* . . . EMI-owned or -controlled works" from the site. JA103-104 [ECF 55-3 at 3-4] (emphasis added).[11] The letter stated that any EMI music appearing on Vimeo was unauthorized. The likelihood after that letter that an amateur artist had somehow secured a license to the rightsholders' music dropped from highly unlikely down to impossible. *See Vimeo*

---

[11] At the time, all plaintiffs were affiliated with EMI.

*I*, 826 F.3d at 97; *cf. MP3tunes, LLC*, 844 F.3d at 93 (defendant was aware that plaintiff had "never authorized their songs to be available digitally" (internal quotation marks omitted)).

A jury could also find that staff knew about the rightsholders' demands. In staff-wide emails, Vimeo employees griped that their videos had been taken down because they contained the rightsholders' music, mocked the rightsholders as "dicks" and "goofballs," and joked about recording "shitty covers of these songs and writ[ing] FUCK EMI at the end." JA994 [ECF 95-1 at 22]; *see* JA990 [*id.* at 18]. Yet, after December 2008, Vimeo employees nevertheless viewed a minimum of 221 videos containing the rightsholders' works. *See* JA1210-1334 [ECF 219-1 Column T—"Uploaded After Dec. 2008 C&D"]. From the perspective of a reasonable juror, all of these "facts" and "circumstances" made it obvious to Vimeo employees that users had not secured licenses for the rightsholders' music. 17 U.S.C. § 512(c)(1)(A)(ii).

When the rightsholders filed these lawsuits a year later, the staff's specific knowledge grew further. Like the 2008 cease-and-desist letter, these lawsuits made it plain that the rightsholders had not authorized their works to appear on Vimeo. And yet after these lawsuits were filed, Vimeo employees watched an additional 137 videos containing the rightsholders' works. Section 512(c) required Vimeo to remove that content, not curate it for Vimeo's profit.

b. In addition to knowing that users likely lacked licenses, the staff possessed the legal knowledge to know the videos almost certainly infringed copyright and did not, "for example," constitute "parodies that may qualify as fair use." *Vimeo*, 826 F.3d at 97.

For one thing, Vimeo staff told users that "adding a third party's copyrighted content to a video generally (but not always) constitutes copyright infringement." JA904 [ECF 93-14 at 52]. The staff frequently followed this "[o]fficial answer" with "[o]ff the record" advice to "[g]o ahead and post it." *Id*. Their cavalier attitude does not negate their legal knowledge.

The staff's legal acumen only grew from there. In February 2009, Vimeo held a meeting with lawyers present and instructed staff to cease uploading videos with infringing music. *See* JA621-625; 970-971 [ECF 88-6 at 55-59; ECF 94-10 at 16-17]; *compare also* JA237 [ECF 72 ¶ 67], *with* JA336 [ECF 78 ¶ 67]. A jury could reasonably infer that Vimeo's staff were told or at least realized that their uploads violated the law. But after that meeting, Vimeo employees nevertheless liked, commented on, promoted, demoted, and otherwise reviewed another 205 specific videos containing the rightsholders' music. *See* JA1210-1334 [ECF 219-1 Column V— "Uploaded After Feb. 2009"].

What's sauce for the goose is sauce for the gander. If employees knew their own videos infringed copyright, they knew the same about users' videos.

## B.     The District Court Ignored Key Evidence.

In reaching the opposite conclusion, the District Court again tilted its inquiry in favor of Vimeo on disputed facts, and again reached several erroneous conclusions.

First, the District Court incorrectly dismissed evidence indicating Vimeo employees knew that securing a license from a major company was a difficult process. *See* SPA108 [ECF 227 at 12].  When it came to the Vimeo blog post explaining the difficulty Vimeo employees "experience" "on a regular basis" with licensing, the Court took the view that the blog post merely "mention[ed]" "licensing as a concept."  SPA108-109 [*Id.* at 12-13]; *see* JA1130 [ECF 189-8 at 11].  Not so.  The post stated that securing licenses was "painful" and frustrating—and a process with which Vimeo employees were intimately familiar.  JA1130 [ECF 189-8 at 11].  A jury could infer that Vimeo employees knew from their own "painful" experience that it was difficult or impossible for average joes to procure licenses from major music companies.

A jury also could conclude that Vimeo employees failed to secure licenses for their *own* infringing uploads because the employees knew it would have been a daunting and futile endeavor—whether for them or for their users.  Vimeo employees were not generic employees at a generic service provider:  Vimeo recruited staff who liked to spend time "inventing, sharing, shooting, editing, gazing at amazing

videos." JA1024 [ECF 96-3 at 2]. Their own repeated actions in choosing to forgo procuring licenses betrays personal knowledge of how difficult that process was.

Second, the District Court likewise erred in dismissing the significance of the cease-and-desist letter and the lawsuits. The District Court concluded that only "categorical knowledge about the licensing practices of particular artists" could give rise to red flag knowledge. SPA119 [ECF 227 at 23]. Thus, under the District Court's theory, a defendant would only have red flag knowledge if the defendant knew that a particular artist "had not authorized any of its music for use on Vimeo." *Id.*

Categorical knowledge can indeed make infringement objectively obvious. *See MP3Tunes*, 844 F.3d at 93 (defendant knew that "there had been no *legal* online distribution of Beatles tracks before 2010"). This Court has never suggested, however, such categorical information is *necessary* to such a finding. If an employee knows that countless videos were unauthorized, including the ones they or their co-employees made and uploaded themselves, the reasonable employee would realize the next such video is obviously unauthorized too. But the District Court rejected that commonsense, deductive reasoning.

In any event, the District Court was wrong about the facts of this case. Vimeo's cease and desist letter *did* provide Vimeo employees with specific, categorical knowledge that the rightsholders had not authorized their works to appear on Vimeo. *See supra* pp. 57-58. But instead of acting on that categorical knowledge,

61

Vimeo's employees mocked the rightsholders as "dicks" and "goofballs," and continued to approve users' infringement.  JA994 [ECF 95-1 at 22].

The District Court also opined that Vimeo employees might reasonably have considered users' videos to be fair use.  *See, e.g.*, SPA110, 117-118, 120 [ECF 227 at 14, 21-22, 24].  But the actual record evidence again belies that conclusion.  Vimeo's official advice to users was that using music generally constituted infringement.  And in February 2009, with legal counsel present, Vimeo told its employees to stop uploading infringing videos.  A jury could easily find that, *at least* after that point, it was obvious to employees that similar user-made videos violated copyright law.

Vimeo argued below that its employees must be "the next Professor Nimmer" to evaluate whether a user's video infringed copyright.  JA1133 [ECF 197 at 7].  How outlandish.  Vimeo's employees were well aware of the legal rule governing this case:  using a song without a license infringes copyright.  A reasonable juror faced with the totality of the evidence could easily have found users' infringement to have been obvious.  And Vimeo's employees could therefore not lawfully ignore that infringement when they saw it.

## CONCLUSION

For the foregoing reasons, the District Court's judgment should be vacated and the case remanded for jury trial.

Respectfully submitted,

/s/ Catherine E.  Stetson
CATHERINE E. STETSON
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
August 30, 2022                    cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.　　This document complies with the type-volume limits of Fed. R. App. P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 13,973 words.

2.　　This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Catherine E. Stetson
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on August 30, 2022. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson