# 21-2949(L)

### 21-2974(CON)

In The

## United States Court of Appeals for the Second Circuit

CAPITOL RECORDS, LLC, a Delaware Limited Liability company, CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC INC., a Connecticut Corporation, EMI APRIL MUSIC INC., a Connecticut Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE DIAMOND MUSIC CORPORATION, a Michigan Corporation, EMI U CATALOG INC., a New York Corporation, JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellants*,

v.

VIMEO, INC., a Delaware Limited Liability company, AKA VIMEO.COM, CONNECTED VENTURES, LLC, a Delaware Limited Liability company,

*Defendants-Appellees*,

DOES, 1-20 INCLUSIVE,

*Defendants*.

Appeal from the United States District Court
for the Southern District of New York

### FINAL REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

RUSSELL J. FRACKMAN
MITCHELL SILBERBERG & KNUPP LLP
2049 Century Park East, 18th Floor
Los Angeles, CA 90067
(310) 312-2000
rjf@msk.com

CATHERINE E. STETSON
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

*Counsel for Plaintiffs-Appellants*

## CORPORATE DISCLOSURE STATEMENT

Appellants Caroline Records, Inc. and Virgin Records America, Inc. have merged into Appellant Capitol Records, LLC. Capitol Records, LLC's parent company is Universal Music Group Holdings, Inc., a wholly-owned subsidiary of Universal Music Group, Inc., which in turn is a wholly-owned subsidiary of Universal Music Group N.V., a publicly-traded company organized under the laws of The Netherlands. Vivendi SE and Compagnie de Cornouaille SAS are publicly-traded companies organized under the laws of France and own more than 10% of Universal Music Group N.V.'s stock. No other publicly traded company owns more than 10% of Universal Music Group N.V.'s stock.

Appellants EMI Blackwood Music, Inc., EMI April Music, Inc., EMI Virgin Music, Inc. (now known as EMI Consortium Music Publishing, Inc.), Colgems-EMI Music, Inc., EMI Virgin Songs, Inc. (now known as EMI Consortium Songs, Inc.), EMI Gold Horizon Music Corp., EMI U Catalog, Inc., EMI Unart Catalog Inc., Jobete Music Co., Inc., and Stone Diamond Music Corporation are all partially owned, indirect subsidiaries of Sony Group Corporation, a publicly-traded company organized under the laws of Japan. No publicly traded company other than Sony Group Corporation owns more than 10% of their stock.

i

# TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ........................................................i

TABLE OF AUTHORITIES ...............................................................................iv

INTRODUCTION ............................................................................................... 1

ARGUMENT ...................................................................................................... 6

I. A REASONABLE JUROR COULD FIND THAT VIMEO
   POSSESSED THE RIGHT AND ABILITY TO CONTROL ................. 6

   A. Vimeo's Extensive Editorial Control More Than
      Qualified As "Substantial Influence" ................................................ 6

   B. Vimeo's Counterarguments Are Wrong ..................................... 11

      1. Vimeo Employees Were Not Neutral Arbiters ................... 11

      2. Record Evidence Shows Extensive Employee
         Review Of Videos ................................................................. 12

      3. The Gameplay Purge Is Telling ........................................... 13

      4. Vimeo's Quibbles With The "Something More"
         Test Are Meritless ................................................................ 15

      5. None Of This Was Forfeited .................................................. 17

      6. Remanding For Trial Will Not Break The Internet ............. 17

   C. This Court Should Reject Vimeo's Argument That "The
      Right And Ability To Control" Is Limited To
      Prescreening ...................................................................................... 18

II. A REASONABLE JUROR COULD ALSO FIND THAT
    VIMEO RECEIVED A DIRECT FINANCIAL BENEFIT .................... 23

III. A REASONABLE JUROR COULD FIND THAT VIMEO
     HAD RED-FLAG KNOWLEDGE ....................................................... 26

**TABLE OF CONTENTS—Continued**

Page

    A.    Employees Knew Facts That Meant The Videos Were Obviously Unlicensed ....................................................26

    B.    Employees Knew Facts That Meant The Videos Were Obviously Not Fair Use ...............................................28

CONCLUSION ......................................................................31

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

<u>Page(s)</u>

**CASES:**

*Brown v. Netflix, Inc.*,
    855 F. App'x 61 (2d Cir. 2021) (summary order)............................................29

*Capitol Recs., LLC v. Vimeo, LLC*,
    826 F.3d 78 (2d Cir. 2016) ...........................................................*passim*

*Columbia Pictures Indus., Inc. v. Fung*,
    710 F.3d 1020 (9th Cir. 2013) ....................................................14, 25

*Downs v. Oath Inc.*,
    385 F. Supp. 3d 298 (S.D.N.Y. 2019) ................................................21

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
    844 F.3d 79 (2d Cir. 2016) ...............................................................27

*Io Grp., Inc. v. Veoh Networks, Inc.*,
    586 F. Supp. 2d 1132 (N.D. Cal. 2008)..............................................16

*Lennon v. Premise Media Corp.*,
    556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................29

*Mavrix Photographs, LLC v. LiveJournal, Inc.*,
    873 F.3d 1045 (9th Cir. 2017) ...................................................*passim*

*Nelson v. Adams USA, Inc.*,
    529 U.S. 460 (2000)...........................................................................17

*Obodai v. Demand Media, Inc.*,
    No. 11 Civ. 2503(PKC), 2012 WL 2189740 (S.D.N.Y. June 13,
    2012) ...........................................................................................20, 21

*Perfect 10, Inc. v. CCBill LLC*,
    488 F.3d 1102 (9th Cir. 2007) .........................................................23

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
    213 F. Supp. 2d 1146 (C.D. Cal. 2002).......................................*passim*

iv

# TABLE OF AUTHORITIES—Continued

Page(s)

*Red Label Music Publishing, Inc. v. Chila Productions*,
388 F. Supp. 3d 975 (N.D. Ill. 2019) ...................................................29

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
316 F.2d 304 (2d Cir. 1963) ............................................................6, 8

*United States v. Soler*,
759 F.3d 226 (2d Cir. 2014) ...............................................................23

