# 21-2949-cv(L), 21-2974-cv(CON)

## United States Court of Appeals

*for the*

## Second Circuit

———————————————

CAPITOL RECORDS, LLC, a Delaware Limited Liability Company,
CAROLINE RECORDS, INC., a New York Corporation, VIRGIN RECORDS
AMERICA, INC., a California Corporation, EMI BLACKWOOD MUSIC INC.,
a Connecticut Corporation, EMI APRIL MUSIC INC., a Connecticut
Corporation, EMI VIRGIN MUSIC, INC., a New York Corporation, COLGEMS-
EMI MUSIC, INC., a Delaware Corporation, EMI VIRGIN SONGS, INC., a New
York Corporation, EMI GOLD HORIZON MUSIC CORP., a New York
Corporation, EMI UNART CATALOG INC., a New York Corporation, STONE
DIAMOND MUSIC CORPORATION, a Michigan Corporation,

———————————————

*(For Continuation of Caption See Inside Cover)*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## FINAL FORM BRIEF FOR DEFENDANTS-APPELLEES

KATHLEEN M. SULLIVAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
(213) 443-3000

MICHAEL A. CHEAH
VIMEO, INC.
330 West 34th Street, 5th Floor
New York, New York 10001
(212) 314-7300

TODD ANTEN
OWEN F. ROBERTS
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000

RACHEL KASSABIAN
QUINN EMANUEL URQUHART
  & SULLIVAN, LLP
555 Twin Dolphin Drive, 5th Floor
Redwood Shores, California 94065
(650) 801-5000

*Attorneys for Defendants-Appellees*

EMI U CATALOG INC., a New York Corporation,
JOBETE MUSIC CO., INC., a Michigan Corporation,

*Plaintiffs-Appellants,*

– v. –

VIMEO, INC., a Delaware Limited Liability Company, AKA Vimeo.com,
CONNECTED VENTURES, LLC, a Delaware Limited Liability Company,

*Defendants-Appellees,*

DOES, 1-20 inclusive,

*Defendants.*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Defendant-Appellee Vimeo, Inc. is a publicly held corporation, and no publicly held corporation owns 10% or more of its stock.

Defendant-Appellee Connected Ventures, LLC is majority controlled by Connected Ventures Management Holdings, LLC, and no publicly held corporation owns 10% or more of its stock.

## **TABLE OF CONTENTS**

**Page**

CORPORATE DISCLOSURE STATEMENT ..........................................................i

TABLE OF AUTHORITIES ...........................................................................iv

PRELIMINARY STATEMENT ........................................................................1

COUNTER-STATEMENT OF ISSUES PRESENTED ...........................................4

COUNTER-STATEMENT OF FACTS .............................................................5

    A.    The DMCA ....................................................................................5

    B.    Vimeo's Video-Hosting Business ........................................................7

    C.    How The Vimeo Platform Works .........................................................9

    D.    Vimeo Staff's Lack Of Expertise In Music Or Copyright Law..........12

    E.    The Proceedings Below And This Court's Interlocutory Opinion ...................................................................................................12

    F.    The Orders On Appeal ......................................................................15

        1.    The District Court's Grant Of Summary Judgment To Vimeo On "Substantial Influence" ...........................................15

        2.    The District Court's Grant Of Summary Judgment To Vimeo On "Red Flag" Knowledge ...........................................17

SUMMARY OF ARGUMENT ..............................................................................19

ARGUMENT ...................................................................................................23

I.    THE DISTRICT COURT CORRECTLY FOUND NO TRIABLE ISSUE OF FACT ON VIMEO'S LACK OF "SUBSTANTIAL INFLUENCE" OVER THE INFRINGING ACTIVITY ..............................23

    A.    Vimeo's *Ex Post* Monitoring And Removal Of User-Uploaded Videos Cannot Create A Triable Issue On Vimeo's Lack Of "Substantial Influence" Over The Infringing Activity........................24

1.      No Reasonable Jury Could Find Vimeo Exerted "Substantial Influence" Over The Infringing Activity .............24

2.      The Court Should Reject Plaintiffs' Novel "Two-Step" "Editorial Judgment" Test.........................................................37

B.    No Reasonable Jury Could Find Vimeo Received A "Financial Benefit Directly Attributable" To The Infringing Activity.................44

II.    THE DISTRICT COURT CORRECTLY FOUND NO TRIABLE ISSUE OF FACT ON VIMEO'S LACK OF "RED FLAG" KNOWLEDGE ...............................................................................49

A.    Plaintiffs Must Prove An Ordinary Person Would Know The Use Of Music In A Video Was "Obviously" Infringing....................50

B.    No Reasonable Jury Could Find That Plaintiffs Proved The Use Of Music In Any Video-In-Suit Was "Obviously" Infringing Under *Vimeo I* .....................................................................................51

1.      There Is Not Legally Sufficient Evidence Showing The Use Of Music In Any Video-In-Suit "Obviously" Was Not Fair .....................................................................................52

2.      There Is Not Legally Sufficient Evidence Showing The Use Of Music In Any Video-In-Suit "Obviously" Was Not Authorized..........................................................................56

CONCLUSION.............................................................................................60

CERTIFICATE OF COMPLIANCE WITH RULE 32(a) .....................................61

CERTIFICATE OF FILING AND SERVICE .......................................................62

iii

# TABLE OF AUTHORITIES

**Page**

## Cases

*Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*,
  11 F.4th 26 (2d Cir. 2021), *cert. granted*, No. 21-869 (Mar. 28, 2022) .............53

*Brown v. Netflix, Inc.*,
  855 F. App'x 61 (2d Cir. 2021) .............................................................54

*BWP Media USA, Inc. v. Clarity Digital Grp., LLC*,
  820 F.3d 1175 (10th Cir. 2016) .................................................... 28, 43

*Campbell v. Acuff-Rose Music, Inc.*,
  510 U.S. 569 (1994) ..............................................................................53

*Capitol Records, Inc. v. MP3tunes, LLC*,
  821 F. Supp. 2d 627 (S.D.N.Y. 2011)......................................... 46, 48
  2013 WL 1987225 (S.D.N.Y. May 14, 2013)....................................46

*Capitol Records, Inc. v. Naxos of Am., Inc.*,
  372 F.3d 471 (2d Cir. 2004) ................................................................29

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) ........................................................ *passim*

*Cariou v. Prince*,
  714 F.3d 694 (2d Cir. 2013) ................................................................53

*Carter v. United States*,
  530 U.S. 255 (2000) ............................................................................46

*Chapman v. Maraj*,
  2020 WL 6260021 (C.D. Cal. Sept. 16, 2020)..................................54

*Columbia Pictures Indus., Inc. v. Fung*,
  710 F.3d 1020 (9th Cir. 2013)............................................................34

*CoStar Grp., Inc. v. LoopNet, Inc.*,
  373 F.3d 544 (4th Cir. 2004)..............................................................41

*Davis v. Pinterest, Inc.*,
  2022 WL 1316566 (N.D. Cal. May 3, 2022) .....................................28

*Downs v. Oath Inc.*,
  385 F. Supp. 3d 298 (S.D.N.Y. 2019)............................... 27, 42, 47, 48

*Ellison v. Robertson*,
　　357 F.3d 1072 (9th Cir. 2004) ............................................................................44

*EMI Christian Music Grp., Inc. v. MP3tunes, LLC*,
　　844 F.3d 79 (2d Cir. 2016) ...............................................................................59

*Feingold v. RageOn, Inc.*,
　　472 F. Supp. 3d 94 (S.D.N.Y. 2020) .................................................................26

*Greg Young Publ'g, Inc. v. Zazzle, Inc.*,
　　2017 WL 2729584 (C.D. Cal. May 1, 2017).....................................................26

*Havlish v. 650 Fifth Ave. Co.*,
　　934 F.3d 174 (2d Cir. 2019) .............................................................................45

*In re Nortel Networks Corp. Secs. Litig.*,
　　539 F.3d 129 (2d Cir. 2008) .............................................................................38

*Io Grp., Inc. v. Veoh Networks, Inc.*,
　　586 F. Supp. 2d 1132 (N.D. Cal. 2008)..................................... 28, 37, 39, 42, 43

*Italian Book Corp. v. Am. Broad. Cos.*,
　　458 F. Supp. 65 (S.D.N.Y. 1978) ......................................................................54

*Kinsley v. Udemy, Inc.*,
　　2021 WL 1222489 (N.D. Cal. Mar. 31, 2021) ...................................................44

*Lennon v. Premise Media Corp.*,
　　556 F. Supp. 2d 310 (S.D.N.Y. 2008) ................................................................54

*Mavrix Photographs, LLC v. Livejournal, Inc.*,
　　873 F.3d 1045 (9th Cir. 2017) .................................................................... 27, 34

*McKinney v. Alabama*,
　　424 U.S. 669 (1976) .........................................................................................40

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*,
　　545 U.S. 913 (2005) .........................................................................................24

*Obodai v. Demand Media, Inc.*,
　　522 F. App'x 41 (2d Cir. 2013)..........................................................................28
　　2012 WL 2189740 (S.D.N.Y. June 13, 2012)....................................................28

*Perfect 10, Inc. v. Cybernet Ventures, Inc.*,
　　213 F. Supp. 2d 1146 (C.D. Cal. 2002)................................ 16, 24, 26, 27, 31, 36

*Red Label Music Publ'g, Inc. v. Chila Prods.*,
　　388 F. Supp. 3d 975 (N.D. Ill. 2019).................................................................54

*Robinson v. Concentra Health Servs., Inc.*,
781 F.3d 42 (2d Cir. 2015) ................................................................. 58

*Seltzer v. Green Day, Inc.*,
725 F.3d 1170 (9th Cir. 2013) ............................................................ 53

*Shapiro, Bernstein & Co. v. H.L. Green Co.*,
316 F.2d 304 (2d. Cir. 1963) .............................................................. 46

*Sid Avery & Assocs., Inc. v. Pixels.com, LLC*,
2021 WL 736258 (C.D. Cal. Feb. 24, 2021) ...................................... 26

*Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*,
2022 WL 1501024 (S.D.N.Y. May 12, 2022) ..................................... 54

*Stross v. Meta Platforms, Inc.*,
2022 WL 1843129 (C.D. Cal. Apr. 6, 2022) ....................................... 49

*Threshold Media Corp. v. Relativity Media, LLC*,
2013 WL 12331550 (C.D. Cal. Mar. 19, 2013) .................................. 54

*UMG Recordings, Inc. v. Shelter Cap. Partners LLC*,
718 F.3d 1006 (9th Cir. 2013) ............................................... 29, 43, 59

*United States v. Ng Lap Seng*,
934 F.3d 110 (2d Cir. 2019) ............................................................... 33

*United States v. Olmeda*,
837 F. App'x 52 (2d Cir. 2020) .......................................................... 50

*Ventura Content, Ltd. v. Motherless, Inc.*,
885 F.3d 597 (9th Cir. 2018) .............................. 29, 32, 43, 45, 47, 49, 58
2013 WL 11237204 (C.D. Cal. July 3, 2013) ........................... 30, 37, 43

*Viacom Int'l Inc. v. YouTube, Inc.*,
676 F.3d 19 (2d Cir. 2012) ...................... 2, 16, 20, 25, 27, 29, 35, 39
940 F. Supp. 2d 110 (S.D.N.Y. 2013) ................................. 25, 32, 33, 37, 42, 43
718 F. Supp. 2d 514 (S.D.N.Y. 2010) ................................................ 45

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
396 F.3d 96 (2d Cir. 2005) ................................................................. 38

*Wolk v. Kodak Imaging Network, Inc.*,
569 F. App'x 51 (2d Cir. 2014) .......................................................... 27
840 F. Supp. 2d 724 (S.D.N.Y. 2012) ..................................... 27, 47, 48
2011 WL 940056 (S.D.N.Y. Mar. 17, 2011) ...................................... 59

## **Statutes**

17 U.S.C. § 512(c) ................................................................. 5, 6, 25

17 U.S.C. § 512(c)(1) ...................................................................5, 6

17 U.S.C. § 512(c)(1)(A)(ii) ...................................................... 3, 5, 13

17 U.S.C. § 512(c)(1)(B) ........................................................ *passim*

17 U.S.C. § 512(c)(2) .....................................................................7

17 U.S.C. § 512(m) ......................................... 7, 21, 31, 32, 33, 34, 59

17 U.S.C. § 512(i) ........................................................................7

## **Legislative Authorities**

H.R. Rep. 105-551 (II) (July 22, 1998) ................................................45