*Ventura Content, Ltd. v. Motherless, Inc.*,
885 F.3d 597 (9th Cir. 2018) .........................................................7, 15

*Viacom Int'l, Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ..........................................................*passim*

*Viacom Int'l Inc. v. YouTube, Inc.*,
940 F. Supp. 2d 110 (S.D.N.Y. 2013) ...............................................16

*Wolk v. Kodak Imaging Network, Inc.*,
840 F. Supp. 2d 724 (S.D.N.Y. 2012) .........................................19, 20

**STATUTES:**

17 U.S.C. § 512(c) ....................................................................*passim*

17 U.S.C. § 512(c)(1)(B) ..........................................................*passim*

17 U.S.C. § 512(m) .....................................................................21, 22

17 U.S.C. § 512(m)(1) ....................................................................21

**LEGISLATIVE MATERIAL:**

S. Rep. No. 105-190 (1998) ...............................................................25

IN THE

# United States Court of Appeals for the Second Circuit

———————

No. 21-2949(L)
No. 21-2974(CON)

———————

## FINAL REPLY BRIEF FOR PLAINTIFFS-APPELLANTS

———————

## INTRODUCTION

Back in the early aughts, as an upstart startup, Vimeo told anyone who would listen that it was not a mere video-sharing platform. Vimeo was "unlike any other site;" it handpicked original content. JA927 [ECF 94-6 at 5]. Bespoke curation made "a big difference." JA1030 [ECF 96-4 at 8]. Hardline "editorial fascism" kept Vimeo "from becoming a trashpile." JA826 [ECF 90-7 at 40]. Without the employees' expert pruning of videos, Vimeo would have become "ugly." *Id*. The staff turned Vimeo into "something beautiful." *Id*.

This was Vimeo's consistent mantra: Vimeo was not a passive receptacle for user content. Instead, Vimeo took charge of user uploads and aggressively curated them. As for the rightsholders who *owned* the music essential to Vimeo's curated content? In Vimeo employees' vernacular: "FUCK" the "dicks" and "goofballs." JA994 [ECF 95-1 at 22].

1

Today, Vimeo is an established, hundred-million-dollar business, and in this Court, Vimeo's brief sings a different tune. "Startup" Vimeo would barely recognize the website that "Established" Vimeo now describes.

According to Vimeo's brief, Vimeo *never* curated content. It was a mere repository for users' videos. Vimeo's informal slogan used to "be 'Not YouTube.'" JA899 [ECF 93-5 at 45]. Now, Vimeo says it was just like YouTube. Vimeo Br. 25-26. Vimeo staff used to manually search for and demote "political vids," along with anything else Vimeo didn't want "to promote." JA825 [ECF 90-6 at 40]. Now, Vimeo touts users like the White House and the Republican Governors Association, and claims Vimeo was always "neutral as to the creative or other aspects of a video." Vimeo Br. 8, 31. Vimeo's sophisticated tools allowed employees to sift through, handpick, and prominently feature content. Now, Vimeo says its website was too big to control. Vimeo Br. 35-36.

Unfortunately for Vimeo, the time period during which the accused infringements occurred is 2006 to 2013. And whatever Vimeo's current characterization of its service, the facts relevant to that time period are voluminous and damning. They come from Vimeo employees' own mouths and contemporaneous documents. Viewing the record in the light most favorable to plaintiffs, as summary judgment demands, Vimeo's extensive curation of its website was that "something more" which meets this Court's test for "substantial influence" and qualifies as "the right

2

and ability to control." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012) (internal quotation marks omitted). That necessarily "fact-based inquiry," *id.* at 36, should be presented to a jury.

Realizing it cannot defend how the District Court disposed of the contested factual question at the heart of this appeal, Vimeo instead advances a radical legal argument. According to Vimeo, a website exercises "the right and ability to control" *only if* that website prescreens content *before* users post it. Vimeo Br. 24-37.

This sweeping theory appears nowhere in the District Court's decision. It has no basis in the DMCA's text, this Court's precedent, or basic copyright law. And the argument that "control" means only "prescreening" makes no sense, for much the same reason this Court explained in *Viacom*: To have control, a service provider need *not* have "item-specific knowledge of infringing activity." 676 F.3d at 36. The DMCA preserves the concept of vicarious liability. It attaches where a service provider "exert[s] substantial influence on the activities of users, without necessarily—or even frequently—acquiring knowledge of specific infringing activity." *Id.* at 38. That is this case. *See* Rightsholders Br. 9-15, 28-34.

In the end, Vimeo invokes the usual policy horribles: If this Court enforces Section 512(c)'s "right and ability to control" provision, websites won't remove "bad" content for fear of copyright liability. Vimeo's concerns are overblown and stale. Today, most tech companies and rightsholders cooperate to license intellectual

property for mutual benefit. And under those arrangements, tech companies curate their websites to a significant degree without worrying about "the right and ability to control."

The difference here is that, during the time period at issue, Vimeo wanted music for free. That is how Vimeo jumpstarted its business. But it was not lawful. The DMCA gave Vimeo a choice: Vimeo could store user data, and not worry about potential liability for users' misdeeds, absent a takedown notice. Or Vimeo could curate content, shape its website, and exercise the same care for others' intellectual property as it did for its own platform. What Vimeo could *not* do was employ one standard for itself—bespoke curation—and another for rightsholders—willful disregard. Section 512(c) preserves vicarious liability to prevent precisely what happened here: a provider aggressively curating content for its own benefit but disclaiming any responsibility to protect the rightsholders who owned that content. This Court should vacate the judgment below, and return the case to the District Court for a jury trial.

This Court should also vacate the District Court's ruling on red-flag knowledge. Vimeo's employees possessed specialized knowledge making it obvious users who posted amateur videos on Vimeo lacked licenses, and were not engaged in fair use. Here too—and much like the District Court—Vimeo's brief minimizes and rationalizes away a damning factual record. *Every* Vimeo employee

4

knew, from company-wide emails, that these rightsholders refused to license *any* of their intellectual property on Vimeo—a fact Vimeo does not contest. But instead of removing infringement when they saw it, Vimeo employees mocked the rightsholders in company-wide emails. *See* JA992-995 [ECF 95-1 at 20-23].