S. Rep. No. 105-190 (May 11, 1998) ................................................5, 45

## **Other Authorities**

4 NIMMER ON COPYRIGHT § 12B.04 (2022) ..........................................45

Antigone Davis, *Advancing Our Policies on Online Bullying and Harassment,* META*, (*Oct. 13, 2021) https://about.fb.com/news/2021/10/advancing-online-bullying-harassment-policies/ ...............................................43

Instagram, *Community Guidelines*, INSTAGRAM, https://help.instagram.com/477434105621119 ....................................44

Edward Lee, *Decoding the DMCA Safe Harbors*, 32 COLUM. J.L. & ARTS 233 (2009) ..........46

LinkedIn, *Violent And Graphic Content*, LINKEDIN, https://www.linkedin.com/help/linkedin/answer/137374. ..................44

TikTok, *Community Guidelines*, TIKTOK, https://www.tiktok.com/community-guidelines#34 ...............................................................44

Twitter, *Hateful Conduct Policy*, TWITTER, https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy ...........................................44

YouTube, *Vaccine Misinformation Policy*, GOOGLE, https://support.google.com/youtube/answer/11161123 ......................43

## **PRELIMINARY STATEMENT**

This appeal arises from two orders by the District Court for the Southern District of New York (Abrams, J.) interpreting the safe harbors of the Digital Millennium Copyright Act of 1998 ("DMCA"), and granting Vimeo summary judgment against claims of copyright infringement arising from its users' videos. In both orders, the district court dutifully applied this Court's precedents— including its earlier interlocutory ruling, 826 F.3d 78 (2d Cir. 2016) ("*Vimeo I*")— to find that, after thirteen years of litigation, Plaintiffs have yet to offer any evidence of a triable issue of fact that Vimeo falls outside of the DMCA's capacious safe harbor. This has dragged on long enough—the Court should affirm.

Vimeo operates an online platform that allows users to upload and share videos. Plaintiffs, a group of music publishing and recording companies, sued Vimeo for copyright infringement for hosting over 1,600 user-created, user-uploaded videos that had audio components incorporating certain of Plaintiffs' songs (the "Videos-in-Suit"). Plaintiffs purposefully did not avail themselves of the DMCA's notice-and-takedown regime by sending Vimeo notices for *any* Video-in-Suit. Instead, Plaintiffs sued Vimeo in pursuit of a bonanza of statutory damages. This gambit has failed along with Plaintiffs' legal arguments.

Plaintiffs argue in essence that: (1) because Vimeo removed some user-uploaded videos for copyright and other reasons, it is *per se* ineligible for safe

1

harbor; and (2) whenever a Vimeo employee comes across *any* video containing music, she must remove it on sight for Vimeo to retain safe harbor. Each point reprises arguments the Court already squarely rejected in *Vimeo I*. Service providers like Vimeo do not fall outside safe harbor merely because they take steps to remove some content containing copyrighted material, nor must they remove every such piece of content after an employee stumbles across it. But here we are again, with Plaintiffs asking the Court to adopt new legal tests and backtrack on its earlier rulings. The Court should not do so.

**"Right and Ability to Control."** Plaintiffs argue that Vimeo does not qualify for safe harbor because it had the "right and ability to control" the allegedly infringing activity at issue (*i.e.*, the presence of music in the Videos-in-Suit) under 17 U.S.C. § 512(c)(1)(B). But the "right and ability to control" requires "something more than the ability to remove or block access to materials posted on a service provider's website." *Viacom Int'l, Inc. v. YouTube, Inc.*, 676 F.3d 19, 38 (2d Cir. 2012) (quotations omitted). Rather, the provider must "exert[] substantial influence on the activities of users." *Id.* To date, the only two cases to have found even a triable fact on this issue both involved platforms that *prescreened* every user submission and refused to publish materials that did not comply with the platform's strict requirements. No such prescreening occurred here; rather, as with the vast majority of platforms that host user content, "[Vimeo's] [u]sers post

videos onto the website without the intervention or active involvement of Vimeo staff, and Vimeo staff do not watch or prescreen videos before they are made available on the website." *Vimeo I*, 826 F.3d at 84. This should end the matter.

Plaintiffs seek to upend this settled precedent with a new test that would withdraw safe harbor whenever an online platform exercises "editorial judgment" by removing material *after* it has been posted by its users and made available on the platform. No court has *ever* adopted Plaintiffs' *ex post* test, and with good reason: it defies the statutory text, flouts *Viacom* (and the law of other circuits), and would disqualify any platform that engages in any form of content moderation—such as banning harassment, misinformation, and a host of other unwanted conduct. In other words, Plaintiffs would have the Court construct a rule punishing platforms for removing injurious and unsuitable content, while leaving safe harbor open only to those that engage in no moderation of any sort.

**"Red Flag" Knowledge.** Plaintiffs seek a do-over of this Court's 2016 decision with respect to whether Vimeo was "aware of facts or circumstances from which infringing activity is apparent" in certain Videos-in-Suit. 17 U.S.C. § 512(c)(1)(A)(ii) (the DMCA's "red flag" provision). The Court should decline this invitation. In *Vimeo I*, this Court held that a Vimeo employee's mere awareness that a video contains copyrighted music is not enough to carry Plaintiffs' burden of establishing that infringement was "obvious," because she

3

"cannot be expected" to know whether the use of such music was a fair use or licensed.  826 F.3d at 96-97.  On remand, Plaintiffs submitted evidence that, like before, at most showed Vimeo's awareness of the presence of copyrighted *music* in these videos, not *infringement* (let alone "obvious" infringement).  Without any evidence that infringement would have been "obvious" to an ordinary person with no specialized knowledge in music or copyright law, the district court granted Vimeo summary judgment on the 281 user-uploaded videos that Vimeo employees saw in whole or in part.  On appeal, Plaintiffs *still* fail to identify any triable issue that the music in any of these videos was "obviously" not a fair use or licensed.

Effectively conceding the point, Plaintiffs move the goalposts: they propose a new "legal rule" that "using a song without a license infringes copyright."  Br. 62.  But *Vimeo I* forecloses this argument—this Court already held that Vimeo's mere awareness that a video contains music is legally insufficient to deny Vimeo summary judgment on whether infringement was "obvious."  The Court should not revisit that ruling.

## COUNTER-STATEMENT OF ISSUES PRESENTED

1.  Whether, under 17 U.S.C. § 512(c)(1)(B), Vimeo: (a) had the "right and ability to control" the infringing activity at issue in videos uploaded by its users; and (b) if so, received a "financial benefit directly attributable" to that infringing activity.

4

2.  Whether Vimeo had "red flag" knowledge that any use of Plaintiffs' music in any Video-in-Suit was "obviously" infringing under 17 U.S.C. § 512(c)(1)(A)(ii), as interpreted by *Vimeo I*.

## COUNTER-STATEMENT OF FACTS

As this case has already come before the Court in *Vimeo I*, Vimeo limits its recitation of facts to those relevant to this appeal.

### A.    The DMCA

Title II of the DMCA provides "[l]imitations on liability relating to material online" for service providers through a series of safe harbors.  Congress recognized that, "without clarification of their liability, service providers may hesitate to make the necessary investment in the expansion of the speed and capacity of the Internet" because "[i]n the ordinary course of their operations service providers must engage in all kinds of acts that expose them to potential copyright infringement liability."  S. Rep. No. 105-190, at 8 (May 11, 1998).

Section 512(c) limits the liability of service providers such as Vimeo that store materials at the direction of their users.  17 U.S.C. § 512(c)(1).  A key feature of this safe harbor is its "notice-and-takedown regime"—a "compromise, which, on the one hand, augments the protections available to copyright owners, and, on the other, insulates service providers from liability for infringements of which they are unaware, contained in material posted to their sites by users, so as to make it

5

commercially feasible for them to provide valuable Internet services to the public."

*Vimeo I*, 826 F.3d at 82-83.

Section 512(c) provides in relevant part:

> (c)(1) In general.—A service provider shall not be liable for monetary relief, or, except as provided in subsection (j), for injunctive or other equitable relief, for infringement of copyright by reason of the storage at the direction of a user of material that resides on a system or network controlled or operated by or for the service provider, if the service provider—
>
> > (A)
> >
> > > (i)    does not have actual knowledge that the material or an activity using the material on the system or network is infringing;
> > >
> > > (ii)   in the absence of such actual knowledge, is not aware of facts or circumstances from which infringing activity is apparent; or
> > >
> > > (iii)  upon obtaining such knowledge or awareness, acts expeditiously to remove, or disable access to, the material;
> >
> > (B)   does not receive a financial benefit directly attributable to the infringing activity, in a case in which the service provider has the right and ability to control such activity; and
> >
> > (C)   upon notification of claimed infringement as described in paragraph (3), responds expeditiously to remove, or disable access to, the material that is claimed to be infringing or to be the subject of infringing activity.

17 U.S.C. § 512(c)(1)(A)-(C).

6

And while the DMCA requires service providers to do (or not do) many other things,[1] it expressly prohibits the conditioning of safe harbor upon "a service provider monitoring its service or affirmatively seeking facts indicating infringing activity." 17 U.S.C. § 512(m)(1). For example, if a service provider voluntarily engages in monitoring to locate and remove *certain* material on its platform, this does not obligate it to also monitor for *other* forms of infringing material. *Vimeo I*, 826 F.3d at 98 ("We see no reason why Vimeo's voluntary undertaking to monitor videos for infringement of visual material should deprive it of the statutory privilege not to monitor for infringement of music.").

B.    **Vimeo's Video-Hosting Business**

Vimeo operates an online video-hosting and video-sharing platform, located at http://www.vimeo.com. SPA2.[2] Launched in 2005, Vimeo allows users to upload, share and view original videos. SPA2. Vimeo emphasizes originality, requiring that its users upload only videos they created or participated in creating. SPA2.

---

[1]    These include, for example, designating a copyright agent to receive takedown notices and implementing a policy for terminating accounts of "repeat" infringers. 17 U.S.C. §§ 512(c)(2), (i). None of those other requirements is at issue here.

[2]    Vimeo, Inc. ("Vimeo") is the owner and operator of the Vimeo online platform. Its co-defendant, Connected Ventures, LLC, is no longer involved in Vimeo or its operations. JA194 (¶3).

"Vimeo has had great success as a site for the storage and exhibition of videos." *Vimeo I*, 826 F.3d at 84. As of September 2012, it hosted over 31 million videos and had 12.3 million registered users in 49 countries uploading about 43,000 new videos every day. *Id.*; JA127-28 (¶7); JA201 (¶18). As of 2012, the total number of videos ever uploaded to Vimeo exceeded 45.5 million. JA127-28 (¶7); JA201 (¶18). Today, Vimeo has over 260 million registered users worldwide, with about 350,000 new videos added every day. *See* https://vimeo.com/about (last accessed July 11, 2022). There have been over 100 billion views of videos posted on Vimeo. *Id.*

The videos hosted by Vimeo are diverse, including home videos as well as original movies, animation, documentaries, shorts, and inspirational works uploaded by artists, politicians, educational institutions and entertainment and music companies. SPA2; JA119-22 (¶¶5-12); JA201 (¶17). As of 2012, Vimeo accountholders included the White House, CNN, Yale Law School, the Republican Governors Association, award-winning filmmakers, and prominent musicians— including those who have been associated with Plaintiffs, such as Beyoncé, Katy Perry, and Coldplay. JA120-22 (¶¶6-12).

Anyone with an Internet connection can view a public video on Vimeo for free. SPA3; JA196 (¶7). To upload a video, however, a user must first register for an account. SPA3; JA197 (¶9). "Vimeo offers two forms of membership

accounts—basic (free) and paid subscription services," which offer members additional benefits. *Vimeo I*, 826 F.3d at 85; SPA3; JA212 (¶¶61-62). The "vast majority" of Vimeo's revenue comes from these subscriptions. *Vimeo I*, 826 F.3d at 85; JA212 (¶61). "A registered user has the ability to note her 'likes' or comment on videos, subscribe to 'groups' of users with common interests, and subscribe to or create 'channels' of videos based on themes." *Vimeo I*, 826 F.3d at 85. As of 2012, there were about 354,000 channels and 131,450 groups on Vimeo. JA1119 (¶36); JA439-40 (¶16).