Nor did Vimeo's employees need to be the next Professor Nimmer to determine whether users' videos were obviously not fair use. Fair use can be complicated sometimes. But *no* court has ever found the synchronization of an entire recording to a video to be fair use. In fact, Vimeo itself has informed users that "unauthorized use of a popular song in the background of your video" constitutes a "clear violation[]" of copyright law. JA1127 [ECF 189-8 at 8]. Vimeo employees *knew* synchronizing recordings to videos was generally infringing, and they were instructed to cease uploading their own videos with copyrighted music. In its Response, Vimeo faults the rightsholders for not detailing what Vimeo's lawyers said to employees. That is rich, given that Vimeo asserted attorney-client privilege to prevent the rightsholders from exploring that issue below. Vimeo can hardly fault them now.

Vimeo is correct about one thing: This case has gone on for a time. At issue in this appeal are Vimeo's misdeeds from 2006-2013, when a brash startup decided to embrace infringement to grow its brand. The longevity of a case is no reason to short-circuit the process. This Court should send this case to the trial it requires.

**ARGUMENT**

## I. A REASONABLE JUROR COULD FIND THAT VIMEO POSSESSED THE RIGHT AND ABILITY TO CONTROL.

As the extensive record in this case demonstrates, Vimeo employees industriously maintained their site. Employees combed through handpicked videos to promote, demote, and purge. *See* Rightsholders Br. 37-42. As one Vimeo employee put it in 2008: "we are just straight controlling our website." JA950 [ECF 94-8 at 49]. Because a reasonable juror could find that Vimeo's control of the content on its website rose to the level of "substantial influence," the District Court erred in granting Vimeo summary judgment. *Viacom*, 676 F.3d at 38.

### A. Vimeo's Extensive Editorial Control More Than Qualified As "Substantial Influence."

The precise contours of Section 512(c)'s right-and-ability-to-control provision are "difficult" "to define." *Viacom*, 676 F.3d at 38. But the DMCA's text, purpose, and precedent confirm that a provider like Vimeo which exercises editorial control over user content cannot invoke Section 512(c)'s safe harbor.

As our opening brief explained, Section 512(c)'s text has its roots in common law vicarious liability, which incentivizes those in the best "position to police" infringement to act. *See Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304, 309 (2d Cir. 1963). Section 512(c)'s control provision "requires something more" than merely possessing the technical capacity to take down a user's video. *Viacom*,

6

676 F.3d at 38 (internal quotation marks omitted). A provider exercises the right and ability to control when it exerts "substantial influence" on user activities. *Id.*

To determine whether a provider exerts the necessary "substantial influence" to trigger the control provision, this Court should engage in a two-step inquiry. First, is there a relationship between the provider's control and the infringing activity at issue in the case? Second, did the provider exercise editorial judgment?

Step 1 flows directly from *Viacom*'s explanation about just *what* things a provider must influence. *See* 17 U.S.C. § 512(c)(1)(B). The provider need not influence the "specific infringing activity" at issue in a case—nor need it even know about that infringement. *Viacom*, 676 F.3d at 38. Instead, the provider must influence the type of "activities of users" that *produced* infringement. *Id.*; *see Mavrix Photographs, LLC v. Livejournal, Inc.*, 873 F.3d 1045, 1058 (9th Cir. 2017).

Step 2 reflects how courts have applied the "something more" and "substantial influence" standard before and after *Viacom*. On one hand are cases in which providers exert little to no control over users' content and conduct extremely brief review (or none at all). For instance, a pornography website's employee may glance at "thumbnail" still-images from videos to spot child pornography and copyright watermarks. *Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597, 601 (9th Cir. 2018). This limited interaction does not enmesh the provider in the user's content and does not constitute "substantial influence."

7

On another hand are cases in which a provider evaluates content, exercises editorial judgment, and displays a degree of oversight. For instance, an employee might review content to ensure a minimum degree of originality. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1160 (C.D. Cal. 2002). Or an employee might confirm that posts discuss relevant topics. *See Mavrix*, 873 F.3d at 1050. These editorial judgments *do* qualify as substantial influence. That aligns with the core purpose of vicarious liability: Providers who more closely examine content and make editorial judgments will be better positioned "to police" infringement. *Shapiro*, 316 F.2d at 309; *see Capitol Recs., LLC v. Vimeo, LLC*, 826 F.3d 78, 96 (2d Cir. 2016) ("*Vimeo I*").

In Vimeo's case, both steps are easily met—especially when viewing the record in the rightsholders' favor. Start with Step 1. Vimeo's "right and ability to control" bore a close relationship to users' infringing activity. Vimeo carefully curated user uploads. The infringement at issue in this case occurred in uploads. That is enough. But the relationship is even closer. The factual record shows that Vimeo's staff played particularly close attention to *the music* in videos. *See, e.g.*, JA822 [ECF 90-6 at 37] (directing staff to avoid featuring videos "with bad music"). Vimeo even encouraged users to add music to videos, and told them music was an essential ingredient to producing superior content. *See* Rightsholders Br. 13.

8

Vimeo's conduct also satisfies Step 2.  As Vimeo bragged, the website was "not just an algorithm, it's people," and those people manually tailored Vimeo's content to their liking.  JA1030 [ECF 96-4 at 8].  Consider the sheer extent of the staff's control during the relevant time period.  At times during that period, Vimeo employees curated *everything* users uploaded.  *See* Rightsholders Br. 37.  In a 2007 email, Vimeo's community director explained how he had looked "through the uploads for the day."  JA943 [ECF 94-8 at 33].  That was not an aberration.  The community director elsewhere confirmed he had been "able to look" through "the entire list of uploads for a day," and testified as much in a deposition. JA911; 688 [ECF 93-14 at 70; ECF 89-1 at 56].  That was why Vimeo told advertisers in late 2009 that "Vimeo's editorial team literally watches every video that gets uploaded."  JA928 [ECF 94-6 at 6].