### C. How The Vimeo Platform Works

All Vimeo users must accept its Terms of Service. *Vimeo I*, 826 F.3d at 84; JA197 (¶9). The Terms of Service contain various content-related requirements for what kinds of videos are permissible to upload on Vimeo, including that the user: (1) agrees not to upload videos that infringe any third party's copyrights; and (2) has all necessary rights for any content she uploads. *Vimeo I*, 826 F.3d at 84; JA197 (¶9); SPA4; JA70-71 (¶¶2-5); JA91-92; *see also* JA450-51 (¶11). Users must also comply with Vimeo's Community Guidelines, which are incorporated into the Terms of Service. SPA4; JA71 (¶¶6-7); JA95-96. The Community Guidelines: (1) reiterate that the user must have created or participated in the video, and must "own or hold all necessary rights (copyrights, etc.) to your video"; and (2) prohibit users from uploading certain types of content—for example,

9

videos that "incite hatred," are "defamatory," pertain to "multi-level marketing" or "get-rich-quick" schemes, or are "captures of video games or gameplay." JA95-96; *see also* JA71-72 (¶¶8-9); JA98-99.

The process of uploading a video is initiated by the user and entirely automated. JA128 (¶10). It is undisputed that "[u]sers post videos onto the website without the intervention or active involvement of Vimeo staff, and Vimeo staff do not watch or prescreen videos before they are made available on the website." *Vimeo I*, 826 F.3d at 84; SPA5 (similar); JA198 (¶12). This is no surprise—it would not be possible (let alone practicable) for Vimeo to prescreen and assess the tens of thousands of videos users upload daily for particular content before they are made available for viewing. SPA5; JA196 (¶8); JA128, JA130 (¶¶10, 18); JA76 (¶14). Because Vimeo does not prescreen, "users have the technical ability to upload videos that do not comply with the rules." *Vimeo I*, 826 F.3d at 84; *see also* JA197-98 (¶11); SPA5 ("a user has the technical ability to upload any video content whether or not it complies with" Vimeo's rules).

Vimeo does, however, moderate its website and proactively remove material that has *already* been uploaded if Vimeo determines the material violates its Terms of Service or Community Guidelines. SPA5; JA132-33 (¶¶23-28); JA76-77 (¶¶15-16). As of September 2012, a 16-person Community Team, assisted by computer programs ("Mod Tools"), was tasked with this responsibility, among other things.

*Vimeo I*, 826 F.3d at 84-85; SPA5. Vimeo voluntarily has removed thousands of videos for violating its Terms of Service or Community Guidelines, including "rips" (unaltered copies) of movies, television shows, and official music videos, even without receiving a takedown notice. SPA5; JA206-07 (¶30); JA77 (¶16); JA449 (¶5); JA133 (¶¶27-28); *Vimeo I*, 826 F.3d at 84-85.

Vimeo staff may watch, "like" and/or comment on certain videos they encounter in the course of their own use of the platform. SPA29. In discrete instances, certain Vimeo staff also may "bury" or "whitelist" a particular video or account.[3] JA434-37 (¶¶2-9). But by any account, Vimeo staff have "discretionary and sporadic interactions with videos on the Website." SPA44. For example, as of November 2012, Vimeo staff gave just 0.2% of all "likes" and 1.6% of all comments on Vimeo (including comments on non-video pages). SPA44; JA439 (¶15).[4] While Vimeo staff have placed some videos they saw and liked in a "Staff Picks" channel, that was just one of the 354,000 channels on Vimeo in 2012. SPA44; JA439-40 (¶16). These statistics demonstrate that Vimeo's "degree of

---

[3] "Burying" means those videos would not appear in the "Discovery" tab on the platform, and "whitelisting" means the "flagging" function for those videos would be disabled. JA434-37 (¶¶2-9).

[4] Vimeo staff also uploaded fewer than 0.005% of all videos on Vimeo, including those they uploaded before becoming employees. JA439 (¶15).

influence" over user activities "is far from substantial; indeed, it is rather arguably *de minimis*." SPA44.

### D. Vimeo Staff's Lack Of Expertise In Music Or Copyright Law

There is no evidence that the 16-person Community Team tasked with enforcing Vimeo's Terms of Service and Community Guidelines—or any Vimeo employee who interacted with any Video-in-Suit—held a legal or licensing position at Vimeo, or had specialized knowledge of music licensing or copyright law. JA1171-72 (¶¶4-5). To the contrary, Vimeo staff repeatedly disclaimed any specialized knowledge in these areas—particularly regarding the law surrounding use of music in otherwise original, personal videos. JA1172-76 (¶¶6(a)-(h)) (detailing testimony). Lacking such expertise, Vimeo employees emphasized they did not know and could not determine whether the uploader of a Video-in-Suit needed permission or had permission to use the music contained in it. JA1178-80 (¶¶10(a)-(e)) (detailing testimony).

### E. The Proceedings Below And This Court's Interlocutory Opinion

Plaintiffs filed these lawsuits against Vimeo in December 2009, alleging that certain videos posted by Vimeo users, located at 199 specific URLs, infringed their

copyrights.[5]  While Plaintiffs never submitted a DMCA takedown notice to Vimeo for any of those videos, Vimeo treated Plaintiffs' complaints as takedown notices and removed the videos.  SPA53-54.  After DMCA-focused discovery, the parties filed cross-motions for summary judgment on Vimeo's entitlement to DMCA safe harbor for all 199 videos.

In its September 18, 2013 Order, the district court in relevant part: (1) granted Vimeo summary judgment on its "lack[] [of] the right and ability to control infringing activity as that language has been defined by courts addressing § 512(c)(1)(B) of the safe harbor" (*see* further *infra* 15-17), SPA37; and (2) denied Vimeo summary judgment in part as to certain videos on the ground that Vimeo staff appeared to have viewed at least a portion of the video, and an employee's awareness of the mere presence of music in the video raised a triable issue as to whether Vimeo "was aware of facts and circumstances that would make it objectively obvious to a reasonable person that those videos were infringing" under 17 U.S.C. § 512(c)(1)(A)(ii), SPA29-33.[6]

---

[5]  *Capitol Records, LLC v. Vimeo, LLC*, No. 09-cv-10101 (S.D.N.Y.) (sound recordings); *EMI Blackwood Music, Inc. v. Vimeo, LLC*, No. 09-cv-10105 (S.D.N.Y.) (musical compositions).

[6]  The district court granted Vimeo summary judgment as to the Videos-in-Suit for which "there was no evidence that Vimeo employees had observed them." *Vimeo I*, 826 F.3d at 86.  Plaintiffs have not appealed that ruling.

In its December 31, 2013 Order, the district court declined to reconsider its "red flag" ruling. SPA64-70. Ultimately, the court denied Vimeo summary judgment on 18 of the 199 videos based solely on the "red flag" issue. SPA70. At that time, the court also granted Plaintiffs' motion to amend to add 1,476 more videos to the case. SPA70-72. The district court certified and this Court granted Vimeo's petition for interlocutory review on whether Vimeo's "viewing of a user-generated video containing all or virtually all of a recognizable, copyrighted song" can create a triable issue on red flag knowledge, and granted Plaintiffs' cross-petition on whether the evidence "showed willful blindness" to infringement by Vimeo. *Vimeo I*, 826 F.3d at 86-87.

On June 16, 2016, a unanimous panel of this Court (Leval, J., joined by Hall and Lynch, JJ.) vacated the district court's "red flag" ruling. *Vimeo I*, 826 F.3d at 100. Recognizing that "the burden falls on the copyright owner," the Court held that the "mere showing that a video posted by a user on the service provider's site includes substantially all of a recording of recognizable copyrighted music, and that an employee of the service provider saw at least some part of the user's material, is *insufficient* to sustain the copyright owner's burden of proving that the service provider had … red flag knowledge of the infringement." *Id.* at 95-96 (emphasis added).

14

The Court explained that there are "many reasons" for this, including because an employee: (1) "cannot be expected to know how to distinguish … between infringements and parodies that may qualify as fair use," *id.* at 97; and (2) cannot "be automatically expected to know how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music," as "[e]ven an employee who was a copyright expert cannot be expected to know when use of a copyrighted song has been licensed," *id.* The Court concluded:

> Vimeo is entitled to summary judgment on those videos as to the red flag knowledge issue, unless plaintiffs can point to evidence sufficient to carry their burden of proving that Vimeo personnel either knew the video was infringing or knew facts making that conclusion *obvious to an ordinary person who had no specialized knowledge of music or the laws of copyright.*

*Id.* at 98 (emphasis added). The Court remanded the case to the district court.

### F. The Orders On Appeal

#### 1. The District Court's Grant Of Summary Judgment To Vimeo On "Substantial Influence"

In a portion of the September 18, 2013 district court order that was not addressed on interlocutory appeal, the court ruled that "Vimeo lacked the right and ability to control infringing activity as that language has been defined by courts addressing § 512(c)(1)(B) of the safe harbor." SPA37.

The court recognized that, because "the DMCA presupposes that service providers have the ability to remove or block content," the right and ability to

15

control requires "'something more' than the ability to remove or block content." SPA38 (quoting *Viacom*, 676 F.3d at 38). Rather, *Viacom* required the court to determine whether "a reasonable juror could find that Vimeo 'exert[ed] *substantial influence* on the activities of [its] users.'" SPA38 (alterations in original) (quoting *Viacom*, 676 F.3d at 38) (emphasis added).

Relevant here, the court considered *Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146 (C.D. Cal. 2002) ("*Cybernet*"), as an "analytical guidepost[]" because it provided a "distinct example of conduct which the Second Circuit has suggested could constitute 'something more.'" SPA39. In *Cybernet*, the service provider prescreened every participating website, and refused to allow websites access to its system until they complied with its strict rules. SPA40 (citing *Cybernet*, 213 F. Supp. 2d at 1173). In contrast to the situation in *Cybernet*, the district court found as to Vimeo that there existed "no triable issue as to the exertion of substantial influence on user activity." SPA45. The court thus granted Vimeo summary judgment, finding each category of Plaintiffs' evidence of "something more" legally insufficient.

*First*, regarding Vimeo's use of filtering tools to "remov[e] undesirable content from the Website" (such as gameplay videos), the district court found there was no evidence Vimeo "had control over videos containing infringing music, or any other content, beyond its ability to remove or block it upon discovery."

SPA40-41, SPA43.  Rather, "Vimeo leaves such editorial decisions in the hands of its users."  SPA43.

*Second*, the district court rejected Plaintiffs' position that, by having the discretion to "promote" particular videos (*e.g.*, "liking," leaving comments, or including them in selected channels), Vimeo exerted "substantial influence" over user activity.  SPA41-42, SPA44.  Specifically, the court found, "it is difficult to imagine" how Vimeo could "exert substantial influence on approximately 12.3 million registered users uploading 43,000 new videos each day," concluding that any degree of influence "is far from substantial," and "arguably *de minimis*."  SPA44.

*Third*, the district court found that "scattered examples" of occasional communications between Vimeo staff and some individual users about the general use of music in videos did not support a finding of Vimeo's "control" over specific infringing activity, evincing instead only those employees' "attitudes towards infringement or their knowledge of it."  SPA42-43, SPA45.

## 2. The District Court's Grant Of Summary Judgment To Vimeo On "Red Flag" Knowledge

On remand from *Vimeo I*, the district court considered the 18 videos previously before it as well as 289 more videos in the Plaintiffs' amended complaints with which Vimeo employees purportedly "interacted," resulting in a

total of 307 remaining Videos-in-Suit.  SPA100 & n.1.[7]  In its May 28, 2021 Order, the court faithfully applied *Vimeo I*'s "red flag" standard, recognizing that "the burden rests with Plaintiffs to show, through affirmative evidence, that the Vimeo employee who interacted with a specific video knew of facts sufficient to determine that the use of copyrighted music was neither authorized nor fair." SPA105.  Under that standard, the court granted summary judgment to Vimeo.

*First*, the district court ruled that evidence that Vimeo employees were "broadly familiar with the concept of copyright" could not permit an inference that these employees had "the ability to distinguish infringements from authorized or fair use with respect to any of the Videos-in-Suit."  SPA107-10.