Vimeo also developed specialized software that allowed the editorial team to exert control over posted content at a larger scale.  The editorial team paid close attention to videos gaining the most views, and videos recommended in the "Discover" feature.  JA556-557; 825 [ECF 88-4 at 98-99; ECF 90-6 at 40].  And Vimeo employees manually trolled the website.  JA1030 [ECF 96-4 at 8] ("[W]e subscribe to people, we subscribe to channels, and groups, and we just filter through it.").

Whenever employees examined a video—and they examined *a lot*—the employees made subjective judgments.  Employees handpicked videos they "liked,"

and promoted them on the Staff Picks and HD channels.  JA601 [ECF 88-6 at 17].

Employees demoted "trashy" videos which were technically "allowed on the site," but which Vimeo did not want "to promote."  JA825 [ECF 90-6 at 40].  And employees differentiated between "unoriginal" and "original" content, removing the former from the site.  *See, e.g.*, JA943 [ECF 94-8 at 33].  These manual, editorial decisions required Vimeo employees to make fine-tuned, subjective assessments.

Among all these assessments, Vimeo *never* removed copyrighted music as "unoriginal."  Quite the opposite.  Music was a key ingredient to Vimeo's brand, and Vimeo affirmatively wanted users to post videos containing music to its site.  That was why Vimeo employees urged users to add music to set "the mood" for videos; encouraged users to produce specific types of content for the site, such as by featuring instructions on how to make infringing lip-dubs on Vimeo's homepage; offered technical help when users ran into difficulties adding music to uploads; made infringing videos with music to inspire users, like the company-wide lip-dub watched by millions; and manipulated the website's source code to attract users looking for infringing content.  *See* Rightsholders Br. 12-15, 40-41, 52 (collecting sources).

In short, record evidence shows that Vimeo deliberately curated its website to ensure it hosted "superior content"—specifically including copyrighted *music*—that was "inspirational" and "creative."  JA1008 [ECF 95-9 at 26] (capitalization

10

altered).  The District Court thus erred in granting summary judgment.  This case should have gone to trial.

## B.  Vimeo's Counterarguments Are Wrong.

Vimeo offers little response to this damning record, and largely ignores what it cannot refute.  Its factual arguments fall well short.  And its legal arguments do not move the needle.

### 1.  Vimeo Employees Were Not Neutral Arbiters.

Start with Vimeo's most peculiar claim: that its employees were "neutral as to the creative or other aspects of a video."  Vimeo Br. 31.  That is not true.  Whenever they curated a video, Vimeo's employees subjectively assessed the video's creativity, and manually manipulated the video's visibility accordingly.  *See, e.g.*, JA825 [ECF 90-6 at 40] ("bury trashy vids"); JA561-562 [ECF 88-4 at 103-104] (Vimeo buried content "not . . . exemplary of Vimeo-esc'd stuff"); JA906 [ECF 93-14 at 62] (staff made "editorial decisions for featured videos"); JA665 [ECF 89-1 at 23] (staff would search for "cool" videos).  Vimeo discriminated among content to maximize Vimeo's editorial vision.

Note, too, that Vimeo characterizes its editorial activities as "the mere ability to remove unwanted content after it is uploaded."  Vimeo Br. 24 (emphasis omitted). That is misleading.  Vimeo did not just *possess* the technical capacity to remove user content.  *Viacom*, 676 F.3d at 37.  It intentionally wielded that power (and then some)

11

to achieve a specific editorial goal. Vimeo's repeated, targeted activities were that "something more" which constitutes "the right and ability to control." *Id.* at 38 (internal quotation marks omitted).

### 2. Record Evidence Shows Extensive Employee Review Of Videos.

This Court should similarly reject Vimeo's assertions that during the time period relevant to this appeal, Vimeo was too big to control and employees had only "discretionary and sporadic" interactions with videos. Vimeo Br. 35-36 (quoting SPA44 [ECF 119 at 44]). That is also not true. As an initial matter, Vimeo ignores the sophisticated tools Vimeo developed to enable employees to scour the website. These tools allowed Vimeo's employees to target their efforts for maximum effect.

Moreover, Vimeo continues to rely on statistics from 2012—the very end of the claims period. That is disingenuous. Between 2007 and 2012, Vimeo grew from 40,000 registered users to 12.3 million, a *300-fold* increase. *See* JA127-128 [ECF 57 ¶¶ 6-7]. Vimeo assiduously avoids saying just how many daily videos users uploaded in 2007—but it does provide that information for 2012. If uploads were proportional to registered users, Vimeo received just *140 uploads* every day in 2007.[1] That explains how the community director watched every upload. *See supra* p. 9.

---

[1] Here is the math: The number of Vimeo users grew 307.5 times from 2007 to 2012 (12,300,000/40,000). In 2012, Vimeo users uploaded 43,000 videos daily. JA127-128 [ECF 57 ¶ 7]. If videos grew at the same rate, the number of daily videos in 2007 was 139.84 (43,000/307.5).

Vimeo points to other evidence suggesting that no one watched every upload. *See* Vimeo Br. 36 n.14. But haggling over which testimony or document to believe is a quintessential matter for the factfinder at trial.

Regardless, it does not matter whether Vimeo employees watched *everything*. On this, we and Vimeo agree. Vimeo Br. 36-37; Rightsholders Br. 46-47. The employees in *Cybernet* did not examine *all* "20 million images" "available on participating web sites." Vimeo Br. 36 (quoting *Cybernet*, 213 F. Supp. 2d at 1158). Yet that provider nonetheless was found to have exercised the right and ability to control the images on its sites. So too with Vimeo. The record evidence that Vimeo's employees sometimes watched and curated *every* video is just icing on the cake.

### 3. The Gameplay Purge Is Telling.

Vimeo also tries to brush aside its extensive gameplay purge. But the purge is an example of the degree of oversight Vimeo exerted over the website's content. As an initial matter, Vimeo (at 33-34) tries to rewrite the District Court opinion. But the court resolved a factual dispute. It stated that record evidence showing "a concerted effort to remove 'game play' videos on the Website" didn't "establish that Vimeo actually did so." SPA43 [ECF 119 at 43]. That is flat-out weighing evidence.