*Second*, considering Plaintiffs' evidence of employees' "interactions" with specific videos (*e.g.*, watching, commenting, "liking," whitelisting, burying, placing in channels) or their likelihood of awareness that a given video contained music (*e.g.*, "music credits," duration, start time), the court found that such evidence "say[s] nothing about the employee's knowledge as to whether the use of such music was authorized or fair."  SPA111-22.  The court further recognized that evidence of Plaintiffs' earlier cease-and-desist letters to Vimeo regarding *different*

---

[7]  On remand, Plaintiffs did not dispute their inability to satisfy their burden of proof for red flag knowledge on the remaining 1,300+ videos.  JA1122-23.

videos "does not suffice to indicate to an employee whether use of that artist's work in a subsequent video is authorized." SPA118-19.

The district court concluded that "Plaintiffs have not demonstrated that any employee who viewed a Video-in-Suit possessed facts sufficient to determine whether the copyrighted material incorporated therein was either authorized or qualified as fair use," and that Plaintiffs' "lack of evidence in that respect is dispositive." SPA107, SPA122.

The district court also ruled that 26 videos "uploaded or partially created by Vimeo employees" raised factual issues as to whether those employees "stored their content as 'users' within the statutory definition or as employees acting within the scope of their employment." SPA107.[8] Plaintiffs voluntarily dismissed those claims, and those videos are not at issue on this appeal. SPA130-35. As a result, on appeal there are 281 Videos-in-Suit for which the district court granted Vimeo summary judgment on red flag grounds.

## SUMMARY OF ARGUMENT

The district court correctly granted Vimeo summary judgment on its safe-harbor defense by finding no triable issue of fact on: (1) Vimeo's lack of

---

[8] Plaintiffs incorrectly represent that the district court found that Vimeo employees "knew that videos they personally uploaded infringed copyright." Br. 23. The court made no such ruling.

"substantial influence" over its users' allegedly infringing activity; and (2) Vimeo's lack of "red flag" knowledge that the use of music in 281 Videos-in-Suit was "obviously" infringing. This Court should affirm.

## I.

The district court correctly found "no triable issue as to [Vimeo's] exertion of substantial influence on user activity."

*First*, this Court's precedent establishes that, for a service provider to have the "right and ability to control" "the infringing activity" at issue, 17 U.S.C. § 512(c)(1)(B), it "requires something more than the ability to remove or block access to materials posted on a service provider's website." *Viacom*, 676 F.3d at 37-38 (quotations omitted). Rather, a copyright holder must show that "a service provider exert[ed] substantial influence on the activities of users." *Id.* at 38 (quotations omitted). The only two cases to have ever found even a triable issue of fact on this theory of liability both involved platforms that (unlike Vimeo here) *prescreened* user submissions before they were published. In contrast, courts in this Circuit and others uniformly recognize that a service provider's *ex post* ability to identify and remove unwanted content already uploaded by the user cannot satisfy this standard as a matter of law. It is undisputed on this record that: (1) Vimeo users post videos without intervention or involvement of Vimeo staff; (2) Vimeo does not prescreen videos before they are published; and (3) users have the

ability to upload videos that do not comply with Vimeo's rules. And while Plaintiffs complain that Vimeo located and removed certain unwanted material (such as "gameplay" videos), 17 U.S.C. § 512(m)(1) prohibits conditioning Vimeo's safe harbor on whether, or the extent to which, it undertakes voluntary monitoring efforts to find and remove certain material from its platform.

Moreover, the Court should reject Plaintiffs' invitation to adopt their newly minted "two-step" test that would condition a platform's safe harbor on whether it exercises "editorial judgment" in removing unwanted material. Not only did Plaintiffs waive this argument below, but such a test has never been accepted by any court, and with good reason: (1) it cannot be reconciled with §§ 512(c)(1)(B) or 512(m); (2) it contradicts *Viacom*'s precedent; and (3) its boundless reach would gut safe harbor protections by penalizing platforms for voluntarily removing harmful content such as online bullying or vaccine misinformation, merely because such moderation efforts involve the exercise of "editorial judgment."

*Second,* given Vimeo's lack of the "right and ability to control" the allegedly infringing content, the district court correctly declined to address whether Vimeo received a "financial benefit directly attributable to the infringing material" under § 512(c)(1)(B), and this Court should do the same. But if the Court does address the issue, the Court should affirm on this alternative ground, as Plaintiffs identify no evidence of either: (1) revenue received by Vimeo directly attributable to the

presence of *infringing* music in a specific video; or (2) users who were drawn to the Vimeo platform specifically because of the allegedly infringing material at issue.

## II.

The district court also correctly found that "none of the evidence adduced by Plaintiffs on remand carries the high burden of raising a triable issue of fact as to whether Vimeo employees" had red flag knowledge that the use of music in the 281 Videos-in-Suit was "obviously" infringing.

*First*, the district court correctly recognized that, under *Vimeo I*, "the burden rests with Plaintiffs to show, through affirmative evidence, that the Vimeo employee who interacted with a specific video knew of facts sufficient to determine that the use of copyrighted music was *neither authorized nor fair*." SPA105 (emphasis added).

*Second*, applying this standard, the district court correctly found that Plaintiffs failed to carry their burden so as to survive summary judgment for Vimeo. As to fair use, Plaintiffs identify no evidence demonstrating that the use of music in any of these 281 Videos-in-Suit was "obviously" not fair—not surprisingly, as courts regularly recognize that the incorporation of a song into a video *can* be fair. That alone is enough to affirm. Plaintiffs also identify no evidence that the use of music in the 281 Videos-in-Suit was "obviously" not

licensed; while Plaintiffs cite generic statements indicating that licensing music can be "confusing" or "painful," they offer no evidence that an ordinary person would know the music in *these* videos was obviously unlicensed.

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY FOUND NO TRIABLE ISSUE OF FACT ON VIMEO'S LACK OF "SUBSTANTIAL INFLUENCE" OVER THE INFRINGING ACTIVITY

Plaintiffs identify no analytical error in the district court's conclusion that Vimeo's mere *ex post* monitoring and removal of certain videos uploaded by users did not forfeit safe harbor. SPA37-45. Simply put, Vimeo did not prescreen the videos that its users posted, much less participate in their creation; rather, Vimeo found and removed videos users had *already* uploaded that violated Vimeo's Terms of Service or Community Guidelines. Courts uniformly rule that such conduct provides no evidence of the "right and ability to control" allegedly infringing activity.

Dissatisfied with the actual legal standard, Plaintiffs urge the Court to adopt a new test: if a service provider exercises "editorial judgment" by identifying and removing *any* material for *any* "merits"-based reason, the whole platform loses safe harbor. Br. 28-32. This unprecedented (and waived) test has no grounding in the DMCA's text or precedent, would be impossible to administer, and would render safe harbor a dead letter.

### A. Vimeo's *Ex Post* Monitoring And Removal Of User-Uploaded Videos Cannot Create A Triable Issue On Vimeo's Lack Of "Substantial Influence" Over The Infringing Activity

The district court correctly found "no triable issue as to the exertion of substantial influence on user activity." SPA45. In granting summary judgment to Vimeo on this issue, the district court examined two decisions as "analytical guideposts": *Cybernet*, 213 F. Supp. 2d 1146, and *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005). SPA39. On appeal, Plaintiffs limit their challenge to the district court's *Cybernet* analysis (Br. 27-28 & n.5). Based on that analysis, and drawing all factual inferences in Plaintiffs' favor, the district court correctly ruled that Vimeo was entitled to summary judgment that it did not exert "substantial influence" over user activities such that Vimeo had "the right and ability to control" its users' allegedly infringing activity. SPA39-45.

#### 1. No Reasonable Jury Could Find Vimeo Exerted "Substantial Influence" Over The Infringing Activity

The district court's correct finding of "no triable issue as to the exertion of substantial influence on user activity" was compelled by precedents that have consistently holding that the mere ability to remove unwanted content *after* it is uploaded cannot foreclose safe harbor. SPA45. These precedents teach that a service provider's decision to identify and remove certain content that its users already have posted cannot constitute evidence of "substantial influence" over the

24

allegedly infringing activity, no matter what degree of "editorial judgment" it may exercise in the process.

*Viacom* provides the starting point. There, this Court recognized that § 512(c)(1)(B) "depart[s] from the common law vicarious liability standard," and "requires *something more* than the ability to remove or block access to materials posted on a service provider's website," an ability that § 512(c) "actually presumes that service providers have." 676 F.3d at 37-38 (quotations omitted, emphasis added). Because the DMCA already requires a service provider to remove certain materials, the ability to find and remove infringing videos cannot also "be a disqualifier." *Id.* at 37. Rather, a "right and ability to control" infringing activity can only even arguably be established where "a service provider exert[ed] substantial influence on the activities of users." *Id.* at 38 (quotations omitted).

On remand, the district court granted summary judgment to YouTube, ruling that "the governing principle must remain clear: knowledge of the prevalence of infringing activity, and welcoming it, does not itself forfeit the safe harbor. To forfeit that, the provider *must influence or participate in the infringement*." *Viacom Int'l Inc. v. YouTube, Inc.*, 940 F. Supp. 2d 110, 118 (S.D.N.Y. 2013) (Stanton, J.) (emphasis added). The court rejected Viacom's proposal to find "something more" through "YouTube's exercise of 'ultimate editorial judgment and control over the content available on the site,'" instead recognizing that, absent

prescreening, such a form of "influence on users is not participation in their infringing activity, and does not amount to the required 'control' beyond the normal ability of every service provider to decide what appears on its platform." *Id.* at 119 (quoting Viacom's brief). The court concluded that the plaintiffs' purported "evidence of control [went] no further than the normal functioning of any service provider, and show[ed] neither participation in, nor coercion of, user infringement activity." *Id.* at 120. Despite the obvious similarities between YouTube and Vimeo, Plaintiffs never even mention this decision.

On appeal, Plaintiffs identify only *two* cases to have found even a triable issue on a service provider's "right and ability to control" users' infringing content, both of which turned on *ex ante* actions in the form of prescreening that distinguish those cases from the record here. Br. 33-34.[9] In *Cybernet*, the defendant promulgated "detailed instructions regard[ing] issues of layout, appearance, and content," and "refused to allow sites to use its system until they comply with its

---

[9] Plaintiffs also cite inapposite decisions (Br. 34) where defendants sold products they manufactured. *See Greg Young Publ'g, Inc. v. Zazzle, Inc.*, 2017 WL 2729584, at *8 (C.D. Cal. May 1, 2017) ("Unlike eBay or Amazon, Zazzle's role is not limited to facilitating the sale of products owned and marketed by third parties. Zazzle *creates* the products."); *Feingold v. RageOn, Inc.*, 472 F. Supp. 3d 94, 102 (S.D.N.Y. 2020) ("RageOn is an online retailer. Commonsense dictates that RageOn had the 'right and ability' to control what it sold[.]"). Even companies that create platforms for third-party sales of infringing physical goods benefit from safe harbor if users "upload whatever images they choose." *Sid Avery & Assocs., Inc. v. Pixels.com, LLC*, 2021 WL 736258, at *4 (C.D. Cal. Feb. 24, 2021).

dictates." 213 F. Supp. 2d at 1173; *id.* at 1181-82 ("Cybernet prescreens sites"); *see also Viacom*, 676 F.3d at 38 (Cybernet "refused access to users who failed to comply with its instructions"). Similarly, in *Mavrix Photographs, LLC v. LiveJournal, Inc.*, 873 F.3d 1045 (9th Cir. 2017), the Ninth Circuit found a triable issue in light of "LiveJournal's extensive review process," including moderators reviewed each user submission "for content and other guidelines such as infringement" *before* publication, rejecting "[n]early two-thirds of submitted posts … including on substantive grounds." *Id.* at 1059; *see also id.* at 1054, 1056 (LiveJournal "manually review[s] submissions and publicly post[s] only about one-third of submissions," in contrast to "other sites where users may independently post content"). In short, in both *Cybernet* and *Mavrix*, the defendants acted (unlike Vimeo here) as content gatekeepers by prescreening posts and vetting them *ex ante*.