Vimeo also argues that its " 'gameplay' removals" were "unrelated to music copyrights," and therefore "shed no light whether Vimeo exerted 'substantial influence' " over "the use of music in the Videos-in-Suit." Vimeo Br. 34. But Vimeo

13

defines the relevant "infringing activity" too narrowly. 17 U.S.C. § 512(c)(1)(B); Vimeo Br. 33-34. The infringing activity in this case was uploading and sharing videos. That activity was *infringing* because those videos contained copyrighted music. But the *activity* Vimeo controlled was uploading and sharing. *See Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013) ("The term 'right and ability to control such activity' . . . emphasizes a general, structural relationship and speaks of 'such activity,' not any particular activity."). Put another way, the fact that Vimeo so carefully controlled one category of user uploads (*e.g.*, videos of gameplay) is indicative of Vimeo's right and ability to control another category of uploads (*e.g.*, videos with infringing music).

Section 512(c) holds providers responsible when they have the capacity to leverage a preexisting "right and ability to control" to prevent "infringing activity." 17 U.S.C. § 512(c)(1)(B). Section 512(c) thus protects a provider when it controls one feature of its website, but users infringe copyright through a different feature. Imagine Vimeo's users had infringed copyright through a private messenger function on Vimeo's website. In that hypothetical, Vimeo's control over videos would not constitute "the right and ability to control" private messages.

That is not, however, what happened here. When Vimeo purged gameplay videos from its platform in 2008, Vimeo controlled the exact type of user activity— uploaded videos—that resulted in infringement. In fact, senior Vimeo employees

*acknowledged* the fundamental similarities between Vimeo's efforts to purge game-play and any potential efforts to purge infringing music. *See* JA950 [ECF 94-8 at 49]. That Vimeo so vigorously prosecuted gameplay videos but embraced videos with infringing music is precisely why Vimeo possessed "the right and ability to control" users' "infringing activity." 17 U.S.C. § 512(c)(1)(B).

### 4. Vimeo's Quibbles With The "Something More" Test Are Meritless.

Vimeo complains that asking whether a provider exercises editorial judgment is not a sufficiently bright-line rule. Vimeo Br. 40-41. But this Court has acknowledged that "how to define the 'something more' that is required" is a "difficult . . . question." *Viacom*, 676 F.3d at 38. If there were a pat answer, this Court would have adopted it in *Viacom*.

Vimeo's suggestion that *all* efforts "to restrict or regulate uploaded content" are "based on content" and so are "obviously editorial in nature" is sophistry. Vimeo Br. 41. There is a meaningful difference in kind between a provider identifying clearly inappropriate material (*e.g.*, weeding out pornography on a real-estate web-site), and handpicking "cool" videos. The former act involves minimal "sampling" to determine the category of content at issue (Is this pornography or a house?). *Vimeo I*, 826 F.3d at 96; *see, e.g.*, *Motherless*, 885 F.3d at 601. The latter effort involves determining the content's subjective merit (Is this video "cool?"). The

15

former does not involve the provider exercising editorial control over the content; the latter does.  Will there be close calls?  Of course.  Is this case one?  No.

Vimeo's own cited cases belie its suggestion its actions were commonplace.  For instance, Vimeo touts the remand decision in *Viacom*.  *See* Vimeo Br. 25-26, 42-43.   There, Viacom put forward evidence that YouTube on two occasions featured a video "clip-in-suit" on its homepage.   On both occasions, however, the clip was *not infringing*.  *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 121 (S.D.N.Y. 2013).  Because that was the "only evidence" Viacom had proffered that YouTube "steered viewers toward infringing videos," and the clips were not infringing, the district court concluded that no reasonable juror could find sufficient "editorial control" over the site.  *Id.*  We think that reasoning on remand is wrong based on this Court's decision in *Viacom* itself; the control is over the infringing *activity* of uploading, not over a particular infringing clip.  But it does not matter:  In contrast to that case, Vimeo employees handpicked *dozens* of infringing videos-in-suit and featured them on Vimeo's Staff Picks and HD channels.  JA1209-1333 [ECF 219-1 Column P—"Vimeo-Moderated or Known Channels"].

Or consider *Io Group*.  Vimeo Br. 43.  There, the service provider conducted "occasional 'spot checks' of video files" to ensure they were not (for example) "junk mail" or "harassing."  *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1150-51 (N.D. Cal. 2008).  By contrast, Vimeo's editorial team reviewed entire

16

videos to determine whether to promote, demote, or purge content. The notion Vimeo was like any other service provider is not true.

### 5. None Of This Was Forfeited.

Vimeo also claims the rightsholders forfeited this argument below. Vimeo Br. 38. Not so. The rightsholders have consistently argued that to possess "the right and ability to control," a provider need not control specific infringements, but must instead control the users' infringing activity, and that Vimeo did so here. JA165 [ECF 69 at 30] (citing *Viacom*, 676 F.3d at 38). And to the extent Vimeo is complaining that the phrase "editorial judgment" did not itself appear below, this Court "does not demand the incantation of particular words" to preserve an argument; "rather, it requires that the lower court be fairly put on notice as to the substance of the issue." *Nelson v. Adams USA, Inc.*, 529 U.S. 460, 469 (2000). Throughout this case, and as new decisions on point arose, the rightsholders have consistently explained that Vimeo was unique in its efforts "to 'curate' the content on its website in furtherance of its goal to develop its image and brand." JA165 [ECF 69 at 30]. There is no forfeiture here.

### 6. Remanding For Trial Will Not Break The Internet.

Finally, Vimeo and its frequent-filer *amici* claim that enforcing "the right and ability to control" would break the Internet. Vimeo Br. 43-44; Electronic Frontier Foundation et al. (EFF) Br. 11-17; Intellectual Property Scholars Br. 23-24. That

canard is trotted out in every Internet copyright case. It is also overblown. In recent years, major service providers like Facebook and TikTok have chosen to police web-sites for things like "vaccine misinformation," Vimeo Br. 43, and have taken an ac-tive role in making "Internet communities safer, healthier, and more inclusive." EFF Br. 17. Those major providers also license music and other intellectual property. *See* National Music Publishers' Association et al. (NMPA) Br. 17-20. As a result, they need not worry if content moderation morphs into "control." And as our *amici* explain, these arrangements benefit everyone involved, users included. *Id*. at 20.