By contrast, courts in this Circuit uniformly find on summary judgment that that *ex post* monitoring programs (like Vimeo's) fall short of "something more." Indeed, "a right and ability to control *must take the form of prescreening content, rendering extensive advice to users regarding content and editing user content.*" *Wolk v. Kodak Imaging Network, Inc.*, 840 F. Supp. 2d 724, 748 (S.D.N.Y. 2012) (Sweet, J.) (emphasis added), *aff'd*, 569 F. App'x 51, 52 (2d Cir. 2014) (affirming "substantially for the reasons stated by the district court"); *see also, e.g.*, *Downs v. Oath Inc.*, 385 F. Supp. 3d 298, 301, 308 (S.D.N.Y. 2019) (Rakoff, J.) (no triable

issue where defendant's employee "screened the [accused] article for offensive or unlawful content" and "added content tags to the article's metadata and a 'related video' link," ruling such "screening and modification" did not forfeit safe harbor because it came after uploading and "contributors self-published their articles directly to the website"); *Obodai v. Demand Media, Inc.*, 2012 WL 2189740, at *2, *8 (S.D.N.Y. June 13, 2012) (Castel, J.) ("[n]o evidence supports a conclusion that the defendant exerted [as] close control over content" as in *Cybernet*, notwithstanding contention that defendant "placed limitations on uploadable content"), *aff'd*, 522 F. App'x 41, 42 (2d Cir. 2013) (affirming "substantially for the reasons articulated by the district court").

Courts around the country agree.[10] As the Ninth Circuit has confirmed, even where a provider hosts infringing material, has the ability to remove it, and implements filtering systems that could have searched for and found infringing content, such facts (which mirror Plaintiffs' assertions here) are not enough to

---

[10] *See, e.g.*, *Davis v. Pinterest, Inc.*, 2022 WL 1316566, at *15 (N.D. Cal. May 3, 2022) (summary judgment for defendant: "[u]sers upload content, and Pinterest does not direct them to upload any specific content"); *BWP Media USA, Inc. v. Clarity Digital Grp., LLC*, 820 F.3d 1175, 1181 (10th Cir. 2016) (same: where "infringing content has merely gone through a screening or automated process, the [service provider] will generally benefit from the safe harbor's protection"); *Io Grp., Inc. v. Veoh Networks, Inc.*, 586 F. Supp. 2d 1132, 1153 (N.D. Cal. 2008) (same: "there is no evidence that Veoh can control what content users choose to upload before it is uploaded").

create a triable issue on the "right and ability to control." *UMG Recordings, Inc. v. Shelter Cap. Partners LLC*, 718 F.3d 1006, 1030 (9th Cir. 2013).

*Ventura Content, Ltd. v. Motherless, Inc.*, 885 F.3d 597 (9th Cir. 2018), on which Plaintiffs rely extensively (*e.g.*, Br. 30-31, 39-40, 42), supports affirmance here. The Ninth Circuit affirmed summary judgment for the defendant because (as with Vimeo) "[n]othing in the record suggests that Motherless told its users what to upload." *Id.* at 613. And while Plaintiffs repeatedly cite one passing reference to what Motherless did *not* do (*see* Br. 31, 39-40, *but see infra* 37-38 (addressing "curation")), a court's citation of multiple facts supporting a conclusion does not constitute a holding that the *absence* of any one fact alone would have resulted in a different outcome. *See Capitol Records, Inc. v. Naxos of Am., Inc.*, 372 F.3d 471, 480 (2d Cir. 2004) (noting "logical fallacy of assuming that the inverse of a proposition is true") (citing Raymond J. McCall, *Basic Logic* 125-26 (2d ed. 1952)).[11] If anything, Motherless moderated content in ways that far exceed the remit of Vimeo's Community Team—it not only "select[ed] certain content to be 'prominently featured' on the website," but also: (1) prescreened and approved all user-created "groups" (*i.e.*, categories of hosted content); (2) "remov[ed]

---

[11] *Viacom* similarly noted that hypothetical practices discussed in cases holding "that control did *not* exist" do not equate to a holding that those practices "are individually sufficient to support a finding of control." 676 F.3d at 38 n.13.

unpopular groups or ones that violate[d] their Terms of Use"; and (3) "review[ed]" images from *every* uploaded video "[w]ithin two to four days" for any information "that would indicate that the … video contains illegal content or violates the Terms of Use." *Motherless*, 2013 WL 11237204, at *2 (C.D. Cal. July 3, 2013) (quotations omitted). Yet the district court and Ninth Circuit *still* found no triable issue.

Applying similar principles, the district court correctly found that there is "no triable issue as to the exertion of substantial influence on user activity" here. SPA45. It is undisputed that: (1) "users have the technical ability to upload any video content to Vimeo," JA197-98 (¶11); (2) "Vimeo makes the uploaded video playable on Vimeo through fully automated means that do not involve the intervention or active involvement of Vimeo staff," JA196 (¶8); and (3) "Vimeo does not pre-screen each video *before* it is uploaded to the Vimeo website," JA198 (¶12); *see also Vimeo I*, 826 F.3d at 84 ("[u]sers post videos onto the website without the intervention or active involvement of Vimeo staff, and Vimeo staff do not watch or prescreen videos before they are made available on the website," and "users have the technical ability to upload videos that do not comply with the rules"). Nor do Plaintiffs identify any facts indicating Vimeo ever participated in its users' infringement before they posted such videos, edited videos after they were posted, or exerted substantial influence over what users chose to upload.

30

These undisputed facts alone establish that, as a matter of law, Vimeo meets the safe harbor requirement in § 512(c)(1)(B). None of Plaintiffs' arguments to the contrary is availing.

*First*, Plaintiffs err in attacking Vimeo's proactive efforts to identify unwanted content—that is, "the Community Team's removal of certain content from the Website with the assistance of Moderator Tools" (SPA43). Br. 42-45. None of this involves prescreening that might amount to Vimeo's controlling users' infringing activity. While Vimeo undertakes efforts to search for unwanted content, its efforts are directed to content *already* uploaded. That is precisely the sort of "monitoring" protected by § 512(m).

Moreover, Vimeo's efforts in this regard are limited to specific types of content but are otherwise neutral as to the creative or other aspects of a video. Vimeo does not, for example, remove videos and instruct users to re-upload them with different camera angles or lighting. The district court correctly distilled the difference between basic content moderation and "substantial influence":

> Absent from this program are the characteristics the court found present in Cybernet's monitoring system, including guidelines that dictated to users (i.e., the participating adult websites) "layout, appearance, and content," and Cybernet's "refus[al] to allow sites to use its system until they compl[ied] with [those] dictates." *Cybernet*, 213 F. Supp. 2d at 1173. While Vimeo's monitoring program aims to filter from the Website content that veers from its mission to provide a platform for user-created "creative works and personal moments," it does not purport to, and

31

> in practice does not, exert substantial influence over the content of the uploaded material. To the contrary, *Vimeo leaves such editorial decisions in the hands of its users*.

SPA43 (emphasis added). Plaintiffs further err in asserting the district court misinterpreted *Cybernet* to disclaim "substantial influence" if a user made "*any* 'editorial decisions'" about her post (Br. 42); the district court above did not refer to "*any*" editorial decisions, but to "*such* editorial decisions" as those made by the service provider in *Cybernet*: prescreening for "layout, appearance, and content."

Vimeo's *ex post* monitoring of published videos falls within "the normal ability of every service provider to decide what appears on its platform," and so "is not participation in [users'] infringing activity, and does not amount to the required 'control.'" *Viacom*, 940 F. Supp. 2d at 119. Nor did the district court resolve any genuine material issues of fact in Vimeo's favor, as Plaintiffs assert. *See* Br. 42-48. The undisputed facts discussed above rendered any such supposed "disputes" (even if any were genuine) immaterial to the inquiry.

*Second*, Plaintiffs err multiple times over in arguing that Vimeo's voluntary removal of "gameplay" videos demonstrates the exertion of "substantial influence" over its users' infringing activity. Br. 43-45. Locating and removing materials that violate Vimeo's Community Guidelines or Terms of Service fall squarely within § 512(m)'s purpose of "expressly provid[ing] that [content] screening does not deprive a website of safe harbor protection." *Motherless*, 885 F.3d at 605; *see*

*also, e.g.*, *Viacom*, 940 F. Supp. 2d at 120 (citing § 512(m) to find no safe harbor violation based on YouTube's choice to monitor some works and not others). Otherwise, every service provider would be forced into a Hobson's choice of either giving up safe harbor or "stay[ing] out of the monitoring business altogether even if monitoring efforts as to some website content might be deemed fruitful to the aims of the service provider and the copyright holder alike." SPA44. Plaintiffs' unsupported insistence that, "once a provider" does some monitoring, § 512(m) "no longer applies" (Br. 44) thus is foreclosed by § 512(m), as this Court already held. *See Vimeo I*, 826 F.3d at 98 ("We see no reason why Vimeo's voluntary undertaking to monitor videos for infringement of visual material should deprive it of the statutory privilege not to monitor for infringement of music.").

Moreover, Plaintiffs' assertion turns on their mistaken insistence that the Court can look to Vimeo's overall "general practices," rather than those involving the specific allegedly infringing activity. Br. 29-30. But the text of the statute refers to "*the* infringing activity," not "activity" generally. 17 U.S.C. § 512(c)(1)(B) (emphasis added). Otherwise, the phrase "the infringing activity" would be superfluous. *See United States v. Ng Lap Seng*, 934 F.3d 110, 123 (2d Cir. 2019) ("statutory text should not be construed so broadly as to render other

statutory text superfluous"). [12]   Thus, Vimeo's "gameplay" removals—which Plaintiffs concede are unrelated to music copyrights—shed no light on whether Vimeo exerted "substantial influence" over "the infringing activity," *i.e.*, the use of music in the Videos-in-Suit.

Plaintiffs next err by mischaracterizing the district court's opinion on this point—the district court never "suggested that Section 512(m) precludes considering Vimeo's 2008 decision to eliminate gameplay videos" (Br. 43) or relied on a "flat-out interpretation of disputed evidence" (Br. 45).  Rather, the court ruled that any dispute over this point was not germane because, "[*i*]*n any event*, it does not necessarily follow [from Vimeo's removal of gameplay videos] that Vimeo had control over videos containing infringing music, or any other content, beyond its ability to remove or block it upon discovery."  SPA43 (emphasis added). Plaintiffs still fail to explain how Vimeo's voluntary removal of however many gameplay videos reflects anything other than "the ability to remove or block access

---

[12]  Plaintiffs' citation to two Ninth Circuit cases (Br. 30) suggesting that the Court need only look at a service provider's "general practices and procedures," *Mavrix*, 873 F.3d at 1048 n.15, or the "overall relationship" between a service provider and its users, *Columbia Pictures Indus., Inc. v. Fung*, 710 F.3d 1020, 1046 (9th Cir. 2013), cannot be squared with the statutory text, and neither case addressed the plain text of § 512(c)(1)(B) on this point.  And notably, *Fung*'s ruling turned on the defendant's "inducing activity like in [*Grokster*]," 710 F.3d at 1046, which Plaintiffs disavow (Br. 28 n.5).

to materials posted on a service provider's website," which lacks the "something more" required to lose safe harbor. *Viacom*, 676 F.3d at 38.

*Third*, contrary to Plaintiffs' suggestion, the district court did not err in referring to "statistics" or to other undisputed facts demonstrating the absence of evidence of Vimeo's right and ability to control the allegedly infringing activity. Br. 45-48. Plaintiffs identify no facts about Vimeo's "discretionary and sporadic interactions with videos on the Website" or its "scattered examples of communication with users" placing in material dispute the undisputed evidence that Vimeo ultimately leaves "editorial decisions in the hands of its users." SPA43-45. For example, there is no material dispute that Vimeo staff "interacted" with only a tiny fraction of the videos that users uploaded to the platform—be it through watching, "liking," commenting, placing in channels, or in any other form. *See* JA201 (¶18) (as of 2012, Vimeo had about 12.3 million registered users, with 43,000 new videos uploaded daily, and more than 31.7 million videos in its database); JA1118-19 (¶¶33-35) (Vimeo employees uploaded fewer than 0.005% of all videos, and had given about 0.2% of all "likes" and about 1.6% of all comments on Vimeo); JA1119 (¶36) (there were about 354,000 channels and

131,450 groups on Vimeo). Given these figures, a small staff could not possibly engage in pre-posting review of more than a trivial percentage of hosted videos.[13]

In light of this daunting reality, Plaintiffs err in suggesting that Vimeo staff really could have watched every video uploaded to its platform. They first misrepresent that, "[i]n *Cybernet*, a twelve-person staff reviewed '20 million images' 'on participating web sites'" (Br. 46-47), when those "20 million images" represented the total "available on participating web sites," not the number of images the staff actually reviewed, 213 F. Supp. 2d at 1158. And Plaintiffs ignore that Cybernet, unlike Vimeo, "prescreened sites." *Id.* at 1164, 1181-82. Plaintiffs cannot create a factual dispute based solely on a single draft marketing pitch that hyperbolically suggested Vimeo's handful of employees somehow "literally review[ed] every" video uploaded to the platform. Br. 37, 47. Even if that were somehow true (and as a matter of pure math it cannot be),[14] it still says nothing about prescreening.