It is fair to require service providers that aggressively moderate content to protect rightsholders' intellectual property with the same (or at least *some*) zeal. That is true if a provider curates "trashy" or "cool" videos, as Vimeo did. It is equally true if a provider curates good and bad vaccine videos. Vimeo Br. 43-44. That basic principle of fairness is at the heart of the DMCA's "right and ability to control" provision, and this Court should enforce it. Vimeo could have adopted that approach in the mid-2000s. Rightsholders Br. 14. It decided not to.

### C. This Court Should Reject Vimeo's Argument That "The Right And Ability To Control" Is Limited To Prescreening.

Apparently recognizing that it exercised considerable editorial control over its website, Vimeo asks this Court to define "the right and ability to control" to mean only "prescreening." This Court should reject that interpretation.

Vimeo argues that because it "did not prescreen the videos that its users posted," Vimeo can do what it likes, "no matter what degree of 'editorial judgment' it may exercise in the process." Vimeo Br. 23-25. This makes no sense. Whether extensive control is wielded ex-ante or ex-post, the result remains the same: a highly curated website. Adopting Vimeo's arbitrary distinction would allow every website to circumvent copyright law, so long as the website waits one beat.

Vimeo's legal theory also has no basis in Section 512(c). The statute could have said—but does not—that a provider must "control" infringing activity *before* users upload material. Or had Congress thought "prescreening" was all that mattered, it could have used that word. Instead, it used a more capacious term—"the right and ability to control"—with common-law roots. 17 U.S.C. § 512(c). This Court should not rewrite Section 512(c) by judicial fiat.

Nor does Vimeo's arbitrary rule have any basis in *Viacom*. *Viacom* cited the very cases Vimeo claims support drawing the line at "prescreening," including *Cybernet* and *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724 (S.D.N.Y. 2012). But *Viacom* rejected "importing a specific knowledge requirement" into the control test, and adopted the "substantial influence" standard instead. *Viacom*, 676 F.3d at 36, 38. This Court's "fact-based," context-specific approach to "the right and ability to control," *id.* at 36, is the opposite of the rigid rule Vimeo proposes.

19

Similarly, neither of the two courts to have found "the right and ability to control" rested their ruling on prescreening. Those courts examined the entire nature of the provider's editorial control. *See Mavrix*, 873 F.3d at 1059; *Cybernet*, 213 F. Supp. 2d at 1181-82.

Examining Vimeo's other preferred precedent also shows little support for interpretating "the right and ability to control" to mean only prescreening. Vimeo presents the district court's decision in *Wolk* as requiring prescreening. Vimeo Br. 27. But *Wolk* predated *Viacom* and involved a *pro se* litigant. 840 F. Supp. 2d at 728. It also offered just one sentence of legal analysis: A "right and ability to control must take the form of prescreening content, rendering extensive advice to users regarding content and editing user content." *Id*. at 748. While ideal dictum for Vimeo, it was unnecessary to decide that case: There was no evidence in *Wolk* that the service provider engaged in *any* meaningful control. And in all events, this Court's subsequent decision in *Viacom* did not embrace *Wolk*'s dictum.

Or consider *Obodai v. Demand Media, Inc.*, No. 11 Civ. 2503(PKC), 2012 WL 2189740 (S.D.N.Y. June 13, 2012). The result there had nothing to do with a lack of "prescreening." The *Obodai* plaintiff claimed the provider exercised control through "a software tool" that measured "search-engine traffic to specific pages." *Id*. at *6; *see id*. at *8. The district court held that, because the software reported "only on site traffic, and not the content of user postings," the service provider did

20

not exert control.  *Id*. at *8.  Here, Vimeo did not just review site traffic; it curated "the content."  *Id*.

Vimeo also cites *Downs v. Oath Inc.*, 385 F. Supp. 3d 298 (S.D.N.Y. 2019). There, users "self-published" "articles directly to" the Huffington Post; HuffPost employees "engaged in cursory screening and modification" of the articles.  *Id*. at 308.  But the district court's decision did not hinge on the fact that screening "came after uploading."  Vimeo Br. 27-28.  Instead, the court held that the employees' "level of involvement" did not rise to the "right and ability to control."  *Downs*, 385 F. Supp. 3d at 308.  We disagree with the ultimate outcome in *Downs*, but we agree with its approach: A court should focus on the nature of the provider's engagement with and editorial control over content.  Under that test—and given the standard of review at summary judgment—Vimeo possessed the right and ability to control.

Finally, nothing in Section 512(m) immunizes Vimeo's behavior or limits "the right and ability to control" to only prescreening, as Vimeo suggests.  Vimeo Br. 31, 32-33, 34-35.  Section 512(m) states that the DMCA shall not "be construed to condition" the safe harbor on "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity."  17 U.S.C. § 512(m)(1).  Section 512(m) therefore protects a provider who does *not* curate its content from needing to monitor its network for infringement.  Rightsholders Br. 44.  Once a provider starts curating content, however, Section 512(m) no longer applies.  At that point,

the provider cannot invoke Section 512(c) because it's curating its platform—not because it has failed to monitor its service. *See Viacom*, 676 F.3d at 35.

Vimeo's contrary approach would immunize every act that involves "monitoring" a provider's "service." That is untenable. It would immunize all types of editorial review—including prescreening and postscreening. And it would completely contradict *Cybernet* and *Mavrix*, which involved providers reviewing their services for unwanted material. Rightsholders Br. 44.

Meanwhile, our interpretation of Section 512(m) is fully consistent with *Vimeo I*. In *Vimeo I*, this Court held that the fact that Vimeo sought out and removed some infringing content did not mean Vimeo *was willfully blind* to other infringing content. *See Vimeo I*, 826 F.3d at 98 (characterizing Section 512(m) as a "statutory privilege not to monitor for infringement"). But this appeal has nothing to do with willful blindness. Vimeo cannot invoke 512(c) because it affirmatively curated videos for its own gain, and many of its videos contained copyrighted material. If this Court concludes that Section 512(m) immunizes Vimeo's conduct here, this Court would contradict *Cybernet* and *Mavrix*, and radically expand DMCA immunity to the point of making Section 512(c)(1)(B) surplusage. Rightsholders Br. 44.