---

[13] Plaintiffs identify no facts that any different conclusion would be reached in earlier years. *See* JA127 (¶6) (40,000 registered users in April 2007). In December 2009, when Plaintiffs filed this action, Vimeo had 2.3 million registered users uploading 11,000 new videos a day, while Vimeo had just 20 full-time employees. JA127-28 (¶7); JA124 (¶22).

[14] *See also, e.g.*, JA476 (118:19-23) (never a time where every video uploaded was reviewed by a Vimeo employee); JA482-83 (223:20-224:4) (statement was never accurate); JA124 (¶22); JA127-28 (¶7); JA439-40 (¶¶15-16).

While the undisputed statistics confirm that there is no triable issue as to Vimeo's inability to exert "substantial influence" over the alleged infringing activity by its users, they are by no means necessary to affirm. That is because there is no dispute that Vimeo does not "prescreen" videos. JA198 (¶12). Accordingly, Vimeo's post-upload activity, however modest or extensive, falls within the "normal ability of every service provider to decide what appears on its platform." *Viacom*, 940 F. Supp. 2d at 118.

For this reason, courts consistently recognize that the very features Plaintiffs call "curation" (Br. 37-39, 46-48) are insufficient to raise a triable issue on the right and ability to control. *See, e.g.*, *Motherless*, 2013 WL 11237204 at *2 (no triable issue where defendant "selects certain content to be 'prominently featured' on the website"); *Viacom*, 940 F. Supp. 2d at 121 ("YouTube employees regularly selected clips to feature with conspicuous positioning on its homepage … No reasonable jury could conclude from that evidence that YouTube participated in its users' infringing activity by exercising its editorial control over the site."); *Io Grp.*, 586 F. Supp. 2d at 1136 (no triable issue although defendant's "employees can and do select videos to be featured on the 'Featured Videos' portion of [the] website").

### 2. The Court Should Reject Plaintiffs' Novel "Two-Step" "Editorial Judgment" Test

Because the district court faithfully applied this Court's precedent to find no triable issue over Vimeo's lack of "substantial influence," the Court need go no

further in order to affirm. It certainly need not consider the made-to-order "two-step" "editorial judgment" test Plaintiffs propose, which: (1) is waived; (2) cannot be reconciled with § 512(c)(1)(B)'s text; (3) flouts Circuit precedent; and (4) would harshly penalize and disincentivize desirable investment in online services.

*First*, as a threshold matter, Plaintiffs waived any argument that their new test should control this case by failing to raise it below. *Compare* Br. 28-32 (proposing test)*, with* JA136-91, JA1092-115 (Plaintiffs' summary judgment briefing with no reference to this two-step test or Vimeo's "editorial judgment"). "[W]here a party has shifted his position on appeal and advances arguments available but not pressed below, … waiver will bar raising the issue on appeal." *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 124 n.29 (2d Cir. 2005) (quotations omitted); *see also In re Nortel Networks Corp. Secs. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) (argument made below merely "resembling" one presented on appeal not sufficient to preserve issue). This rule counsels particular vigilance here, where Plaintiffs ask the Court to upend an established legal regime governing online expression.

*Second*, Plaintiffs' test does not provide a faithful, or even workable, means of assessing a service provider's "substantial influence" over the infringing activity. Plaintiffs cite *no authority* whatsoever even proposing, much less adopting, their

test.  *See* Br. 28-34.  That absence of support is explained by the test itself, which is incompatible with § 512(c)(1)(B).

The first of Plaintiffs' "steps" (Br. 28-30) is at war with the text of § 512(c)(1)(B).  Plaintiffs postulate (Br. 28) that the service provider's "control" for the purposes of the state is a free-floating concept that merely requires some sort of "relationship" between (i) its ability to control its "network" and (ii) its users' "infringing activity."  But the statute by its terms is concerned only with whether a service provider "has the right and ability to control" "the infringing activity" itself.  17 U.S.C. § 512(c)(1)(B).  The inquiry is not whether a service provider "controls" its entire platform (as virtually all do), but rather whether it "controls" *users' specific conduct* of posting infringing material, *i.e.*, "exert[s] substantial influence on the activities of users."  *Viacom*, 676 F.3d at 38; *see also Io Grp.*, 586 F. Supp. 2d at 1151 ("[T]he plain language of section 512(c) indicates that the pertinent inquiry is not whether Veoh has the right and ability to control its *system*, but rather, whether it has the right and ability to control the *infringing activity*.").  *See also supra* 33-34 (inquiry turns on right and ability to control "the infringing activity," not overall platform).

Plaintiffs' second "step" (Br. 30-32)—asking whether a service provider exercises "editorial judgment" in any manner over user-generated content on its platform—fares no better.  Nothing in § 512(c)(1)(B) suggests that any

consideration by a service provider of the contents of works hosted on its platform establishes "substantial influence" over users' "infringing activity." To the contrary, this Court already has recognized that Vimeo staff could have "many different business purposes" in viewing videos, including "application of technical elements of computer expertise, classification by subject matter, sampling to detect inappropriate obscenity or bigotry, and *innumerable other objectives having nothing to do with recognition of infringing music in the soundtrack*." *Vimeo I*, 826 F.3d at 96 (emphasis added). Plaintiffs misleadingly omit the Court's reference to "innumerable other objectives" from their quotation of this portion of *Vimeo I* (Br. 31), and in any event ignore that identifying "obscenity or bigotry" itself entails "editorial judgment." *See, e.g.*, *McKinney v. Alabama*, 424 U.S. 669, 688 (1976) (Brennan, J., concurring) ("judging obscenity … by its definition, calls for an appraisal of material according to the average person's application of contemporary community standards").

Rather than acknowledge the futility of this exercise, Plaintiffs double down by asking the Court to then carve out exceptions to their own rule by "drawing [a] line" between (i) "common activities" such as "removing child pornography" or "basic site maintenance" and (ii) the amorphous exercise of "editorial judgment" based on the "merits" (whatever that means). Br. 31. Plaintiffs provide no guidelines for such arbitrary line-drawing, and their own example proves no line

40

exists.  Plaintiffs suggest that operators of a website for real-estate listings would not exercise "editorial judgment" if they were to "glance" at photographs "to ensure they actually depict houses."  Br. 31.  But the decision to restrict or regulate uploaded content in such a manner—whether based on a "glance" or a searching stare—is obviously editorial in nature (*i.e.*, one based on content).  Plaintiffs provide no sound limiting principle that distinguishes the removal of irrelevant photos from the real estate website from the removal of child pornography or gameplay videos—all involve removing materials *because* of their content, and require a modicum of judgment.[15]

What is more, under Plaintiffs' test, enforcement of even the most commonsense rules or guidelines would disqualify the *entire* platform from safe harbor—even though they have nothing to do with "infringing activity"—because any assessment of compliance requires "editorial judgment."  According to Plaintiffs, if an issue takes more than a "glance" to resolve, safe harbor is unavailable.  Plaintiffs' standard would thus have impracticable consequences, requiring a jury trial on safe harbor whenever a plaintiff claims post-upload review

---

[15]  The real estate website at issue in *CoStar Grp., Inc. v. LoopNet, Inc.*, 373 F.3d 544 (4th Cir. 2004), cited by Plaintiffs (Br. 31), did not even address the right and ability to control third-party activity, but rather whether LoopNet's conduct was "volitional" for the purposes of its own *direct* liability.  *Id.* at 555-56.

involved "judgment," and thereby eviscerating the DMCA's protections for service providers.

Finally, and notably, the district court in *Viacom* expressly considered and rejected an "editorial judgment" test like the one Plaintiffs propose here. The plaintiffs there argued that "YouTube's exercise of 'ultimate editorial judgment and control over the content available on the site'" constituted substantial influence. 940 F. Supp. 2d at 119. The court rejected that attempt to impose liability on the basis of a different "control" than that referenced in § 512(c)(1)(B), ruling that "the normal ability of every service provider to decide what appears on its platform" was insufficient and that "[n]o reasonable jury could conclude from that evidence that YouTube participated in its users' infringing activity by exercising its editorial control over the site." *Id.* at 119, 121. Plaintiffs do not acknowledge, let alone distinguish, this decision.

*Third*, Plaintiffs' "editorial judgment" test cannot be squared with years of cases finding safe harbor in the face of conduct indistinguishable from Vimeo's. Every "editorial judgment" by Vimeo that Plaintiffs highlight (Br. 37-42) merely reflects the run-of-the-mill operations of a service provider, as prior cases granting summary judgment confirm, including: (1) voluntary policies prohibiting certain content, *Io Grp.*, 586 F. Supp. 2d at 1150; (2) *ex post* screening of articles and adding "content tags" to metadata, *Downs*, 385 F. Supp. 3d at 301; (3) post-upload

42

"curation" of videos "to avoid looking 'like a dumping ground for copyrighted stuff,'" *Viacom*, 940 F. Supp. 2d at 119, 121; (4) "select[ing] certain content to be 'prominently featured' on the website," *Motherless*, 2013 WL 11237204 at *2, *aff'd*, 885 F.3d 597; (5) "enforc[ing] its policies by removing content," *Io Grp.*, 586 F. Supp. 2d at 1151; and (6) "issuing instructions" on recommended topics, and encouraging adding photos to original content, *BWP Media*, 820 F.3d at 1181.

*Fourth*, Plaintiffs' proposed test would in practice disqualify from safe harbor almost every platform that permits user-uploaded content. Safe harbor exists because Congress "was loath to permit the specter of liability to chill innovation that could also serve substantial socially beneficial functions." *UMG Recordings*, 718 F.3d at 1014. Yet Plaintiffs propose that *any* exercise by a service provider of "editorial judgment" over how it hosts user submissions—for purposes of assessing copyright infringement *or anything else*—should disqualify that provider from safe harbor. Br. 30. Thus, according to Plaintiffs, a service provider's decision to remove vaccine misinformation, [16] online bullying, [17]

---

[16] *See, e.g.*, YouTube, *Vaccine Misinformation Policy*, Google, (last accessed July 11, 2022), https://support.google.com/youtube/answer/11161123.

[17] *See, e.g.*, Antigone Davis, *Advancing Our Policies on Online Bullying and Harassment*, Meta, (Oct. 13, 2021), https://about.fb.com/news/2021/10/advancing-online-bullying-harassment-policies/.

"hateful" speech,[18] dangerous challenges or stunts,[19] some kinds of nudity but not others (for example, as an "act of protest"),[20] or gory or disturbing content[21] should disqualify the service provider from safe harbor for its users' acts of *copyright infringement*, whether or not the service provider was even aware such infringements existed. That cannot be squared with the DMCA, which carefully avoided discouraging such companies from monitoring the materials they store at user direction.

### B. No Reasonable Jury Could Find Vimeo Received A "Financial Benefit Directly Attributable" To The Infringing Activity

Because Vimeo did not have the "right and ability to control" the allegedly infringing activity, the district court correctly declined to address whether Vimeo also received "a financial benefit directly attributable" to that activity. SPA37. This Court likewise may affirm without reaching this issue. *See, e.g.*, *Kinsley v. Udemy, Inc.*, 2021 WL 1222489, at *5 (N.D. Cal. Mar. 31, 2021); *Ellison v. Robertson*, 357 F.3d 1072, 1079 n.10 (9th Cir. 2004). But if the Court reaches this

---

[18] *See, e.g.*, Twitter, *Hateful Conduct Policy*, TWITTER, (last accessed July 11, 2022), https://help.twitter.com/en/rules-and-policies/hateful-conduct-policy.