22

## II. A REASONABLE JUROR COULD ALSO FIND THAT VIMEO RE-CEIVED A DIRECT FINANCIAL BENEFIT.

Vimeo did not curate content for art's sake. It was a business. It sought to turn a profit. As the record shows, Vimeo received "a financial benefit directly attributable to the infringing activity." 17 U.S.C. § 512(c)(1)(B).

For starters, Vimeo intentionally monetized its lip-dub channel, cashing in on that inherently infringing meme. Rightsholders Br. 50-51. More generally, the record shows that Vimeo earned ad revenue "directly attributable" to its infringing content. And because infringing videos garnered more views on average, infringing content was more profitable for Vimeo than non-infringing content. Rightsholders Br. 51-52. Additionally, users reported that they were drawn to the site because Vimeo was a safe haven for infringement. *Id.* at 53.

Vimeo offers no meaningful response. As an initial matter, this Court should decline Vimeo's invitation (at 44-46) to split with the Ninth Circuit and apply something other than the common-law standard. *See Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1117 (9th Cir. 2007) (holding that " 'direct financial benefit' should be interpreted consistent with the similarly-worded common law standard for vicarious copyright liability."). So long as the "identity between the common law words and the statutory words is clear," "the common-law meaning canon applies." *United States v. Soler*, 759 F.3d 226, 233 (2d Cir. 2014).

But under any standard, Vimeo received a benefit directly attributable to the infringement. Vimeo characterizes the Carmex lip-balm deal as "plainly *de minimis*." Vimeo Br. 47-48. De minimis? Carmex paid over $10,000 per month to sponsor the lip-dub channel. JA842 [ECF 90-9 at 14]. And in any event, the amount doesn't matter: Under Section 512(c), a "financial benefit need not be substantial or a large proportion of the service provider's revenue." *Mavrix*, 873 F.3d at 1059.

Additionally, Vimeo is wrong that the lip-dub revenue was not linked to infringement. Vimeo Br. 47-48. Lip-dubs involved synchronizing popular, copyrighted recordings to videos; the meme was inherently infringing. Vimeo does not even try to offer evidence that *anything* on the lip-dub channel was actually "a fair use or authorized." *Id.* Without infringement, Vimeo would not have ever received its "lump-sum payment" because there would have been no content on the entire channel. *Id.*[2]

Vimeo's other ad revenue was also directly attributable to infringement. *First*, contrary to Vimeo's claim (at 47-48), multiple courts have held that ad revenue *can* constitute a direct financial benefit. The court in *Mavrix* permitted a jury to decide financial benefit where the subject website "derive[d] revenue from advertising

---

[2] Vimeo's claim that it did not "create or moderate" Lip Dub Stars is disingenuous. Vimeo Br. 48 n.23. Vimeo featured Lip Dub Stars as a channel "we like," sought sponsorship, and internally touted its efforts. JA305; 956 [ECF 74-1 at 28; 94-8 at 55].

24

based on the number of views." 873 F.3d at 1059. And the court in *Fung* held that advertising revenue constituted a direct financial benefit. 710 F.3d at 1045.

*Second*, Section 512(c) does not require the ad to have been placed "specifically *because* the video on that page contained infringing music." Vimeo Br. 48 (emphasis added). Quite the opposite. Congress instructed Courts to "take a common-sense, fact-based approach, not a formalistic one" to "determining whether the financial benefit criterion is satisfied." S. Rep. No. 105-190, at 44 (1998); *Mavrix*, 873 F.3d at 1059 (quoting same). The fact that Vimeo earned revenue directly attributable to each infringing video satisfies the statute.

*Third*, in any event, the record facts show that infringing videos-in-suit earned more revenue on average, 10-20% of all Vimeo videos contained infringing music, and Vimeo manipulated the website's source code to attract users searching for infringing content. Rightsholders Br. 12, 52. These facts establish an even closer, direct connection between the infringement and Vimeo's resulting ad revenue, and they should go to a jury.

Finally, Vimeo does not dispute the considerable evidence demonstrating that users flocked to Vimeo because Vimeo was a haven for infringing content. *See* Rightsholders Br. 53-54. Vimeo's only complaint is there is no direct testimony from specific users confirming they were drawn to Vimeo because of the particular videos-in-suit. Vimeo Br. 49. Even if Vimeo were correct that only revenue from

25

the videos-in-suit matters, juries are allowed to reason from circumstantial evidence. The rightsholders identified 1,600 specific infringing videos, which were far more popular than typical Vimeo videos. JA308-309 [ECF 75 ¶¶ 6, 10]. A reasonable jury could easily conclude that the popular, infringing videos-in-suit drew in at least some paying subscribers.

## III. A REASONABLE JUROR COULD FIND THAT VIMEO HAD RED-FLAG KNOWLEDGE.

The District Court's decision on red-flag knowledge was an independent reversible error. This aspect of the case boils down to two essential fact questions: Did Vimeo employees know the music was obviously unauthorized, and did they know it was obviously not fair use. These are the precise kinds of "expertise" and "knowledge with respect to the market for music and the laws of copyright" that this Court said *could* give rise to red-flag knowledge. *Vimeo I*, 826 F.3d at 97. The District Court erred in granting summary judgment.

### A. Employees Knew Facts That Meant The Videos Were Obviously Unlicensed.

A jury could find that Vimeo employees knew facts that made it obvious the rightsholders had not authorized Vimeo users to use everything from The Beatles to The Beastie Boys in amateur videos. Vimeo's employees had specific experience licensing music, and knew how challenging that process was. Rightsholders Br. 56; *see* NMPA Br. 8-17 (describing difficulties of licensing). And after December 2008,

*every* employee knew that the rightsholders had not authorized their music *anywhere* on Vimeo. Rightsholders Br. 57-58.