[19] *See, e.g.*, TikTok, *Community Guidelines*, TIKTOK, (last accessed July 11, 2022), https://www.tiktok.com/community-guidelines#34.

[20] *See, e.g.*, Instagram, *Community Guidelines*, INSTAGRAM, (last accessed July 11, 2022), https://help.instagram.com/477434105621119.

[21] *See, e.g.*, LinkedIn, *Violent And Graphic Content*, LINKEDIN, (last accessed July 11, 2022), https://www.linkedin.com/help/linkedin/answer/137374.

question, the undisputed facts show the absence of any "financial benefit directly attributable" to the infringing activity and thus provide an alternative ground for affirmance. *See Havlish v. 650 Fifth Ave. Co.*, 934 F.3d 174, 183 n.10 (2d Cir. 2019) (Court may "affirm on any basis for which there is sufficient support in the record") (quotations omitted).

It is clear from the text of the statute that the financial benefit must be "*directly attributable*" to the infringing activity. 17 U.S.C. § 512(c)(1)(B) (emphasis added). That is, the revenue at issue must be "distinctly" attributable to the use of the challenged content in an infringing manner. *Motherless*, 885 F.3d at 613. For example, "a service provider conducting a legitimate business would *not* be considered to receive a 'financial benefit directly attributable to the infringing activity' where the infringer makes the same kind of payment as non-infringing users of the provider's service." 4 NIMMER ON COPYRIGHT § 12B.04 (2022) (quoting S. Rep. 105-190, at 44-45; H.R. Rep. 105-551 (II) (July 22, 1998), at 54); *Viacom*, 718 F. Supp. 2d 514, 521 (S.D.N.Y. 2010) (similar).

Seeking to change the test, Plaintiffs err in arguing that "'direct financial benefit' has its common-law meaning" such that any "causal relationship" between infringing activity and Vimeo's eventual receipt of revenue is enough. Br. 49-50. But the phrase "direct financial benefit" does not even appear in the statute. This matters, as "financial benefit directly attributable to the infringing activity" is a

novel term of "Congress's own creation." Edward Lee, *Decoding the DMCA Safe Harbors*, 32 COLUM. J.L. & ARTS 233, 241 (2009); *see also Carter v. United States*, 530 U.S. 255, 264 (2000) ("canon on imputing common-law meaning applies only when Congress makes use of a statutory term with established meaning at common law"). "[I]t is clear that the 'direct financial benefit' prong of the common law vicarious liability standard is construed more broadly than it is under the DMCA." *Capitol Recs., Inc. v. MP3tunes, LLC*, 2013 WL 1987225, at *10 (S.D.N.Y. May 14, 2013).[22]

Moreover, the statute's text forecloses Plaintiffs' reliance on general benefits not distinctly attributable to the Videos-in-Suit. *See* Br. 52 (arguing Vimeo earned "more revenue" because it attracted both infringers and non-infringers). That Vimeo is an appealing platform cannot evidence a financial benefit "directly attributable" specifically to the use of music *in an infringing manner*. *See Capitol Recs., Inc. v. MP3tunes, LLC*, 821 F. Supp. 2d 627, 645 (S.D.N.Y. 2011) ("EMI argues that infringing activity on Defendants' sites acts as a draw and increases

---

[22] *Shapiro, Bernstein & Co. v. H.L. Green Co.*, 316 F.2d 304 (2d. Cir. 1963) (cited at Br. 50), is inapposite not only for this reason, but also because its facts bear no resemblance to those here. *Shapiro* involved a dance hall that *hired* the record sellers pursuant to written licenses, and received 10% to 12% of the gross profits from its tenant's sale of infringing works. *Id.* at 306-08. In contrast, Vimeo did not hire users to post videos, "[a]ny member of the public with access to the Internet can visit and watch a [public] video," and Vimeo received no revenue directly tied to a visitor watching an infringing video. JA196 (¶7).

user traffic.  However, the financial benefit must be attributable to the infringing activity."); *Motherless*, 885 F.3d at 613 (prong not satisfied where "the more [content] Motherless had, the more users it would attract, and more views would lead to more advertising revenue" because "[t]he words 'the' and 'directly' in the statute … must mean that some revenue has to be distinctly attributable to the infringing material at issue").

There is no evidence Vimeo received a "financial benefit directly attributable" to users' posting of videos that use music in an infringing manner. Plaintiffs do not challenge that "the vast majority of Vimeo's revenues are derived from sales of [member] subscriptions," let alone dispute that such fees cannot satisfy this prong.  JA212 (¶61); *Wolk*, 840 F. Supp. 2d at 731 (defendant "received the same payment" regardless of content).   Plaintiffs' reliance on Vimeo's comparatively modest revenue from general advertising (Br. 50-52) is deficient as a matter of law, for several reasons.

*First*, Plaintiffs point to "advertising" Vimeo displayed, focusing on a single sponsor (Carmex Lip Balm) of just one of Vimeo's 354,000 channels.  Br. 50-51; JA1119 (¶36).  Putting aside that a single sponsorship of a single channel is plainly *de minimis*, "it is not enough for [Plaintiffs] to show that [Vimeo] ran commercial advertisements on its website.  If that were sufficient, then practically every revenue-generating website would satisfy" this prong.  *Downs*, 385 F. Supp. 3d at

307. Fatally, Plaintiffs identify no evidence that any revenue Vimeo derived from this sponsor was directly attributable to the specific presence of *infringing* music in videos on that channel (versus attributable to, say, the presence of creative videos, or even the general presence of music). *See Wolk*, 840 F. Supp. 2d at 748 ("no evidence that [defendants] capitalize[] specifically because a given image a user selects to print is infringing"); *Capitol Recs.*, 821 F. Supp. 2d at 645 (similar). Vimeo's lump-sum payment for that sponsorship was the same regardless of whether the use of music in any specific video a user placed on that channel was infringing or not infringing (*e.g.*, a fair use or authorized).[23]

Similarly, while some brands advertised on Vimeo on a "cost-per-impression basis" (Br. 51-52), these ads were placed across Vimeo's entire site, without regard to any page's (or any video's) specific content. JA445 (¶8); JA212-13 (¶63); *see Downs*, 385 F. Supp. 3d at 307 ("HuffPost simply ran advertisements on user-generated articles, some of which inevitably contained infringing material"). Plaintiffs cite no evidence any ad was placed, or any user clicked on an ad, specifically because the video on that page contained infringing music.

---

[23]  While this alone is sufficient to find that revenue from this sponsorship was not "directly attributable" to the Videos-in-Suit, that conclusion is confirmed by the fact that Vimeo did not even create or moderate this channel. JA1139-41; JA1156 (207:6-11).

Similarly, Google's proprietary algorithms, not Vimeo, automatically determined the webpages on which its sponsored links appeared.  JA213 (¶64); JA445 (¶7).

*Second*, Plaintiffs identify no evidence that Vimeo earned revenue directly attributable to "drawing" users to the Videos-in-Suit.  Br. 53-54.  As noted, the proper inquiry is whether a financial benefit is "directly attributable" to the specific infringing activity at issue.  But even if the Court were to accept Plaintiffs' "draw" theory, it fails here because Plaintiffs identify no evidence that users were "drawn" to Vimeo specifically "because of the infringing material at issue, not just that copyright infringement generally occurs on the service."  *Stross v. Meta Platforms, Inc.*, 2022 WL 1843129, at *3 (C.D. Cal. Apr. 6, 2022) (evidence that 40% of Facebook traffic was to pages displaying infringing content insufficient to show defendant "drew users to Facebook because of *Plaintiff's infringed works*") (emphasis added); *see also Motherless*, 885 F.3d at 613 (no "draw" where defendant "did not advertise itself as a place to get pirated materials").  Again, the absence of a "direct" connection to the Videos-in-Suit is dispositive and supports summary judgment for Vimeo, should the Court reach this issue.

## II.  THE DISTRICT COURT CORRECTLY FOUND NO TRIABLE ISSUE OF FACT ON VIMEO'S LACK OF "RED FLAG" KNOWLEDGE

*Vimeo I*'s mandate left no room for doubt: "Vimeo is entitled to summary judgment" on red flag knowledge unless Plaintiffs prove it would be "obvious" to

an ordinary person that the use of music in each specific video was not fair or licensed. 826 F.3d at 96-98.

Now back before this Court for a second time, Plaintiffs offer the same kind of evidence the Court rejected the first time. But as the district court correctly found, "none of the evidence adduced by Plaintiffs on remand carries the high burden of raising a triable issue of fact as to whether Vimeo employees" had red flag knowledge that the use of music in the 281 Videos-in-Suit was "obviously" infringing. SPA121. This Court should affirm.

### A. Plaintiffs Must Prove An Ordinary Person Would Know The Use Of Music In A Video Was "Obviously" Infringing

It is Plaintiffs' obligation to "point to evidence sufficient to carry their burden of proving that Vimeo personnel either knew the video was infringing or knew facts making that conclusion obvious to an ordinary person who had no specialized knowledge of music or the laws of copyright." *Vimeo I*, 826 F.3d at 98. This is the law of the case.[24]

Disregarding this Court's prior holdings, Plaintiffs ask the Court to treat Vimeo employees as experienced in "licensing music" (Br. 56) or "aware of the [purported] legal rule [that] using a song without a license infringes copyright" (Br.

---

[24] *United States v. Olmeda*, 837 F. App'x 52, 54 (2d Cir. 2020) ("Under the law-of-the-case doctrine, this Court will generally adhere to its own decision at an earlier stage of the litigation,' and will depart from this rule only for compelling reasons.") (quotations omitted).

62). But the undisputed record cannot support that Vimeo's employees had such specialized knowledge, *see supra* 12, and there plainly is no such "legal rule." To the contrary, as *Vimeo I* explained, infringement of music in a video may not be "obvious" because a Vimeo employee cannot be expected to: (1) "distinguish ... between infringements and … fair use"; or (2) "know how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music," as "[e]ven an employee who was a copyright expert cannot be expected to know when use of a copyrighted song has been licensed." 826 F.3d at 96-97.

### B. No Reasonable Jury Could Find That Plaintiffs Proved The Use Of Music In Any Video-In-Suit Was "Obviously" Infringing Under *Vimeo I*

On remand, the district court meticulously applied this Court's standard to Plaintiffs' evidence and correctly granted summary judgment to Vimeo. Even construing all factual inferences in Plaintiffs' favor, the court correctly found that their evidence showed, at most, that Vimeo employees were aware of the presence of *music* in these 281 Videos-in-Suit, not the presence of "obvious" *infringement.* SPA111-21; *see also* SPA111 ("[t]hese modes of interaction with infringing videos say nothing about the employee's knowledge as to whether the use of such music was authorized or fair").

While *Vimeo I* recognized there are "many reasons" why the use of music in a video would not be "obviously" infringing to an ordinary person, 826 F.3d at 94,

51

the Court need look only to two to resolve this appeal: the lack of evidence that music in a Video-in-Suit was obviously (1) not fair use or (2) not authorized.[25]

### 1. There Is Not Legally Sufficient Evidence Showing The Use Of Music In Any Video-In-Suit "Obviously" Was Not Fair

*Vimeo I* held that a "service provider's employee cannot be expected to know how to distinguish … between infringements and … fair use." *Id.* at 97. Here, *every* Video-in-Suit incorporates an audio component into a separate, original visual component (JA1158 (¶1)), and Plaintiffs do not assert copyrights in the visual components of the Videos-in-Suit (JA1171 (¶2)). In light of such transformative use of music as part of the user's audiovisual creation, Plaintiffs adduced no evidence that it would have been "obvious" to a Vimeo employee on sight that the particular use of music in this context was not a fair use.

Plaintiffs do not seriously challenge that proposition, dedicating just *one page* in their entire brief to fair use. Br. 59. Nor do Plaintiffs engage in a Video-by-Video assessment of whether a particular use of music in a Video-in-Suit was fair use under well-established transformative use precedent; indeed, they do not venture to analyze a single Video-in-Suit. Instead, they ask the Court to adopt a

---

[25] Plaintiffs also did not raise a triable issue to establish that Vimeo staff who "interacted" with the Videos-in-Suit: (1) watched each Video for more than a brief period; or (2) did so for the purpose of assessing infringement of a musical work, *Vimeo I*, 826 F.3d at 96, both of which independently support affirmance. *See* JA1185-89 (¶¶22-28).

blanket rule that, as a matter of law, *any* use of music in a user-uploaded video is *obviously* not fair use. *See* Br. 62 (identifying "the legal rule governing this case" as "using a song without a license infringes copyright"). This "legal rule" not only violates *Vimeo I*, but would upend decades of fair use precedent.