That last point bears emphasis. And Vimeo does not contest it. Instead, Vimeo suggests that a rightsholder's letter cannot give rise to red-flag knowledge. That again could be so, in some other hypothetical case. But here, the facts show that *every* Vimeo employee knew about the rightsholders' demands—and mocked them in company-wide emails. Vimeo employees thus had categorical knowledge about the rightsholders' licensing practices. *See EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79, 93 (2d Cir. 2016). Vimeo employees watched 221 videos after the December 2008 letter, and knew each one was obviously unlicensed.

Vimeo's other arguments fare no better. Yes, generously read, text in two (2) videos indicated the user purported to possess a license. Vimeo Br. 57. Both videos were uploaded *after* the 2008 letter, and were therefore not indicative of authorization. *See* JA1294, 1318 [ECF 219-1 at 89, 113] (Video Nos. 201, 265). If anything, the express reference to "EMI" in the captions made users' infringement easier to spot. Meanwhile, Vimeo never reckons with videos like the one with credits pleading, tongue-in-cheek: "Please don't sue us." Video 6 at 4:08. How could anyone think *that* lip-dub was authorized? Finally, Vimeo's suggestion (at 56-57) that employees—despite everything they knew—could think users had jumped through every necessary licensing hoop is outlandish. *See* NMPA Br. 8-17. The question is

whether a reasonable juror could find the lack of authorization to have been "obvious," not whether employees could dispel every iota of doubt. *Vimeo I*, 826 F.3d at 94.[3]

### B. Employees Knew Facts That Meant The Videos Were Obviously Not Fair Use.

Vimeo's employees also knew facts that made it obvious videos synchronized to popular recordings, such as lip dubs, were not fair use. Employees repeatedly told users as much. And Vimeo's lawyers told employees to stop uploading videos with music.

Vimeo doubles down on fair use, but it misrepresents that doctrine in the process. Don't take our word for it; take Vimeo's. Vimeo's own Frequently Asked Questions page stated that "unauthorized use of a popular song in the background of your video" "constitute[s] clear violation[]" of copyright law. JA1127 [ECF 189-8 at 8]. Correct. Not a single one of the four fair-use factors favors synchronizing entire recordings to videos. *See* NMPA Br. 22-26.

Before this Court, Vimeo argues that fair use is always a hard question. Vimeo Br. 53-54. But Vimeo does not point to any court that has ever approved of synchronizing an entire, unaltered recording to a video. For good reason: None has.

---

[3] Vimeo points (at 57) to the fact that three Vimeo users submitted counter-notifications. But piecemeal attacks on specific videos-in-suit are exactly why a jury should sift through the evidence.

NMPA Br. 23.  There may be hard fair-use cases that bedevil even copyright experts.  User lip dubs are not hard cases.

To understand how far Vimeo overreaches, consider the facts of *Brown v. Netflix, Inc.*, 855 F. App'x 61 (2d Cir. 2021) (summary order), which Vimeo says demonstrates the difficulty of determining fair use, Vimeo Br. 54.  *Brown* found fair use when a documentary film about burlesque art briefly showed "part of" a "dancer's performance," and "incidentally capture[d]" "eight seconds" of a sound recording "as brief background accompaniment to her burlesque act."  855 F. App'x at 63-64.  Describing that opinion demonstrates its inapplicability here.  So too with *Red Label Music Publishing, Inc. v. Chila Productions*, 388 F. Supp. 3d 975, 984 (N.D. Ill. 2019), where documentary "filmmakers used the song for eight seconds in the 100-minute documentary, only four [seconds] of which contain lyrics."  And in *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 322 (S.D.N.Y. 2008), the filmmaker incorporated a 15-second excerpt of a song "for purposes of criticism and commentary."  There is no relationship between those contexts and this one, and no meaningful argument that lip-dubs and other Vimeo videos—which used entire re-cordings—were fair use.

Vimeo employees knew that users needed licenses to make lip-dubs and sim-ilar synchronizations.  Vimeo does not point to evidence in which *any* employee thought otherwise.  Instead, Vimeo quibbles (at 55) over the fact that employees

knew that "adding a third party's copyrighted content to a video generally (but not always) constitutes copyright infringement." JA904 [ECF 93-14 at 52]. The "but not always" carveout does not save Vimeo at summary judgment. A jury could easily decide that employees knew the caveat referenced brief sampling, not using entire recordings.

Vimeo itself extinguished any lingering doubt on the issue when its attorneys directed employees to cease uploading videos with copyrighted content. Rightsholders Br. 59 (collecting record cites). Vimeo now says (at 55) that it was just taking "a conservative approach," because Vimeo cannot claim the "safe harbor for employee infringement." But the reason Vimeo had to worry about employee uploads was because the uploads were *infringing*. That proves our point: Employees knew they—and by extension the users—were not engaged in fair use.

In any event, Vimeo is correct that we do not know precisely what Vimeo's lawyers said. Vimeo vigorously asserted privilege below on that exact issue. *See, e.g.*, JA622-625 [ECF 88-6 at 56-59]. Given the information we do have, a jury could certainly infer employees were told some version of what Vimeo ultimately put on its website: Using copyrighted music as a soundtrack to video is obviously not fair use. JA1127 [ECF 189-8 at 8].

## CONCLUSION

For the foregoing reasons, and those in the opening brief, the District Court's judgment should be vacated and the case remanded for jury trial.

Respectfully submitted,

/s/ Catherine E. Stetson
CATHERINE E. STETSON
NATHANIEL A.G. ZELINSKY
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600
cate.stetson@hoganlovells.com

August 30, 2022

*Counsel for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE

1.      This document complies with the type-volume limits of Fed. R. App.

P. 32(a)(7) because, excluding the parts of the document exempted by Fed. R. App.

P. 32(f), this document contains 6,995 words.

2.      This document complies with the typeface requirements of Fed. R.

App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6)

because this document has been prepared in a proportionally spaced typeface using

Microsoft Word for Office 365 in 14-point Times New Roman.

/s/ Catherine E. Stetson
Catherine E. Stetson

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing was filed with the Clerk using the appellate CM/ECF system on August 30, 2022. All counsel of record are registered CM/ECF users, and service will be accomplished by the CM/ECF system.

/s/ Catherine E. Stetson
Catherine E. Stetson