This Court is familiar with the complex nature of fair use, which presents "an open-ended and context-sensitive inquiry," *Cariou v. Prince*, 714 F.3d 694, 705 (2d Cir. 2013), that "is not to be simplified with bright-line rules," *Campbell v. Acuff-Rose Music, Inc.*, 510 U.S. 569, 577 (1994). Indeed, in the 2022 Term, the U.S. Supreme Court is scheduled to consider an appeal from this Court addressing whether Andy Warhol's incorporation into an artwork of an entire photograph of the musician Prince was or was not a fair use. *Andy Warhol Found. for Visual Arts, Inc. v. Goldsmith*, No. 21-869 (*cert. granted* Mar. 28, 2022). That case demonstrates just how far from "obvious" this inquiry is. *See id.*, 11 F.4th 26, 52 (2d Cir. 2021) (fair use cannot be based on "simplistic formulas," but rather requires "contextual balancing based on principles that will lead to close calls in particular cases"). Courts recognize that the incorporation of one image entirely into another work can be fair. *See, e.g.*, *Cariou*, 714 F.3d at 708 ("appropriation" artist fairly incorporated entire photograph into new paintings); *Seltzer v. Green Day, Inc.*, 725 F.3d 1170, 1179 (9th Cir. 2013) (band fairly incorporated entire artwork throughout four-minute music video).

Music cases are no different. As this Court held just last year, incorporating a song into a movie can be a fair use as a matter of law. *Brown v. Netflix, Inc.*, 855 F. App'x 61, 62 (2d Cir. 2021); *see also*, *e.g.*, *Sketchworks Indus. Strength Comedy, Inc. v. Jacobs*, 2022 WL 1501024, at *2, *9 (S.D.N.Y. May 12, 2022) (use of plaintiffs' songs and tracks in theater production fair); *Red Label Music Publ'g, Inc. v. Chila Prods.*, 388 F. Supp. 3d 975, 979 (N.D. Ill. 2019) (use of song in film fair); *Chapman v. Maraj*, 2020 WL 6260021, at *11 (C.D. Cal. Sept. 16, 2020) (use of original song as form of "artistic experimentation" fair); *Threshold Media Corp. v. Relativity Media, LLC*, 2013 WL 12331550, at *5 (C.D. Cal. Mar. 19, 2013) (use of songs in film fair); *Lennon v. Premise Media Corp.*, 556 F. Supp. 2d 310, 327 (S.D.N.Y. 2008) (use of song *Imagine* in film fair); *Italian Book Corp. v. Am. Broad. Cos.*, 458 F. Supp. 65, 71 (S.D.N.Y. 1978) (use of song in news video fair). This is just as true of "lip dub" videos—about which Plaintiffs go on at length (*see* Br. 14-15, 40-41, 52)—which contain both visual and audio material: "With this type of video, fair use is an open relevant question." SPA117.

Even Universal Music, corporate parent of the Plaintiff recording companies (*see* Br. i) has acknowledged that fair use cannot be determined based upon mere "viewing" of a video because the copyright holder lacks "information uniquely within the knowledge of the user who incorporated the original work." Appellants' Third Brief on Cross-Appeal at 16, *Lenz v. Universal Music Corp.*, No. 13-

16106(L), Dkt. 56 (9th Cir. Feb. 4, 2014). If Plaintiffs cannot form a view whether the use of their own song in a video is fair, the absence of fair use cannot be *obvious* to a Vimeo employee.[26]

Ignoring this substantial body of fair-use law, Plaintiffs instead point to Vimeo informing individual users that adding third-party copyrighted content to a video "generally (but not always) constitutes copyright infringement." Br. 59. While perhaps conservative (as one would expect from a site hosting user content), the statement is consistent with fair use—use of copyrighted content is "not always" infringing (let alone *obviously* so). And such a generalization certainly cannot serve as a proxy for what would be obvious in a particular case.

Nor does it matter that Vimeo staff were told at a meeting (held after Plaintiffs sent their first letter to Vimeo) to not include unlicensed music in their *own* videos they personally upload. Br. 59; JA336 (¶67). Whether Vimeo is protected by safe harbor for employee infringement presents a different question, so taking a conservative approach on employees' personal works makes sense. Moreover, Plaintiffs cite no evidence that fair use was even mentioned at that

---

[26] Plaintiffs' *amici* seem to argue Plaintiffs' fair use legal position on their behalf, offering a rule that use of music in an original video can never be fair, and obviously so. *See* NMPA Br. 22-26. Those *amici* do not address the law above, offer no analysis of the use of music in any specific Video-in-Suit, and do not acknowledge the transformative nature of combining an audio element (music) with an entirely different visual component.

"meeting," and in any event, an employee being directed in an exercise of caution to not post her own videos with unlicensed music cannot confer knowledge that every video containing music she might ever see must "obviously" be infringing.

### 2. There Is Not Legally Sufficient Evidence Showing The Use Of Music In Any Video-In-Suit "Obviously" Was Not Authorized

Plaintiffs' failure to identify evidence showing that the use of music in each Video-in-Suit was obviously not a fair use is enough alone to affirm the district court's red flag ruling in Vimeo's favor. But the Court may also rely on Plaintiffs' failure to identify evidence showing that it would be obvious to an ordinary person that the use of music in any Video-in-Suit was unauthorized.

*Vimeo I* already recognized that a Vimeo employee cannot "be automatically expected to know how likely or unlikely it may be that the user who posted the material had authorization to use the copyrighted music." 826 F.3d at 97. As the district court correctly ruled, Plaintiffs identified no evidence that it would have been obvious to an ordinary person that the use of music in any of the Videos-in-Suit was not authorized. The absence of such evidence is dispositive on this issue.

*First*, while Plaintiffs argue that certain staff members at Vimeo knew that licensing music for use in videos could be "confusing" or "painful" (Br. 56, 60), this cannot give rise to an inference that it was obvious that the music in any specific Video-in-Suit was, in fact, not licensed. Indeed, such acknowledgments

demonstrate it *is* possible to obtain licenses (and that such licenses have been obtained); such generalized statements certainly cannot make it "obvious" to an ordinary person that, in fact, no license was ever obtained for a specific video. On this point, Plaintiffs' *amici* support Vimeo—if music licensing is "complex" (NMPA Br. 8), then an ordinary person cannot be expected to know the outcome of any given licensing effort.[27] But this is academic—Plaintiffs simply "adduced no evidence, either in general or specific to the Videos-in-Suit, to suggest that Vimeo employees had such knowledge in this case." SPA122.

Plaintiffs' theory is further undermined by the fact that multiple Videos-in-Suit indicated the music used *was* authorized, so any infringement could not be "obvious." *See, e.g.*, JA1383-84 (description states: "Commissioned by Nicola Brown for Virgin/EMI"); JA1407 ("license exclusive EMI Music France"). Vimeo users also submitted DMCA counter-notifications, including for videos and songs Plaintiffs' asserted in this action. JA1181 (¶13) ("our contract with Capitol Records stipulates that we may use a copy of the music video to promote ourselves as Directors"); JA1160-61 (¶¶14-15). Nor can such a determination be made based on whether a subjective assessment that a video was "clearly unsophisticated." Br.

---

[27] Plaintiffs' *amici* further err (NMPA Br. 17-20) by looking only to examples of *current* "platform-level licenses" for use of music in user-created videos, not licensing models as they may have existed in May 2012 (by which time all of the Videos-in-Suit had been removed). JA86 (¶50).

57. *See Motherless*, 885 F.3d at 608-09 ("apparent amateurism may be a skilled professional means of giving them an appearance of authenticity"). Nothing about this exercise is obvious.

*Second*, Plaintiffs err in suggesting (Br. 56, 60-61) that, because Vimeo employees supposedly uploaded their *own* videos without securing licenses, a jury could speculate that (1) they did so because getting licenses is "impractical[]," and so (2) they must have known that uploaders of the Videos-in-Suit did not get them either. Such speculation on top of speculation about whether a Vimeo employee tried to obtain a license (or even needed one) for her *own* video says nothing about whether it would have been obvious that *other* users who uploaded the *Videos-in-Suit* did or did not have licenses. *See Vimeo I*, 826 F.3d at 99 (red flag knowledge must "relate to specific infringements"); *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (party cannot rely on inferences based on "speculation" to defeat summary judgment).

*Third*, Plaintiffs fare no better in arguing that their earlier cease-and-desist letters to Vimeo alleging infringement as to *different* videos should confer red flag knowledge upon all Vimeo employees as to these 281 specific videos merely because they involved the same artists. Br. 57-58. As the district court correctly recognized, "[t]he fact that an artist's copyright was *previously* infringed on Vimeo does not suffice to indicate to an employee whether use of that artist's work in a

*subsequent* video is authorized." SPA118-19 (emphasis added). This is because "past notices do not identify and locate other, and future, infringing activity." *Wolk,* 2011 WL 940056, at *5 (S.D.N.Y. Mar. 17, 2011); *see also UMG Recordings*, 718 F.3d at 1023 ("just because UMG owns the copyrights for some Britney Spears songs does not mean it owns the copyright for all Britney Spears songs").[28] To hold otherwise not only would constitute an end-run around the DMCA's notice-and-takedown regime, but would improperly require Vimeo "constantly to take stock of all information their employees may have acquired that might suggest the presence of infringements in user postings, and to undertake monitoring investigations whenever some level of suspicion was surpassed," which would "largely undo the value of § 512(m)." *Vimeo I*, 826 F.3d at 98-99.

---

[28] In contrast, the defendant in *EMI Christian Music Grp., Inc. v. MP3tunes, LLC*, 844 F.3d 79 (2d Cir. 2016) (cited at Br. 61), admitted to having *actual knowledge* that *all* Beatles tracks distributed before 2010, no matter how used, were unauthorized because such tracks had never even been made available in digital format. *Id.* at 92-93. And that case presented no fair use issues, as the defendant simply hosted pure files of audio tracks. SPA106 n.2.

## **CONCLUSION**

The Court should affirm the judgment below.


Dated:  August 30, 2022                              Respectfully submitted,

                                                     /s/ Todd Anten
                                                     Todd Anten
                                                     Owen F. Roberts
                                                     QUINN EMANUEL URQUHART &
                                                       SULLIVAN, LLP
                                                     51 Madison Avenue, 22nd Floor
                                                     New York, New York 10010

                                                     Kathleen M. Sullivan
                                                     QUINN EMANUEL URQUHART &
                                                       SULLIVAN, LLP
                                                     865 South Figueroa Street, 10th Floor
                                                     Los Angeles, California 90017

                                                     Rachel Kassabian
                                                     QUINN EMANUEL URQUHART &
                                                       SULLIVAN, LLP
                                                     555 Twin Dolphin Drive, 5th Floor
                                                     Redwood Shores, California 94065

                                                     Michael A. Cheah
                                                     VIMEO, INC.
                                                     330 West 34th Street, 5th Floor
                                                     New York, New York 10001

                                                     *Attorneys for Defendants-Appellees
                                                     Vimeo, Inc. and Connected Ventures,
                                                     LLC*

**<u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)</u>**

1.  This brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) and Second Circuit Local Rule 32.1(a)(4)(A) because this brief contains **<u>13,997</u>** words (based on the Microsoft Word word-count function), excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using **<u>Microsoft Word</u>** in **<u>14 point Times New Roman</u>**.

Date: August 30, 2022

*/s/ Todd Anten*

Todd Anten
QUINN EMANUEL URQUHART &
 SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010

## CERTIFICATE OF FILING AND SERVICE

I hereby certify that on August 30, 2022, the FINAL FORM BRIEF FOR DEFENDANTS-APPELLEES was electronically filed and served on all parties or their counsel of record through the CM/ECF system, pursuant to Second Circuit Local Rule 25.1(h).

Date: August 30, 2022

/s/ Todd Anten
Todd Anten
QUINN EMANUEL URQUHART &
  SULLIVAN, LLP
51 Madison Avenue, 22nd Floor
New York, New York 10010